UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x

RICHARD ZECHER, ROBERT YADEGAR,  :
ZECH CAPITAL LLC, Y-GAR CAPITAL   :
LLC, RICHARD N. ZECHER 2010 FAMILY :
TRUST, RICHARD N. ZECHER 2010    :
FAMILY TRUST FOR THE BENEFIT OF   :
EVAN GREGORY ZECHER and RICHARD   :
N. ZECHER 2010 FAMILY TRUST FOR   :
THE BENEFIT OF RACHEL JOY ZECHER, :
                                  :
            Plaintiffs,           :
                                  :
    vs.                           :
                                  :
VINCE HOLDING CORP., JILL GRANOFF, :
LISA KLINGER, MARK BRODY,         :
BRENDAN HOFFMAN, DAVID STEFKO,    :
MARC J. LEDER, SUN CAPITAL        :
PARTNERS, INC., SUN CARDINAL, LLC, :
SCSF CARDINAL, LLC and SUN CAPITAL :
PARTNERS MANAGEMENT V, LLC,       :
                                  :
            Defendants.           :

———————————————————— x

Civil Action No.

COMPLAINT FOR VIOLATIONS UNDER
THE FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and their own acts and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Vince Holding Corp. ("Vince" or the "Company"), Company press releases, earning calls, analyst reports, and media reports about the Company. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      Plaintiffs bring this federal securities action under the Securities Exchange Act of 1934 (the "Exchange Act") against Vince and certain of its former and current officers, directors and controlling shareholder to recover damages for losses Plaintiffs have suffered in connection with their acquisition of Vince common stock between March 19, 2015 and May 19, 2017, both dates inclusive (the "Relevant Period").  Plaintiffs purchased Vince common stock at artificially inflated prices during the Relevant Period and suffered damages as a result of the violations of the securities laws alleged herein.

2.      Defendant Vince is a luxury clothing brand based in New York City.  The Company markets itself as "a prominent, high-growth contemporary apparel brand known for its modern, effortless style and everyday luxury essentials."

3.      Defendant Vince is majority owned and controlled by private equity firm Sun Capital Partners, Inc. ("Sun Capital") and its affiliates.  Sun Capital formed Vince by spinning off assets from the Kellwood Company (together with all parents, subsidiaries and successors, "Kellwood"), which was wholly-owned by Sun Capital.  In November 2013, Sun Capital took Vince public in an initial public offering selling ten million shares at $20 per share and generating gross proceeds of $200 million.  The IPO proceeds were primarily used to repay a note receivable issued to Kellwood,

- 1 -

the repayment of which in turn was largely used to repay certain fees and indebtedness to affiliates of Sun Capital.

4.      Following the IPO, Sun Capital continued to own approximately 68% of Vince's outstanding common stock and control the Company.  According to Vince's certificate of incorporation, Sun Capital, through its affiliates, also had the right to appoint a majority of Vince's Board of Directors (the "Board") even if it owned less than a majority of Vince stock, as long as its beneficial ownership exceeded 30%.  In addition, Sun Capital selected, and had significant control over, the most senior executive officers of the Company.  Furthermore, Sun Capital affiliates entered into a tax receivable agreement with Vince that required the Company to pay to these affiliates an amount equal to 85% of certain tax benefits to which the Company would otherwise be entitled, essentially shifting these tax benefits to Sun Capital (the "Tax Receivable Agreement").

5.      As a result of the foregoing, Sun Capital was highly incentivized to make it appear that Vince was successful and to minimize or conceal any operational difficulties at the Company so that Vince could raise money from investors, the proceeds of which could be used to make the payments that Vince owed to Sun Capital and its affiliates.

6.      Post-IPO, Vince retained numerous consulting and services agreements with Sun Capital and Kellwood.  According to one of these agreements, referred to herein as the "Shared Services Agreement," the Company relied on certain critical administrative, financial, operational and other support services provided by Kellwood.  In the months following the IPO, Vince began migrating these services to its own systems and those provided by third parties.

7.      Then, on March 19, 2015, Vince announced that it had "completed the migration of several shared service activities from Kellwood" and that it planned to "fully migrate" the remaining information technology ("IT") systems, processes and support structure by the end of the year.

Vince's Chief Executive Officer ("CEO") at the time, Defendant Jill Granoff, stated that the migration was one of several "*organic growth levers*" that would allow Vince to "take greater control of our own destiny." She continued, "we believe that having control of our technical infrastructure will enable us to more efficiently respond to our specific business needs and support our growth initiatives." Similarly, the Company's Chief Financial Officer ("CFO") at the time, Defendant Lisa Klinger, assured investors, "[O]bviously we want to make sure that *we're doing this very thoughtfully and prudently*."[1]

8.     Unbeknownst to investors, Vince's migration of key services away from Kellwood was a disaster from the start, characterized by disorganization, dysfunction and, ultimately, severe disruptions to Vince's business and operations. For example, issues with the new systems and software impeded the ability of stores to timely process credit card transactions. Delivery delays caused seasonal merchandise to arrive too late. Cash registers broke down. Customer transactional data was lost, corrupted or miscategorized. Major inventory systems failed.

9.     Vince's sales plummeted as the quality of its customers' experiences with the Company deteriorated. Shoppers walked out on transactions that failed to timely process. Once-loyal customers stopped returning, and new ones failed to take their place. Issues with the transition grew so bad that Vince was forced to hire a second set of consultants to problem-solve the many challenges experienced by the initial consultants overseeing the project.

10.    The transition was initially delayed and then beset by mounting problems, yet Defendants continued to conceal the behind-the-scenes chaos related to their migration efforts. For example, in September 2015, Vince's new CFO, Defendant David Stefko, stated that there would be a strategic "defer[ment]" of the transition purportedly due to "competing priorities within the

---

[1]     Unless otherwise noted, emphasis is added and citations are omitted throughout.

business." However, he continued to contend that the new systems would lay "a foundation to support the Company's long-term growth" and that he was "confident that [Vince's] current platform ***will continue to support the growth*** until the new platform is implemented." At the time, neither he nor any of the other Defendants disclosed the severity of the challenges facing the transition efforts and the disruptions that these challenges had caused to Vince's business and operations.

11.     In subsequent quarters, Defendants failed to disclose that operational challenges and adverse sales trends had been directly impacted by severe problems with the systems migration. Instead, Company representatives repeatedly claimed that Vince was making "***great strides***" in its strategic initiatives; "***doing what's*** right for the long-term health of the brand"; and on a "***path to deliver consistent sales and earnings growth over the long term***," among many other similar representations. In June 2016, even as the severity of the problems caused by the Company's migration failures increased, Vince's new CEO, Defendant Brendan Hoffman ("Hoffman"), claimed that Vince was "***on track***" with its systems migrations and "***continuing to make great progress*** setting the stage for long-term profitable growth by making decisions that are right for the integrity of the brand." As Defendants knew or recklessly disregarded, these statements were materially false and misleading when made.

12.     In April 2016, with the price of Vince stock artificially inflated and in furtherance of Defendants' fraud, Vince completed a $65 million rights offering supported by Sun Capital that allowed the Company to raise tens of millions of dollars from public investors (the "First Rights Offering"). The Company used proceeds from the First Rights Offering in part to make over $22 million in payments to Sun Capital.

13.     Then, in a series of startling public disclosures, Vince belatedly acknowledged severe complications with its systems migration efforts after a number of sales and earnings shortfalls. On

April 14, 2017, Vince issued a press release announcing that it would be unable to timely file its annual financial report for the year ended January 28, 2017 due to delays "related to the transition from Kellwood."  In addition, the Company disclosed that its use of the new systems had led to one or more material weaknesses in its internal controls over financial reporting and systems infrastructure.  The impairment to Vince's business as a result of these challenges was so great that the Company warned investors that its very ability to operate as a going concern was in doubt.

14.     Following this news, the price of Vince stock plummeted more than 19%, or $2.29 per share, in a single trading day to close at $9.59 per share on April 17, 2017.[2]

15.     On April 28, 2017, the Company further shocked investors when it finally issued its unaudited results for the fourth quarter and fiscal year ended January 28, 2017.  The Company disclosed that net sales had fallen 21.9% to $63.9 million during the fourth quarter.  In addition, Vince posted a massive net loss of *$162.1 million*, which included $55.1 million in asset impairment charges.  This compared to net income of $1.8 million for the fourth quarter of 2015.  In the release, Hoffman blamed the abysmal performance "primarily" on "challenges related to our systems conversion."  The release also confirmed that there was a substantial doubt about the Company's ability to operate as a going concern and that multiple unremediated material weaknesses plagued the Company's financial, risk and systems controls as a result of problems from the systems migration.

16.     These disclosures once again decimated the price of Vince stock. Over three trading days, the price of Company shares plummeted about *72%*, or $8.86 per share, to close at $3.47 per share on May 2, 2017.

---

[2]     All prices and volume information for Vince stock adjusted to account for the April 14, 2016 share rights offering (referred to herein as the "First Rights Offering"), the September 8, 2017 share rights offering, and the October 23, 2017 1-for-10 reverse stock split, unless otherwise noted.

17.    On May 19, 2017, Vince issued a press release announcing that it had received a written notice from the New York Stock Exchange ("NYSE") informing the Company that it was in violation of exchange listing requirements.  While the Company had once boasted more than $1 billion in market capitalization in the months following the IPO, its market capitalization had shrunk to approximately $47.2 million as of May 15, 2017.

18.    Defendants' fraudulent scheme and the devastating impact on the price of Vince common stock is illustrated in the following chart:



19.    Despite the failure of Vince and the collapse of its share price, Sun Capital and its affiliates have received hundreds of millions of dollars from the Company and its investors.

Meanwhile, Vince's public investors were left holding the bag as the Company teetered on the edge of bankruptcy, and Plaintiffs have lost tens of millions of dollars on their Vince investments as a result of Defendants' fraud.

## JURISDICTION AND VENUE

20.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

22.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District and Plaintiffs reside in this District.

23.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

**Plaintiffs**

24.     Plaintiff Richard Zecher ("Zecher"), together with entities and accounts that he owns, controls and/or for which he has received assignment to prosecute these claims, purchased tens of millions of dollars' worth of Vince common stock during the Relevant Period at artificially inflated prices and has been damaged thereby.

25.     Plaintiff Robert Yadegar ("Yadegar"), together with entities and accounts that he owns and controls, purchased tens of millions of dollars' worth of Vince common stock at artificially inflated prices during the Relevant Period and has been damaged thereby.

26.     Plaintiff Zech Capital LLC ("Zech Capital") is an investment firm owned, operated and controlled by Plaintiff Zecher. Plaintiff Zech Capital purchased over ten million dollars' worth of Vince common stock during the Relevant Period at artificially inflated prices and has been damaged thereby.

27.     Plaintiff Y-GAR Capital LLC ("Y-GAR Capital") is an investment firm owned, operated and controlled by Plaintiff Yadegar. Plaintiff Y-GAR Capital purchased tens of millions of dollars' worth of Vince common stock during the Relevant Period at artificially inflated prices and has been damaged thereby.

28.     Plaintiff Richard N. Zecher 2010 Family Trust is a family trust maintained for the benefit of Plaintiff Zecher and members of his family.

29.     Plaintiff Richard N. Zecher 2010 Family Trust For The Benefit Of Evan Gregory Zecher is a family trust maintained for the benefit of members of Plaintiff Zecher's family.

30.     Plaintiff Richard N. Zecher 2010 Family Trust For The Benefit Of Rachel Joy Zecher is a family trust maintained for the benefit of members of Plaintiff Zecher's family.

31.     The Plaintiffs listed in ¶¶28-30 are collective referred to herein as "Plaintiff Zecher Family Trust." Plaintiff Zecher Family Trust purchased over ten million dollars' worth of Vince common stock during the Relevant Period at artificially inflated prices and has been damaged thereby.

**Vince Defendants**

32.     Defendant Vince is a luxury brand headquartered in New York, New York. Vince common stock trades on the NYSE under the ticker symbol, "VNCE."

33.    Defendant Jill Granoff ("Granoff") formerly served as Chairman of the Board and the CEO of Vince.  Sun Capital selected Defendant Granoff to fill these roles and assume her CEO position before the IPO.  Defendant Granoff was replaced as Chairman by Marc Leder on June 2, 2015, and resigned as CEO of the Company in July 2015, which took effect in September 2015 following a transition period.

34.    Defendant Lisa Klinger ("Klinger") formerly served as the CFO and Treasurer of Vince.  Sun Capital selected Defendant Klinger to fill these roles before the IPO.  In June 2015, Defendant Klinger resigned from her positions with the Company.

35.    Defendant Mark Brody ("Brody") formerly served as a director of Vince until he resigned in April 2016.  He also formerly served as the Company's CFO from June 2015 to September 2015 and as the Company's Interim CEO from September 2015 to October 2015.  In addition to his roles with Vince, Defendant Brody served as the Managing Director and Group CFO for Sun Capital both before and after serving as a senior executive with the Company, although he has subsequently left Sun Capital.

36.    Defendant Brendan Hoffman ("Hoffman") has served as CEO and a director of Vince since October 2015.  Defendant Hoffman was appointed to these positions by Sun Capital through its control and influence over the Company, its management and the Board.

37.    Defendant David Stefko ("Stefko") has served as CFO of Vince since September 2015 (initially on an interim basis).  Defendant Stefko was appointed to these positions by Sun Capital through its control and influence over the Company, its management and the Board.  Before assuming his roles with Vince, Defendant Stefko served as Group CFO for Sun Capital.

38.     Defendant Marc J. Leder ("Leder") has served as a director since April 2014 and as its Chairman of the Board since June 2015. He is the Co-Founder and Co-CEO of Sun Capital and maintains significant ownership interests in Sun Capital-affiliated funds and entities.

39.     The Defendants referenced above in ¶¶33-38 are collectively referred to herein as the "Individual Defendants."  The Individual Defendants made, or caused to be made, materially false and misleading statements that artificially inflated the price of Vince common stock.

40.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Vince's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

**Sun Capital Defendants**

41.     Defendant Sun Capital Partners, Inc. ("Sun Capital") is a private equity firm headquartered in Boca Raton, Florida.  Prior to the IPO, Sun Capital privately owned the Company through various affiliates.  After the IPO, Sun Capital retained a substantial ownership stake in the Company and controlled its actions.  Sun Capital also has significant agreements and financial arrangements with the Company, either directly or through various affiliates.  Affiliates of Sun

Capital also owned and controlled Kellwood through their ownership of Kellwood Holding, LLC, until December 2016.

42.     Defendant Sun Cardinal, LLC ("Sun Cardinal") is an affiliate of Sun Capital and was a selling stockholder in the IPO.

43.     Defendant SCSF Cardinal, LLC ("SCSF Cardinal") is an affiliate of Sun Capital and was a selling stockholder in the IPO.

44.     Defendant Sun Capital Partners Management V, LLC ("Sun Capital Management") is the investment management arm of Sun Capital.  Sun Capital Management provided consulting and other services to Vince and to Kellwood in exchange for fees pursuant to certain management and consulting services agreements.

45.     Defendants Sun Capital, Sun Cardinal, SCSF Cardinal and Sun Capital Management are collectively referred to herein as the "Sun Capital Defendants."  The Sun Capital Defendants controlled and exercised substantial influence over Vince before, during and after the IPO. At all relevant times, the Sun Capital Defendants were majority shareholders of Vince.  In addition, revisions to the Company's articles of incorporation prior to the IPO entitled Sun Capital to appoint a majority of the Board so long as Sun Capital or its affiliates beneficially owned at least 30% of the outstanding shares of Vince stock.  The Sun Capital Defendants also selected and oversaw the most senior executive officers of the Company, and representatives of the Sun Capital Defendants were intimately involved in the day-to-day operations of Vince.

46.     In SEC filings, Vince stated that it was controlled by the Sun Capital Defendants.  For example, the prospectus filed with the SEC on November 22, 2013 on Form 424b for the IPO (together with the registration statement for the IPO and all amendments, the "IPO Prospectus") stated in pertinent part:

- 11 -

Upon consummation of this offering, affiliates of Sun Capital will own approximately 72% of our outstanding common stock, assuming the underwriters do not exercise their option to purchase additional shares from the selling stockholders. If the underwriters exercise their option to purchase additional shares from the selling stockholders, affiliates of Sun Capital will own approximately 68% of our outstanding common stock. *As such, affiliates of Sun Capital will, for the foreseeable future, have significant influence over our reporting and corporate management and affairs, and will be able to control virtually all matters requiring stockholder approval.* For so long as affiliates of Sun Capital own 30% or more of our outstanding shares of common stock, Sun Cardinal, one of our selling stockholders, will have the right to designate a majority of our board of directors. For so long as Sun Cardinal has the right to designate a majority of our board of directors, the directors designated by Sun Cardinal are expected to constitute a majority of each committee of our board of directors, other than the Audit Committee, and the chairman of each of the committees, other than the Audit Committee, is expected to be a director serving on such committee who is designated by Sun Cardinal […].

*   *   *

*Affiliates of Sun Capital will control actions to be taken by us and our board of directors*, including amendments to our amended and restated certificate of incorporation and amended and restated bylaws and approval of significant corporate transactions, including mergers and sales of substantially all of our assets. The directors designated by Sun Cardinal will have the authority, subject to the terms of our indebtedness and the rules and regulations of the NYSE, to issue additional stock, implement stock repurchase programs, declare dividends and make other decisions. The NYSE independence standards are intended to ensure that directors who meet the independence standard are free of any conflicting interest that could influence their actions as directors. Our amended and restated certificate of incorporation will provide that the doctrine of "corporate opportunity" will not apply against Sun Capital or its affiliates, or any of our directors who are associates of, or affiliated with, Sun Capital, in a manner that would prohibit them from investing in competing businesses or doing business with our partners or customers. It is possible that the interests of Sun Capital and its affiliates may in some circumstances conflict with our interests and the interests of our other stockholders, including you. For example, Sun Capital may have different tax positions from other stockholders which could influence their decisions regarding whether and when we should dispose of assets, whether and when we should incur new or refinance existing indebtedness, especially in light of the existence of the Tax Receivable Agreement that we will enter into in connection with this offering, and whether and when we should terminate the Tax Receivable Agreement and accelerate our obligations thereunder. In addition, the structuring of future transactions may take into consideration tax or other considerations of Sun Capital and its affiliates even where no similar benefit would accrue to us […].

## SUBSTANTIVE ALLEGATIONS

**The Company and its Business**

47.     Defendant Vince is a luxury consumer brand founded in 2002.  The Company historically specialized in high-end women's garments, such as cashmere sweaters and knits. It has launched other lines more recently, including menswear.  The Company is incorporated in Delaware and headquartered in New York, New York.

48.     Vince operates two primary sales channels: (1) wholesale; and (2) direct-to-consumer. The Company's wholesale channel consists of sales to premier department stores and specialty stores, which in turn sells these items to consumers.  Vince's direct-to-consumer sales channel consists of Vince's own retail stores and sales through the Company's website.  At the time of the IPO, the Company generated approximately 80% of its net sales through its wholesale segment (both U.S. and international), while approximately 20% of its sales were generated through Vince's direct-to-consumer segment.

49.     Vince opened its first retail store in 2008 and, as of October 5, 2013, operated 27 retail stores.  In IPO offering materials, the Company touted its direct-to-consumer segment as a driver of future growth.  For example, the IPO Prospectus stated, "we expect sales from [the direct-to-consumer] channel to accelerate as we drive productivity in existing stores, open new stores and upgrade and re-launch our website in 2014."  Indeed, by fiscal 2016, the direct-to-consumer sales channel accounted for 37% of Vince's net sales and the Company was operating 54 store locations, a 100% increase in the number of Vince retail stores shortly before the IPO.  Consequently, in the years following the IPO, the success of the Company increasingly depended on the success of its direct-to-consumer segment and successful engagement with consumers.

**Sun Capital Sponsors the IPO**

50.     Prior to the IPO, Vince was part of a larger company known as Kellwood.  In connection with the IPO, Sun Capital engaged in a series of restructuring transactions to separate the Vince assets from other assets that would remain a part of Kellwood and under the private control of Sun Capital.

51.     Through the restructuring transactions, Sun Capital obliged Vince to pay hundreds of millions of dollars to Sun Capital and its affiliates both during and after the IPO.  For example, Sun Capital caused Kellwood to issue a $341.5 million note receivable to Vince (the "Kellwood Note Receivable"), which was repaid from IPO proceeds as well as from a new $169.5 million term loan facility taken out by the Company.  Kellwood, in turn, used proceeds from the repayment of the Kellwood Note Receivable to repay certain of its indebtedness, including $118 million in term loan agreements with Sun Capital affiliates.  Defendant Sun Capital Management also received a $3.3 million restructuring fee and Defendant Granoff received a $6 million debt recovery bonus from the repayment of the Kellwood Note Receivable.

52.     As part of the restructuring transactions, Vince entered into a consulting agreement with Sun Capital Management that obliged the Company to reimburse Sun Capital Management for any expenses incurred in providing consulting services.

53.     In addition, Sun Capital caused Vince to enter into the Tax Receivable Agreement, whereby the Company became obliged to make payments to Sun Capital in an amount equal to 85% of the aggregate reduction in taxes payable realized by Vince and its subsidiaries from the utilization of pre-tax benefits following the IPO.  Pursuant to the Tax Receivable Agreement, certain tax benefits that would otherwise flow to Vince were instead to be paid to affiliates of Sun Capital.  At the time of the IPO, the Company estimated that it would make $172 million in payments to affiliates of Sun Capital under this agreement.  The ability of Vince to make these future payments to

- 14 -

Sun Capital depended on the Company's ability to continue to generate capital, either through the Company's business performance or through additional capital raises.

54.     Vince also entered into the Shared Services Agreement with Kellwood, whereby certain "key" services, such as distribution, finance, administrative, operations, IT and other services, were to be provided by Kellwood until the Company replaced the services with in-house systems or third-party providers. Vince described the services to be provided by Kellwood in the IPO Prospectus in pertinent part:

> As a business unit of Kellwood, we have historically relied on the financial resources and the administrative and operational support systems of Kellwood to run our business. Some of the Kellwood systems we are using include enterprise resource planning ("ERP"), human resource management systems and distribution applications. Many of these systems are complex and either highly customized or proprietary.

*       *       *

> Kellwood will continue to provide certain information technology services to us until such time as we elect to terminate provision of such services in accordance with the terms of the Shared Services Agreement.   These services include information technology planning and administration, desktop support and help desk, our ERP system, financial applications, warehouse systems, reporting and analysis applications and our retail and e-commerce interfaces.

> Our ERP system was developed from a core system that is widely used in the apparel and fashion industry, which we have customized to suit our inventory management and order processing requirements.

55.     The IPO Prospectus acknowledged that the successful provision of these services was critical to the Company's business, operations and prospects.  For example, the systems were highly customized and integrated the sales, inventory, customer and other data necessary for the Company to fill orders, replenish merchandise and provide accurate financial reporting.   Similarly, substantially all of the Company's products were sourced through a single distribution center operated by Kellwood out of City of Industry, California.

56.     The IPO Prospectus stated that Vince was "in the process of separating our assets from those of Kellwood and either creating our own financial, administrative, operational and other support systems or contracting with third parties to replace Kellwood's systems that will not be provided to us under the terms of the Shared Services Agreement."  Thus, the migration of these services began around the time of and in conjunction with the IPO.

57.     The IPO Prospectus characterized Vince as "a prominent, high-growth contemporary apparel brand known for its modern, effortless style and everyday luxury essentials."  Similarly, the IPO Prospectus touted the "strength of the Vince brand" as "demonstrated by our growth trajectory, with net sales, comparable store sales growth, Adjusted EBITDA and net income" each growing by more than double-digits in the months and years leading up to the IPO, as reflected in the following chart provided in the IPO Prospectus:

| Period | Net Sales | Change from Prior Period | Comparable Store Sales Growth | Adjusted EBITDA | Change from Prior Period | Net Income |
|--------|-----------|--------------------------|-------------------------------|-----------------|--------------------------|------------|
| (Dollars in Millions) | | | | | | |
| Fiscal 2010 | $    111.5 | — | 9.3% | $   23.6 | — | $    9.1 |
| Fiscal 2011 | 175.3 | 57.2% | 7.6% | 44.2 | 86.9% | 16.7 |
| Fiscal 2012 | 240.4 | 37.1% | 23.1% | 51.5 | 16.6% | 10.3 |
| First six months of Fiscal 2012 | 90.5 | — | 13.9% | 15.3 | — | 1.2 |
| First six months of Fiscal 2013 | 114.7 | 26.6% | 31.7% | 21.5 | 40.9% | 2.4 |

58.     The IPO Prospectus stated that the key to this rapid and continued growth lay in Vince's loyal customer base and focus on providing a satisfying shopping experience to its high-end customers.  For example, the IPO Prospectus listed as a "competitive strength" Vince's "exceptional customer loyalty and reach" and stated that the "premium nature of the Vince brand is reinforced"

- 16 -

through a "retail strategy designed to ensure a consistent brand presentation and enhanced customer experience." Similarly, the IPO Prospectus stated that Vince's "stores offer a personalized, service-oriented shopping experience in a boutique setting that reflects the lifestyle and modern aesthetic of the brand." As a result, it was important to the Company's continued success – and thus material to its investors – that Vince maintain a pleasant retail experience for its clientele even as it scaled in size and migrated its critical support systems away from Kellwood.

59.     The Sun Capital Defendants completed the IPO on or around November 22, 2013. In the IPO, Vince sold 10 million shares to the investing public at $20 per share (unadjusted), thereby generating $200 million in gross proceeds. As detailed herein, these proceeds were primarily used to repay the Kellwood Note Receivable, which in turn was largely used to make payments to the Sun Capital Defendants. Defendant Sun Cardinal and Defendant SCSF Cardinal also sold an additional 1.5 million Vince shares in the IPO at $20 per share pursuant to an over-allotment option, thereby generating an additional $30 million in gross proceeds for the Sun Capital Defendants.

**The Secondary Offering**

60.     In the months following the IPO, at first it seemed that Vince's business strategy was working. For its first reported fiscal quarter following the IPO, the quarter and year ended February 1, 2014,[3] Vince reported "record" fourth quarter and fiscal 2013 sales results. In a press release announcing the results filed March 6, 2014, Vince stated that total net sales had increased 20.5% in the fourth quarter to $87.8 million. Similarly, on June 6, 2014, Vince reported positive results for the quarter ended May 3, 2014, announcing in a press release that its net sales had increased 32.4% to $53.5 million. Following this news, the price of Vince stock reached $295.13 per share on June 9, 2014 on an adjusted basis, or $34.04 per share on an un-adjusted basis.

---

[3]     Vince operates on a 52- or 53-week fiscal year, ending the year on the Saturday closest to January 31 of the following year.

61.     On June 23, 2014, Vince announced that it would conduct a secondary offering to allow the Sun Capital Defendants to sell more of their Vince shares (the "Secondary Offering"). The Secondary Offering was priced at $34.50 per share (unadjusted) on June 25, 2014 and the offering was completed in July 2014. Through the Secondary Offering, the Sun Capital Defendants sold approximately 5 million additional shares of Vince stock at $34.50 per share to the investing public for more than $171 million in gross proceeds. The Company received no proceeds from this offering.

## RELEVANT PERIOD MATERIALLY FALSE
## AND MISLEADING STATEMENTS

**Defendants Condition Market to Believe Vince's Systems
Migration Would Be Carried Out with the Utmost Care and
Minimal Disruptions**

62.     The Relevant Period starts on March 19, 2015. On that date, Vince issued a press release announcing its financial results for the quarter and year ended January 31, 2015 (the "FY 2014 Release"). The FY 2014 Release stated that the Company had achieved "record fourth quarter and fiscal year 2014 results." The FY 2014 Release also stated that the Company had increased net sales by 7.9% to $94.7 million for the fourth quarter and by 18.1% to $340.4 million for the fiscal 2014. It also stated that the Company's adjusted diluted earnings per share ("EPS") had increased 21.7% to $0.28 for the fourth quarter and by 28.8% to $0.94 for the fiscal year.

63.     Defendant Granoff was quoted in the FY 2014 Release as stating that the "exceptional growth" in Vince's "retail, ecommerce, international and licensing businesses" was "building a platform for the future," and that the Company had "many growth opportunities in our domestic wholesale business and will continue to focus on strategically driving our productivity within existing doors while maintaining our brand's luxury profile." In addition, the release quoted Defendant Granoff as stating, "At the same time, *we will aggressively pursue our other meaningful*

*growth levers* from a product, channel, and international expansion perspective to realize the full

potential of the VINCE brand and deliver double-digit growth in sales and profit over the long term."

64. Also on March 19, 2015, Vince hosted an earnings call with investors and analysts to

discuss the quarter and year end results, in which Defendant Granoff and Defendant Klinger

participated. During the call, Defendants claimed that Vince had improved its operating capabilities

during the quarter, setting the stage for future growth. For example, Defendant Granoff stated in her

prepared remarks, "We delivered record sales and profits, and made great progress on all of our

strategic growth initiatives. We also continued to invest in our business, in order to *set a solid*

*foundation for future growth*." She also stated that Vince had "made many strides in our

organization and operations," including because it had "improved our operat[ing] processes to

increase efficiency and effectiveness" and thereby "set the platform for future growth."

65. Defendant Granoff pronounced that Vince would "take control of its own destiny"

through various strategic initiatives, including by migrating its system services away from Kellwood.

Granoff stated that the Company would take abundant precautions to ensure a "*smooth migration*

*with minimal disruption.*" She further stated that the Company had already made substantial

progress in these efforts and planned to finish the necessary conversions by the end of 2015, stating

in pertinent part:

> Finally, on the operations front, we will continue to build our infrastructure to
> support the long-term growth of the business. As I mentioned earlier, *we*
> *accomplished significant achievements in 2014 related to our operation strategy*,
> by adding talent, expanding vendor relationships and enhancing our internal
> capabilities. *We also completed the migration of several shared service activities*
> *from Kellwood*.
>
> During 2015, *we plan to fully migrate our IT systems, processes and support*
> *structure*. While a major undertaking, *we believe that having control of our*
> *technical infrastructure will enable us to more efficiently respond to our specific*
> *business needs and support our growth initiatives*. During this migration, we will
> incur incremental transition costs, as we run dual systems for a period of time *to*
> *ensure a smooth migration with minimal disruption*.

66.   Defendant Klinger likewise assured investors that the IT migration would be accomplished with the utmost care to ensure its success and in order to minimize any disruptions to Vince's business and operations during the transition, stating in pertinent part:

> [A]s far as the IT migration, obviously *we want to make sure that we're doing this very thoughtfully and prudently, so we're making sure that we have full redundancy during the transaction*.  So the dual system and the migration, right now we're planning to incur incremental transition costs of between $700,000 and $1 million into our SG&A this year.

67.   On March 27, 2015, Vince filed its annual report on Form 10-K with the SEC for the fiscal year ended January 31, 2015 (the "2014 10-K"), which Defendant Granoff, Defendant Klinger, Defendant Brody and Defendant Leder, among other directors, signed. In addition, Defendant Granoff and Defendant Klinger certified the 2014 10-K was accurate, not misleading and free from fraud.  The 2014 10-K contained the sales and earnings figures previously provided in the FY 2014 Release.  In addition, the 2014 10-K claimed that Vince had already successfully begun separating its assets and migrating its critical systems away from Kellwood, stating in pertinent part:

Shared Services Agreement

In connection with the consummation of the IPO, Vince, LLC entered into a shared services agreement with Kellwood Company, LLC on November 27, 2013 (the "Shared Services Agreement") pursuant to which Kellwood Company, LLC provides certain support services, including distribution, information technology and back office support. Kellwood will provide these services until we elect to terminate the provision thereof in accordance with the terms of such agreement. Some of the Kellwood systems we continue to use following the IPO include enterprise resourcing planning, or "ERP", human resource management systems and distribution applications.  ***In conjunction with our separation from Kellwood, we are in the process of separating our assets from those of Kellwood. We have recently commenced the development and implementation of our own ERP system and IT infrastructure, engaged with a new e-commerce platform provider and migrated the human resource recruitment system***.

                    *        *        *

***Kellwood provides us with certain key services for our business, some of which we are in the process of transitioning to our own systems.  If Kellwood fails to perform its obligations to us during the period of transition or if we cannot successfully***

*transition these services to our own systems, our business, financial condition, results of operations and cash flows could be materially harmed*.  (Emphasis in original.)

Prior to the IPO and Restructuring Transactions that closed on November 27, 2013, we operated as a business unit of Kellwood, and we historically relied on the financial resources and the administrative and operational support systems of Kellwood to run our business.  Some of the Kellwood systems we continue to use following the IPO and Restructuring Transactions include ERP, human resource management systems and distribution applications.  *In conjunction with our separation from Kellwood, we are in the process of separating our assets from those of Kellwood. We have recently commenced the development and implementation of our own ERP system and IT infrastructure, engaged with a new e-commerce platform provider and migrated the human resource recruitment system*.

68.    The 2014 10-K also stated that Vince utilized a centralized distribution system provided by Kellwood that was "fully customer and vendor compliant" and "completely integrated with our current EPR and accounting systems."  The 2014 10-K stated in pertinent part:

Distribution Facilities

Pursuant to the Shared Services Agreement, Kellwood provides distribution facilities and services to us in the U.S. These services include distribution, storage and fulfillment. Kellwood will continue to provide these services to us until such time as we elect to terminate the provision of such services in accordance with the terms of the Shared Services Agreement. . . .

As of January 31, 2015, we operated out of three distribution centers, two located in the U.S. and one in Belgium. The primary warehouse, located in City of Industry, California, includes 75,000 square feet dedicated to fulfilling orders for our wholesale partners and retail locations. An adjacent warehouse spanning 22,000 square feet supports Vince's e-commerce business and offers additional capacity to support our projected growth over the next several years. *Our space in both of the California warehouses utilize warehouse management systems that are fully customer and vendor compliant and are completely integrated with our current ERP and accounting systems*.

\*        \*        \*

*We believe we have sufficient capacity in our domestic and international distribution facilities to support our continued growth*.

- 21 -

69.     In addition, the 2014 10-K stated that Vince had implemented a tried-and-tested and fully integrated IT and ERP system that allowed the Company to meet its "financial reporting and accounting requirements," quickly incorporate new information into its systems, and further, that these integrated systems provided Vince "with merchandising, retail inventory management, point-of-sale systems, customer relationship management and retail accounting."  The 2014 10-K also claimed that Vince had already successfully begun the migration process.  The 2014 10-K stated in pertinent part:

Information Systems

Kellwood has continued to provide certain information technology services to us and will continue to do so until such time as we elect to terminate provision of such services in accordance with the terms of the Shared Services Agreement.  These services currently include information technology planning and administration, desktop support and help desk, our ERP system, financial applications, warehouse systems, reporting and analysis applications and our retail and e-commerce interfaces.

***Our current ERP system was developed from a core system that is widely used in the apparel and fashion industry, which we have customized to suit our inventory management and order processing requirements***.  We ***have integrated*** Oracle Financials with our ERP system to meet our financial reporting and accounting requirements.  Additionally, ***we use a suite of third-party hosted retail applications integrated with our ERP system*** that provide us with merchandising, retail inventory management, point-of-sale systems, customer relationship management and retail accounting.  Our retail applications are supported through a "Software as a Service" model, which ***allows for new implementations to occur quickly***.  Our ERP and warehouse management systems ***are also integrated*** with a hosted, third-party e-commerce platform.  ***During fiscal 2014, we commenced the development and implementation of our own ERP system and IT infrastructure, engaged with a new e-commerce platform provider and migrated the human resource recruitment system. The ERP implementation is expected to be completed by the end of the third quarter of fiscal 2015***.  The new ERP system is based on a system from Microsoft Dynamics AX and is cloud based. It will replace our current Oracle Financials and retail related sub systems.

70.     On June 2, 2015, the Board replaced Defendant Granoff with Defendant Leder as Chairman.  At the time, Defendant Leder was co-CEO of Sun Capital.

71.     On June 4, 2015, Vince issued a press release announcing its financial results for the quarter ended May 2, 2015 (the "1Q 2015 Release").  The 1Q 2015 Release stated that the Company had increased net sales by 12.0% to $59.8 million during the quarter.  It also stated that the Company's diluted EPS had increased 50.0% to $0.06 for the quarter.  Defendant Granoff was quoted in the 1Q 2015 Release as stating, "Despite our solid first quarter performance, we are lowering our guidance for the full fiscal year based on current business trends and other macro dynamics. [. . .] *We remain confident that we are taking the appropriate actions that will drive both sales and profit growth over the long term* as Vince continues its evolution into a global, dual gender, multi-channel lifestyle brand."

72.     Also on June 4, 2015, Vince hosted an earnings call with investors and analysts to discuss the quarterly results, in which Defendant Granoff and Defendant Klinger participated.  During the call, Defendant Granoff stated that the Company had lowered guidance due to certain "business trends" and "macro" challenges, but that Vince had "an exceptional brand, a highly loyal customer base, and strong relationships with our wholesale partners" and that she was "confident that *we are taking the right steps* and have the right business model in place *to drive healthy double-digit sales and profit growth* over the long term."  She continued by discussing the long-term growth of the Company in light of Vince's ongoing strategic initiatives, stating in pertinent part:

> While we are not happy about our revised guidance, we firmly believe in the long-term potential of the Vince brand, and are taking steps to solidify our leadership position and achieve continued success.  We know our customers are passionate about Vince products, and we are committed to realizing our full potential as a global lifestyle brand.  We have a lot of opportunity ahead of us from a product, channel and geographic perspective, and *we look forward to driving significant growth in our Company and increasing shareholder value* over the long term.

73.     Defendant Granoff highlighted the IT migration process as a key to the Company's long-term growth.  She stated that the Company was "continu[ing] to invest in the Business to build

out an infrastructure that will support the Company as we grow" and that Vince "***remain[s] on track to fully migrate our IT systems, processes, and support structure*** during the back half of the year."

74.    Defendant Klinger likewise represented that the transfer of Vince's support services away from Kellwood remained on track.  For example, she stated that Vince's capital expenditures on IT investments remained within expectations.  Later in the call, she stated that Vince had "taken a very sharp pencil to each one of our variable and discretionary costs" and was "prudently" managing costs for strategic initiatives, which at the time included the IT systems migration, "because as a growing Company, you want to make sure that you're supporting the initiatives that you have ***for the long term***."  She continued, "So to the extent that we can again prudently cut costs or defer costs, we are doing that, but we are absolutely still investing in the business and investing in the long-term future."

75.    On June 10, 2015, Vince filed its quarterly report on Form 10-Q with the SEC for the quarter ended May 2, 2015 (the "1Q 2015 10-Q"), which Defendant Granoff and Defendant Klinger signed and certified were accurate, not misleading and free from fraud.  The 1Q 2015 10-Q contained the sales and earnings figures previously provided in the 1Q 2015 Release.  In addition, the 1Q 2015 10-Q claimed that Vince had already successfully begun separating its assets and migrating its critical systems away from Kellwood, but failed to disclose any problems or issues that had arisen as a result of that migration, stating in pertinent part:

> Shared Services Agreement
>
> In connection with the consummation of our IPO on November 27, 2013, Vince, LLC entered into a Shared Services Agreement pursuant to which Kellwood provides support services in various operational areas, including, among other things, e-commerce operations, distribution, logistics, information technology, accounts payable, credit and collections and payroll and benefits.  ***Since the IPO, we have been working on transitioning certain back office functions performed by Kellwood under the Shared Services Agreement.  Among these functions that have transitioned to Vince are certain accounting related functions as well as benefits administration.  We have also been working on developing our own information***

***technology infrastructure and are now in the process of implementing our own enterprise resource planning ("ERP") system***. We have engaged with a new e-commerce platform provider and migrated the human resource recruitment system. The new ERP system is planned to be completed and functional by the end of fiscal year 2015, however, until such time, we will continue to utilize the Kellwood information technology infrastructure under the Shared Services Agreement.

76.     On June 25, 2015, Vince announced that Defendant Klinger had resigned from the Company, effective immediately, and that she had been replaced by Defendant Brody as Vince's Interim CFO.

77.     On July 13, 2015, Vince announced that Defendant Granoff had resigned from the Company and would be leaving once a successor had been appointed.  In addition, it was announced that same day that Karin Gregersen, President and Chief Creative Officer had decided to leave the Company, effective as of the close of business on July 16, 2015.

78.      The statements referenced in ¶¶63-69, 71-75 above were materially false and/or misleading because they misrepresented and failed to disclose, as Defendants knew or recklessly disregarded, that Vince did not have the necessary plans, capabilities, procedures, personnel, fail-safes or systems in place so as to provide a reasonable likelihood that the systems migration would be successfully completed without significant disruptions to Vince's business, operations or financial results.

**Vince Experiences Severe Impairments to its Business,
Operations and Prospects as a Result of the Systems Migration**

79.     Despite Defendants' assurances to investors that the migration of Vince's critical accounting functions, inventory services, ERP systems, IT systems and other functions away from Kellwood would be carried out so as to "ensure a smooth migration with minimal disruption" and set a "solid foundation for future growth," behind the scenes the efforts were plagued with crippling setbacks and failures from the start.  After an initial delay, the systems migration began in earnest in August 2015, but without the promised "redundancy," prudence, technical expertise and fail-safes in

place.  From the moment it began, and by at least September 2015, Vince's migration of key services away from Kellwood was characterized by disorganization, dysfunction and severe setbacks as detailed herein.  These problems worsened throughout the Relevant Period, resulting in significant disruptions to Vince's business, financial results and operations.

80.     For example, as a result of the systems migration, computers used to process customer in-store transactions froze, experienced long load times and suffered from software bugs. Customer transactional data was lost, corrupted or miscategorized, adversely impacting the Company's ability to track sales, inventory and cash.  At times, registers were unable to timely process credit card transactions. In addition, the Company's point of sale systems' ability to communicate and share information with its back office inventory systems used to receive shipments, transfer inventory and order customer merchandise suffered crippling failures.  As a result, the Company's ability to track inventory, collect reliable sales data, manage its warehouse and fill customer orders was severely impaired.  Delivery delays caused seasonal merchandise to arrive too late, limiting its appeal to shoppers.  The issues grew so bad that Vince would ultimately be forced to hire a second group of consultants to rectify problems experienced by the consultants hired early in the transition process.

81.     These myriad problems would lead to declines in Vince's sales results, operational capabilities and future expected cash flows. Vince's sales plummeted as the quality of its customers' experiences with the Company deteriorated.  Shoppers walked out on transactions that failed to timely process.  Once-loyal customers stopped returning, and new ones failed to take their place. Rather than setting a "solid foundation for future growth," the systems migration effort had, in truth, substantially diminished the Company's ability to grow revenues or earnings and impaired its financial results.

**Defendants Conceal the Extent, Nature and Severity of**
**Problems with Vince's Systems Migration and The Impact of**
**These Problems to Vince's Business, Operations and Prospects**

82.     On September 3, 2015, Vince issued a press release announcing its financial results

for the quarter ended August 1, 2015 (the "2Q 2015 Release"). The 2Q 2015 Release stated that net

sales for the Company had decreased by 10.4% to $80 million for the quarter. The press release also

stated that the Company had posted a net loss of $5 million, or $0.14 per diluted share, for the

quarter. The Company revised downward its guidance for fiscal 2015 to total net sales of $285

million to $295 million and adjusted diluted EPS of $0.31 to $0.37.

83.     The 2Q 2015 Release named Defendant Brody, who was then on the Board, as

Vince's Interim CEO, and Defendant Stefko as Vince's Interim CFO and Treasurer. Both

Defendants were employees of Sun Capital at the time of their appointment. Although they took a

leave of absence from their position with Sun Capital, they continued to receive health and welfare

benefits, remained eligible for bonuses from Sun Capital and were partners in one or more

investment partnerships affiliated with Sun Capital that beneficially owned stock of the Company.

84.     Defendant Brody was quoted in the 2Q 2015 Release as blaming the worsening sales

trends on "lower than expected sell-through and customer reorders," but stated that Vince was

"taking corrective actions to protect and enhance the strength of the Vince brand" including by

"taking steps to . . . improve operational performance, ***including tighter inventory and procurement***

***practices*** which will also help lead to a ***more carefully managed distribution*** in the off-price

channel."

85.     Also on September 3, 2015, Vince hosted an earnings call with investors and analysts

to discuss the quarterly results, in which Defendant Brody and Defendant Stefko participated.

During the call, Defendant Brody represented that the Company's problems were short-term and

were being addressed, stating we "feel like the long-term strategies of Vince are still intact" and that

he "continue[d] to believe that Vince is a powerful brand with ***tremendous long-term growth***

***potential***." He continued, "we are not looking to change any of our strategies," simply to "execute

on them better." Defendant Brody stated that the Company was doing just that by taking

"aggressive" corrective actions focused on improved operational performance. For example,

Defendant Brody stated that Vince management was "working closely with [in-house professionals]

to take aggressive steps that will ***put us on the path to improved performance***"; that the Company

had taken "***steps to ensure that sales, planning and sourcing teams are fully aligned on all aspects***

***of our inventory*** buys with the goals of optimizing our full price selling opportunities and delivering

stronger gross margins"; and that the Company remained "committed to taking additional aggressive

measures to get the Company ***on the right path to deliver consistent, long-term growth***, while we

continue to move forward with our multiple strategic growth opportunities."

86.    Defendant Stefko, meanwhile, stated that the IT migration had been "deferred" in

order to focus on other business initiatives, but made no mention of the significant challenges that

had already impaired the Company's ability to use its critical systems as a result of the systems

transfer and the lack of effective backup systems to smooth the transition process. To the contrary,

Defendant Stefko claimed that Vince was "continuing to invest in the business to build a foundation

to support the Company's long-term growth" through the IT systems migration and that management

remained "***confident that our current platform will continue to support the growth*** until the new

platform is implemented."

87.    On September 8, 2015, Vince filed its quarterly report on Form 10-Q with the SEC

for the quarter ended August 1, 2015 (the "2Q 2015 10-Q"), which Defendant Brody and Defendant

Stefko signed and certified were accurate, not misleading and free from fraud. The 2Q 2015 10-Q

contained the sales and earnings figures previously provided in the 2Q 2015 Release. In addition,

the 2Q 2015 10-Q claimed that Vince had already successfully begun separating its assets and migrating its critical systems away from Kellwood, but failed to disclose any problems or issues that had arisen as a result of that migration, stating in pertinent part:

Shared Services Agreement

In connection with the consummation of our IPO on November 27, 2013, Vince, LLC entered into a Shared Services Agreement pursuant to which Kellwood provides support services in various operational areas, including, among other things, e-commerce operations, distribution, logistics, information technology, accounts payable, credit and collections and payroll and benefits. *Since the IPO, we have been working on transitioning certain back office functions performed by Kellwood under the Shared Services Agreement. Among these functions that have transitioned to Vince are certain accounting related functions as well as benefits administration. We have also been working on developing our own information technology infrastructure and are now in the process of implementing our own enterprise resource planning ("ERP") system.* We have engaged with a new e-commerce platform provider and are still developing that system. The new ERP system is also under development. Until those systems are implemented, we will continue to utilize the Kellwood information technology infrastructure, including e-commerce platform systems, under the Shared Services Agreement.

88.    In the 2Q 2015 10-Q, Vince also stated that the Company had been unable to make approximately $22.8 million in payments it owed to Defendant Sun Cardinal under the Tax Receivable Agreement. The 2Q 2015 10-Q stated that Sun Cardinal had agreed to postpone payment of the tax benefit, plus accrued interest, to September 15, 2016. The 2Q 2015 10-Q also estimated that Vince still owed approximately $169 million under the Tax Receivable Agreement.

89.    On October 22, 2015, Vince announced that Hoffman had been appointed the Company's CEO, while Brody remained a member of the Board and had returned to his former positions with Sun Capital.

90.    On November 23, 2015, Vince announced that it had engaged two of the Company's founders, Rea Laccone and Christopher LaPolice, to provide consulting services to it under a two-year agreement, further indicating that the Company was in the midst of a turnaround and addressing the purported reasons for its recent sales and earnings shortfall.

- 29 -

91.     On December 10, 2015, Vince issued a press release announcing its financial results for the quarter ended October 31, 2015 (the "3Q 2015 Release").  The 3Q 2015 Release stated that net sales for the Company had decreased by 21.5% to $80.9 million for the quarter.  The press release also stated that the Company had earned net income of $5.9 million, or $0.16 per diluted share, for the quarter.  The Company revised downward its guidance for fiscal 2015 to total net sales of $285 million to $290 million and adjusted diluted EPS of $0.17 to $0.21 primarily due to "the engagement of new personnel and consulting services for product development, design and merchandising, and revised expectations for the DTC business, as well as an increase in marketing investments."  The 3Q 2015 Release quoted Defendant Hoffman as stating that the quarterly results "were ***largely in line with our expectations***," and that he was "excited to be leading the Vince brand" and "working with our founders, Rea and Christopher, as well as the rest of the team to recapture the brand DNA and position the Company for long term sales and profitability growth."

92.     Also on December 10, 2015, Vince hosted an earnings call with investors and analysts to discuss the quarterly results, in which Defendant Hoffman and Defendant Stefko participated.  Defendant Hoffman began the call by confirming that he had become familiar with Vince's business and challenges since joining the Company by meeting with employees in Vince's main offices in New York and Los Angeles, as well as meeting with wholesale partners, visiting retail stores and getting to know the Company's customers.  Hoffman claimed that based on this first-hand knowledge, he was "***confident***" that he would be able to "***drive improved performance*** in the business."  Hoffman also claimed that he and the rest of management "***know what we need to do to succeed***" and that they had already "begun putting plans in place to get there."  He continued, "I am confident that we are on the right path to deliver ***consistent sales and earnings growth*** over the

long term."  Later, in response to an analyst question, Defendant Hoffman stated he saw Vince "had great potential and *huge upside*."

93.     On the call, both Defendant Hoffman and Defendant Stefko commented on the purported positive progress the Company was making on its systems upgrades and migrations.  For example, Defendant Hoffman stated that Vince was "*very pleased with the direction of the e-commerce business*," and that it was "launching the platform in 2016, which we think is just going to *increase our ability to service the customer*."  Similarly, Defendant Stefko stated, "We have our ongoing conversion from Kellwood that we have discussed in the past, *that is going forward*."  He continued, "We also have the launching of a new e-commerce platform in line with that. And that is a project that started in 2015, and *we plan on finishing that in 2016*."

94.     On December 10, 2015, Vince also filed its quarterly report on Form 10-Q with the SEC for the quarter ended October 31, 2015 (the "3Q 2015 10-Q"), which Defendant Hoffman and Defendant Stefko signed and certified were accurate, not misleading and free from fraud.  The 3Q 2015 10-Q contained the sales and earnings figures previously provided in the 3Q 2015 Release.  In addition, the 3Q 2015 10-Q claimed that Vince had already successfully begun separating its assets and migrating its critical systems away from Kellwood, but failed to disclose any problems or issues that had arisen as a result of that migration, stating in pertinent part:

Shared Services Agreement

In connection with the consummation of our IPO on November 27, 2013, Vince, LLC entered into a Shared Services Agreement pursuant to which Kellwood provides support services in various operational areas, including, among other things, e-commerce operations, distribution, logistics, information technology, accounts payable, credit and collections and payroll. *Since the IPO, we have been working on transitioning certain back office functions performed by Kellwood under the Shared Services Agreement. Among these functions that have transitioned to Vince are certain accounting related functions as well as benefits administration. We have also been working on developing our own information technology infrastructure and are now in the process of implementing our own enterprise resource planning ("ERP") system.*  We have engaged with a new e-commerce

platform provider and are still developing that system.  The new ERP system is also under development.  Until those systems are implemented, we will continue to utilize the Kellwood information technology infrastructure, including e-commerce platform systems, under the Shared Services Agreement.

95.     The 3Q 2015 10-Q also stated that Vince was "in the process of migrating [its] U.S. distribution system from Kellwood to a new third party provider" after it had entered into a service agreement with a new third party in November 2015.  In addition, the 3Q 2015 10-Q stated that Vince's "ability to meet the needs of [its] wholesale partners and [its] own retail stores depends on the proper operation of this distribution facility" and that the "migration of these services from Kellwood requires [Vince] to implement new system integrations and requires Kellwood to assist with the migration."   Although the 3Q 2015 10-Q stated that "[p]roblems with our distribution system, including any disruption caused by the migration, *could* materially harm [Vince's] ability to meet customer expectations, manage inventory, complete sale transactions and achieve targeted operating efficiencies," it failed to disclose that significant challenges had already occurred as a result of the systems migration, rendering the conditional statements of potential harm in the 3Q 2015 10-Q themselves materially misleading.

96.     On January 14, 2016, Vince announced that Defendant Stefko had been named Vince's permanent CFO, after serving as Interim CFO previously.

97.     On February 12, 2016, the Company filed a registration statement on Form S-3 for a share rights offering of up to $65 million (the "First Rights Offering").  The registration statement stated that Vince intended to use the proceeds from the First Rights Offering to make approximately $21.8 million in payments plus accrued interest to Sun Cardinal pursuant to the Tax Receivable Agreement, in addition to certain other payments under Vince's revolving credit facility.

98.     On March 7, 2016, Vince issued a press release announcing its preliminary financial results for the quarter and year ended January 30, 2016 (the "FY 2015 Prelim Release").  The FY

2015 Prelim Release stated that the Company estimated its net sales for fiscal 2015 would be between $300.5 million and $302.5 million and that its adjusted diluted EPS would be between $0.32 and $0.34.  Defendant Hoffman was quoted in the release as stating, "We were pleased to see our fiscal 2015 preliminary net sales exceed our most recent guidance. . . .  [W]e believe that our initiatives will begin to yield more meaningful results later in the year with our Fall 2016 delivery which will be our first collection designed and merchandised by our founders since their return. Overall, while we still have a lot of work in front of us, *we remain confident that the plans we have in place will position us for sustainable, profitable growth over the long-term*."

99.     The FY 2015 Prelim Release also provided the Company's guidance for its 2016 fiscal year, including total net sales of between $290 million and $305 million and diluted EPS of $0.00 to $0.08.  The release quoted Hoffman as stating that the Company's 2016 outlook factored in higher spending on various "*strategic initiatives* designed to enhance the product and further strengthen our brand and market leadership position" that "*will drive improved financial performance* in late 2016."

100.     On March 16, 2016, Vince issued a press release announcing the subscription price for the First Rights Offering.  The release stated that in the First Rights Offering the Company would entitle the holders of its common stock to purchase approximately 0.3191 shares of common stock at the subscription price of $5.50 per whole share of common stock (unadjusted), providing one non-transferable right for every share of common stock that they owned as of the Record Date, up to an aggregate 11.8 million new shares.  On March 16, 2016, the price of Vince publicly traded stock closed at $7.74 per share on an unadjusted basis.

101.     On March 29, 2016, Vince issued a press release announcing its financial results for the quarter and year ended January 30, 2016 (the "FY 2015 Release").  The FY 2015 Release stated

that the Company's net sales had decreased 13.6% to $81.8 million during the quarter and decreased 11.1% to $302.5 million for the year. The FY 2015 Release also stated that the Company had earned net income of $1.8 million, or $0.05 per diluted share, and $5.1 million, or $0.14 per diluted share, for the quarter and year, respectively. In addition, the FY 2015 Release reaffirmed the 2016 guidance provided in the FY 2015 Prelim Release. Defendant Hoffman was quoted in the FY 2015 Release as claiming that the Company had taken "important measures toward positioning the Company for sustainable long-term growth." He also was quoted as stating that Vince was "***carefully managing our inventory levels*** and diligently controlling costs while ***making strategic investments*** to support our business for the long term" and that he believed "the initiatives we have in place ***will enable us to achieve the full potential of the Vince brand***."

102. Also on March 29, 2016, Vince hosted an earnings call with investors and analysts to discuss the quarter and year end results, in which Defendant Hoffman and Defendant Stefko participated. Defendant Hoffman used his prepared remarks to repeatedly tout the purported "progress" Vince had made in improving its operations, stating that since joining the Company he had worked to "build a strong foundation and position the Company to succeed over the long term." He claimed that the Company had made "***great strides***" during that time, and that "***[e]verything we have done since that point has been moving us toward that goal***." Defendant Hoffman stated that he was "confident" that Vince was "***on the right path***."

103. Defendant Hoffman held up as examples of this "progress" improvements in the support systems that Vince was developing and transferring from Kellwood. For example, he stated that the Company was improving its inventory management, that it was launching a new e-commerce platform so "consumers have a consistent experience across channels," and that strategic

- 34 -

investments, which at the time included the IT migration, would provide a "path to deliver consistent sales and earnings growth over the long term," stating in pertinent part:

> We are working on some ***initiatives that will enable us to quickly chase business and capture incremental sales, if performance exceeds presentations***, while remaining prudent in the way we manage inventory levels. Quite frankly, at this juncture we would much rather have demand outweigh supply and potentially miss a few sales, than to build inventory too quickly and risk excessive markdown events.
>
> \*     \*     \*
>
> In addition, ***we continue to be pleased with our e-commerce business, and will be migrating to a new platform that will enable us to increase the functionality of the site***. This will be followed by a creative overhaul to ensure that the site is more reflective of the Vince brand, as ***we want consumers to have a consistent experience across channels***.
>
> \*     \*     \*
>
> We are also focused on ***making the necessary investments in the business to support our long-term growth objectives***, and taking steps to put us in the financial position to do so, with our recently announced rights offering, which we commenced today. Overall, I am very proud of the work that the team has done thus far. We believe that we are on track to achieve improved results for holiday 2016 and into 2017, and look forward to continuing on this ***path to deliver consistent sales and earnings growth over the long term***.

104. On April 14, 2016, Vince filed its annual report on Form 10-K with the SEC for the fiscal year ended January 30, 2016 (the "2015 10-K"), which Defendant Hoffman, Defendant Stefko, Defendant Brody and Defendant Leder, among other directors, signed. In addition, Defendant Hoffman and Defendant Stefko certified the 2015 10-K was accurate, not misleading and free from fraud. The 2015 10-K contained the sales and earnings figures previously provided in the FY 2015 Release. In addition, the 2015 10-K claimed that Vince had continued to successfully separate its assets and migrate its critical systems away from Kellwood, but failed to disclose any problems or issues that had arisen as a result of that migration, stating in pertinent part:

Shared Services Agreement

In connection with the consummation of the IPO, Vince, LLC entered into a shared services agreement with Kellwood Company, LLC on November 27, 2013 (the "Shared Services Agreement") pursuant to which Kellwood Company, LLC would provide certain support services in various operational areas including, among other things, e-commerce operations, distribution, logistics, information technology, accounts payable, credit and collections and payroll and benefits. Since the IPO, we have been working on transitioning certain back office functions performed by Kellwood under the Shared Services Agreement. Among these functions that have transitioned to Vince are certain accounting related functions as well as benefits administration. *We have also been working on developing our own information technology infrastructure and are now in the process of implementing our own enterprise resource planning ("ERP") system, point-of-sale systems, e-commerce platform and supporting systems. We are also in the process of migrating our U.S. distribution system from Kellwood to a new third party provider. Until those systems are implemented, we will continue to utilize the Kellwood information technology infrastructure, including e-commerce platform systems, under the Shared Services Agreement.*

*       *       *

Prior to the IPO and Restructuring Transactions that closed on November 27, 2013, we operated as a business unit of Kellwood, and we historically relied on the financial resources and the administrative and operational support systems of Kellwood to run our business. Some of the Kellwood systems we continue to use following the IPO and Restructuring Transactions include ERP, POS and human resource management systems as well as distribution applications. *We are in the process of transitioning to our own systems and processes from those of Kellwood.*

105.    The 2015 10-K also stated that Vince utilized a centralized distribution system provided by Kellwood that was "fully customer and vendor compliant" and "completely integrated with our current EPR and accounting systems." The 2015 10-K stated in pertinent part:

Distribution Facilities

Pursuant to the Shared Services Agreement, Kellwood provides distribution facilities and services to us in the U.S. Kellwood has provided distribution facilities and services to us in the U.S. These services included distribution, storage and fulfillment. In November 2015, we entered into a service agreement with a new third-party distribution provider and commenced the migration of the distribution facility from Kellwood in the first quarter of 2016. Kellwood will continue to provide these services to us through a transition period until such time as we terminate the provision of such services in accordance with the terms of the Shared Services Agreement. . . .

As of January 30, 2016, we operated out of three distribution centers, two located in the U.S. and one in Belgium.  The primary warehouse operated by Kellwood is located in City of Industry, California, and included 75,000 square feet dedicated to fulfilling orders for our wholesale partners and retail locations.  An adjacent warehouse spanning 22,000 square feet supported Vince's e-commerce business. *Our space in both of the California warehouses utilize warehouse management systems that are fully customer and vendor compliant and are completely integrated with our current ERP and accounting systems*.

*       *       *

*We believe we have sufficient capacity in our domestic and international distribution facilities to support our continued growth*.

106.    In addition, the 2015 10-K stated that Vince had implemented a tried-and-tested and fully integrated IT and ERP system that allowed the Company to meet its "financial reporting and accounting requirements," quickly implement new information into its systems, and further, that these integrated systems provided Vince "with merchandising, retail inventory management, point-of-sale systems ('POS'), customer relationship management and retail accounting." The 2015 10-K also claimed that the IT migration process was well under way, and expected to be completed in fiscal 2016.  The 2015 10-K stated in pertinent part:

Information Systems

Kellwood has continued to provide certain information technology services to us and will continue to do so until such time as we elect to terminate provision of such services in accordance with the terms of the Shared Services Agreement.  These services included information technology planning and administration, desktop support and help desk, our ERP system, financial applications, warehouse systems, reporting and analysis applications and our retail and e-commerce interfaces

The ERP system we current use under the Shared Services Agreement was developed from a core system that is *widely used in the apparel and fashion industry, which was customized to suit our inventory management and order processing requirements. Oracle Financials has been integrated with the ERP system to meet our financial reporting and accounting requirements*.  Additionally, we use a suite of third-party hosted retail applications integrated with the ERP system that provide us with merchandising, retail inventory management, point-of-sale systems ("POS"), customer relationship management and retail accounting, all of which are currently used under the Shared Services Agreement.  The ERP and warehouse management systems are also integrated with a hosted, third-party e-commerce platform.  *We have*

*commenced the development and implementation of our own ERP, POS and supporting systems and network infrastructure*, engaged with a new e-commerce platform provider and completed the migration of the human resource recruitment system. *The ERP, POS, e-commerce platform and supporting system implementations are expected to be completed in 2016*. Our new ERP system is operated on a system from Microsoft Dynamics AX and is cloud based and will integrate with our new POS, e-commerce platform and other supporting systems. Collectively, these systems will replace the current ERP, Oracle Financials and all other systems currently used under the Shared Services Agreement. Once implemented, we will no longer rely on Kellwood's information technology services.

107.    The 2015 10-K also stated that the Company's business and results of operation "*may*" be materially and adversely affected "*[i]f*" the Company was unable "to successfully transition [its] systems" away from Kellwood or if it experienced "any disruption caused by the migration" of its distribution system to a new third-party provider.  While the 2015 10-K acknowledged the material importance to investors of successfully completing the systems migration and minimizing disruptions in the Company's business, it failed to disclose that significant challenges in the transition effort had already occurred and were negatively impacting the Company's business and results from operations, rendering the conditional statements of potential harm in the 2015 10-K themselves materially misleading.

108.    The 2015 10-K also represented that Vince management had reviewed the Company's internal controls over financial report and that these controls were effective as of January 30, 2016. The 2015 10-K stated in pertinent part:

Changes in Internal Control Over Financial Reporting

*There was no change in our internal control over financial reporting that occurred during our latest fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting*.

Management's Annual Report on Internal Control Over Financial Reporting

Management, including our Chief Executive Officer and Chief Financial Officer, is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) and 15d-15(f) under the Exchange Act).  Our internal control over financial reporting is a process to provide reasonable assurance

regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.  Our internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on our financial statements.

\*     \*     \*

Management assessed the effectiveness of our internal control over financial reporting as of January 30, 2016. In making this assessment, management used the criteria established by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control-Integrated Framework (2013). ***Based on this assessment, management has concluded that, as of January 30, 2016, our internal control over financial reporting was effective, at a reasonable assurance level***.

109.    On April 22, 2016, Vince announced the completion of the First Rights Offering. The Company stated that it had received subscriptions and oversubscriptions from its existing stockholders for 11.6 million shares of its common stock, resulting in $63.9 million in gross proceeds.  The Company used these proceeds to pay Defendant Sun Cardinal $22.3 million pursuant to the Tax Receivable Agreement, in addition to other credit payments.

110.    On June 7, 2016, the Company issued a press release announcing its financial results for the quarter ended April 30, 2016 (the "1Q 2016 Release").  The 1Q 2016 Release stated that net sales for the Company had increased by 13.0% to $67.6 million for the quarter.  It also stated that the Company had posted a net loss of $1.9 million, or $0.05 per share, for the quarter.  The 1Q 2016 Release reaffirmed the Company's net sales and EPS guidance provided in the FY 2015 Release. The 3Q 2015 Release quoted Defendant Hoffman as stating that the "first quarter results came in largely as expected," and Vince remained "***on track to meet our expectations for the year***."  He also

was quoted as stating, "Overall, we will continue to move forward with strategic actions and investments that support recapturing the Vince DNA as we strive to position the Company for *improved results in the second half of Fiscal 2016 and for long-term profitable growth*."

111.    Also on June 7, 2016, Vince hosted an earnings call with investors and analysts to discuss the quarterly results, in which Defendant Hoffman and Defendant Stefko participated. Defendant Hoffman used his prepared remarks to once again highlight the Company's purported successes in migrating its systems away from Kellwood and towards in-house and new third-party providers, claiming that these efforts were "on track" and that they would provide substantial benefits to the Company's financial results and operations.  Defendant Hoffman stated in pertinent part:

> Finally, we continue to make investments in the business that will ultimately support our long-term growth.  During the first quarter we *substantially completed the changeover to our new distribution center, which will enable us to better control our inventory* going forward and, in turn, drive gross margin expansion.
>
> In addition, *we continue to make progress on our IT migration which is due to be completed later this year*.  Among the benefits will be *better reporting analytics as well as improved functionality* on the website, which should also drive higher margin in the future.
>
> *Overall, we are on track with our plans for the year*.  While we expect that the business will remain challenged throughout much of 2016, we are taking actions that we believe position us to deliver improved financial performance as we move throughout the year and into 2017.  Importantly*, we are continuing to make great progress setting the stage for long-term profitable growth* by making decisions that are right for the integrity of the brand.

112.    Defendant Stefko, meanwhile, noted the costs of the IT migration and other systems transfers during the quarter, but made no mention of the significant challenges that had already impaired the Company's ability to use its critical systems and adversely impacted the Company's earnings and sales results.

113.    On June 8, 2016, Vince also filed its quarterly report on Form 10-Q with the SEC for

the quarter ended April 30, 2016 (the "1Q 2016 10-Q"), which Defendant Hoffman and Defendant

Stefko signed and certified were accurate, not misleading and free from fraud.  The 1Q 2016 10-Q

contained the sales and earnings figures previously provided in the 1Q 2016 Release.  In addition,

the 1Q 2016 10-Q claimed that Vince had already successfully begun separating its assets and

migrating its critical systems away from Kellwood, but failed to disclose any problems or issues that

had arisen as a result of that migration, stating in pertinent part:

> Shared Services Agreement
>
> In connection with the consummation of the Company's IPO on November 27, 2013, Vince, LLC entered into a Shared Services Agreement pursuant to which Kellwood would provide support services in various operational areas, including, among other things, e-commerce operations, distribution, logistics, information technology, accounts payable, credit and collections and payroll and benefits.  ***Since the IPO, the Company has been working on transitioning certain back office functions performed by Kellwood under the Shared Services Agreement.  Among these functions that have transitioned to Vince are certain accounting related functions as well as benefits administration.  The Company has also been working on developing its own information technology infrastructure and is now in the process of implementing its own enterprise resource planning ("ERP") system, point-of-sale systems, e-commerce platform and supporting systems.  The Company has substantially completed the migration of its U.S. distribution system from Kellwood to a new third party provider***.  Until those systems are implemented, the Company will continue to utilize the Kellwood information technology infrastructure, including e-commerce platform systems, under the Shared Services Agreement.

114.    The 1Q 2016 10-Q also stated that Vince had already "***substantially completed*** the

process of migrating our U.S. distribution system from Kellwood to a new third party provider."

The 1Q 2016 10-Q also stated that Vince's "ability to meet the needs of [its] wholesale partners and

[its] own direct-to-consumer business depends on the proper operation of this distribution facility"

and that the "migration of these services from Kellwood required [Vince] to implement new system

integrations and requires Kellwood to assist with the migration."  Although the 1Q 2016 10-Q stated

that "[p]roblems with our distribution system, including any disruption caused by the migration,

*could* materially harm [Vince's] ability to meet customer expectations, manage inventory, complete sale transactions and achieve targeted operating efficiencies," it failed to disclose that significant challenges had already occurred as a result of the systems migration, rendering the conditional statements of potential harm in the 1Q 2016 10-Q themselves materially misleading.

115.    The statements referenced in ¶¶84-87, 91-95, 98-99, 101-108, 110-114 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and financial condition, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants failed to disclose:

(a)    that Vince did not have the necessary plans, procedures, personnel or systems in place to provide an orderly and successful transition effort, but in fact was engaged in the piecemeal and disorganized migration of its critical IT, financial, administrative, inventory, distribution and other systems, which the Company implemented by hiring multiple third-party consultants and in-house technicians with overlapping and unclear responsibilities and employing faulty and inadequately tested software and data systems;

(b)    that Vince did not utilize a "dual" system to ensure a smooth systems migration, but instead prematurely migrated critical services away from Kellwood before those systems were fully functioning or able to support Vince's business and operations;

(c)    that failures in integrating Vince's new software system led to functionality problems, such as long load times, software bugs, computer crashes, cash registers not working and the inability of stores to timely process credit card transactions;

(d)    that systematic breakdowns in communications between the Company's point of sale and back office systems had impaired Vince's ability to track inventory, receive shipments, fill customer orders and manage its warehouse;

(e)     that delayed shipments had caused Vince stores to receive seasonal merchandise after critical seasonal sales windows had closed, causing the Company to miss key sales opportunities;

(f)     that problems with Vince's new systems impaired the Company's ability to effectively record and maintain critical sales and inventory data and to accurately track sales transactions, customer information and cash from in-store sales transactions;

(g)     that Vince suffered from numerous material weaknesses in its internal controls over financial reporting, including: (i) failures to maintain appropriate corporate governance, change management and system implementation controls to identify and address the risks associated with the implementation of the Company's new ERP and payroll systems; (ii) failures to maintain program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records were tested, approved and implemented appropriately before being implemented; and (ii) failures to maintain adequate user access controls to ensure the appropriate segregation of duties and restriction of access to the Company's financial applications and data;

(h)     that the problems resulting from the systems migration and internal control failures listed in (a)-(g), above, had negatively impacted the Company's sales and earnings results, impaired Vince's business, operations and prospects, and diminished the Company's ability to retain existing customers and attract new ones; and

(i)     that, as a result of the facts listed in (a)-(h), the Company was not on track to achieve the guidance for the Company's fiscal 2016 provided in the FY 2015 Release and FY 2015 Prelim Release and such guidance lacked a reasonable basis.

- 43 -

116.     Then, on September 8, 2016, the Company issued a press release announcing its financial results for the quarter ended July 30, 2016 (the "2Q 2016 Release").  The 2Q 2016 Release stated that net sales for the Company had decreased by 24.1% to $60.7 million during the quarter.  It also stated that the Company had posted a net loss of $2.0 million, or $0.04 per share, for the quarter.

117.     On news of the disappointing second quarter results, the price of Vince stock declined approximately 5%, or $3.20 per share, over two trading days to close at $58.01 per share on September 9, 2016 on abnormally high trading volume. An analyst described the results as "dreadful," as Vince had barely met the diminished expectations it had set for itself.

118.     Defendants, however, failed to disclose that the disappointing quarterly results were due in significant part to problems with Vince's migration to systems away from Kellwood.  In addition, Defendants' statements were intended to mitigate, and did in fact mitigate, fallout from Vince's second quarter results and to prevent the full truth of the Company's business disruptions and operational failures as a result of the Company's disastrous systems migration from becoming known to the investing public.  Indeed, Defendants failed to disclose the adverse facts detailed in ¶¶78-81, 115 and instead represented that Vince was "on track" with its strategic initiatives and in-line with expected financial performance.  As a result, the price of Vince stock remained artificially inflated.

119.     For example, the 2Q 2016 Release reaffirmed the Company's net sales and EPS guidance provided in the FY 2015 Release.  The 2Q 2016 Release quoted Defendant Hoffman as stating in pertinent part:

> Our second quarter results were ***largely in line with our expectations***.  As we transitioned our product to Fall, we flowed fewer styles into the wholesale channel as well as our own retail stores, which contributed to the reduction in sales.  Our Fall collection has just recently been set on the selling floor and we are very pleased with the presentation.  As we have said in the past, we look forward to the holiday season, at which time our new vision will be fully reflected in our assortment.  ***Overall, we***

*believe that we are on track to achieve our net sales and diluted EPS targets for fiscal 2016*.

120.     Also on September 8, 2016, Vince hosted an earnings call with investors and analysts to discuss the quarterly results, in which Defendant Hoffman and Defendant Stefko participated. During the call, Hoffman repeatedly represented that the Company was successfully transferring its systems away from Kellwood and that progress on the systems migration had been in-line with the Company's expectations, notwithstanding minor delays that were not "unexpected." Defendant Hoffman further stated that even the minor issues were "largely behind us now" and that the process would be completed by year end.  For example, Defendant Hoffman stated in his prepared remarks:

> *We completed the transition of our e-commerce site to Demandware in July*, and have continued to see strong performance in this business.  The site looks fantastic. *We now have added functionality which will further enhance our customer experience*.  We are incredibly pleased with the elevated look and feel on our website, as well as the way that it's translated to our social media outreach as we work to reconnect and re-engage customers with the Vince brand and recapture the DNA.
>
> I would note that the product changeover for fall was delayed a few weeks *by the migration to our distribution center, which was not entirely unexpected with a project of this nature.  It is largely behind us now. Importantly our infrastructure, e-commerce site and POS system in our stores are now all live*.  We are still working on upgrading the systems for our wholesale business and back-office functions, and expect these transitions to be substantially completed by year end.
>
> *          *          *
>
> Finally, we are making the necessary infrastructure, operational and strategic investments to support the business over the long term.  *As we look to the remainder of the year, we believe that we are well positioned to reach our sales and earnings goals*.

121.     Similarly, Defendant Hoffman stated during the Q&A portion of the call that Vince management was "***patting ourselves on the back a little bit***" because of its success in setting up the Company's e-commerce website. He continued in pertinent part:

> *We've morphed over to Demandware*.  Timed it with the new creative assets as we Brought in Tomoko, our new Brand Director.  And *the website just looks fantastic*.

- 45 -

So that's all we think, re-energizing and reinforcing the brand that we're moving forward with.

122.     In his prepared remarks, Defendant Stefko reaffirmed the Company's 2016 guidance and its expectation for improving sales trends for the remainder of the year.  He stated in pertinent part:

> Now turning to our outlook for FY16.  ***We continue to expect total sales for the year to be between $290 million and $305 million*** including revenues from the six new retail stores already opened this year and comparable sales growth inclusive of e-commerce sales in the flat to low single digit range. Total sales guidance continues to reflect a flat to positive mid-single-digit sales increase in the second half of the year.

123.     Defendant Hoffman also expressed his "confidence" that the Company's sales guidance would be met in response to an analyst question regarding "current trends" he was seeing in the business. Defendant Hoffman answered:

> We always knew that the back half of the year was when we needed to see and expected to see the direct-to-consumer improvement.  Last year we were tremendous reduction in inventory levels, which carried through the spring season.  So just now we're starting to build back up the inventories closer to last year levels.  And we'll see the inventory levels finally start to have an increase over last year as we get later into the quarter and back half of the year.  ***And as we've been out-trending our inventory levels all year, that gives us a lot of confidence that with this new product we'll be able to hit those numbers in the back half of the year***.

124.     Later in the call, in response to an analyst question, Defendant Hoffman claimed that the Company had instilled a "lot of discipline" in its inventory management, and that the issue was "really top of mind" for the Company's management.  He continued, "we've just done a much better job about making sure that we keep the inventories clean."  Defendant Hoffman stated that Vince had "***really cleaned up our own [direct-to-consumer] channel***.  So we're thrilled about that."  He also stated that he thought Vince had "***made all the right moves to better stock our own stores***."  He elaborated on those moves in pertinent part:

> We are reconstructing replenishment, which ate up a lot of SKUs. And so we've pulled that back.  And we'll see what categories and products earn their way to future replenishment.  ***But we have more depth so that we can stay in stock longer.***  We

- 46 -

also reduced the breadth of our size assortment. ***So that allows us to stay in stock on key sizes.***

125.    In response to an analyst question, Defendant Stefko also represented that Vince had made numerous positive investments in its supply chain and inventory management, specifically citing the Company's migration away from using Kellwood's distribution services. He stated in pertinent part:

> ***One, things we've been working on which we talked about, the transition of our warehouse to our independent third-party provider away from Calwood [sic]***. And then there's some factors of headcount that we've added. And then ***when we look at the back half of the year, we're looking at things, just from a delivery standpoint, being more efficient in our supply chain***, how quick we can get product from when it hits the port onto the shelf, investments in that. Some of looking at supply chain is causing us to look at some investments in leadership which we may make. And then also exit packaging, looking at how we deliver to the customer when you look at our direct-to-consumer channel.

126.    On September 8, 2016, Vince also filed its quarterly report on Form 10-Q with the SEC for the quarter ended July 30, 2016 (the "2Q 2016 10-Q"), which Defendant Hoffman and Defendant Stefko certified were accurate, not misleading and free from fraud. The 2Q 2016 10-Q contained the sales and earnings figures previously provided in the 2Q 2016 Release. In addition, the 2Q 2016 10-Q claimed that Vince had already successfully begun separating its assets and migrating its critical systems away from Kellwood, but failed to disclose any problems or issues that had arisen as a result of that migration, stating in pertinent part:

Shared Services Agreement

In connection with the consummation of the Company's IPO on November 27, 2013, Vince, LLC entered into a Shared Services Agreement with Kellwood (the "Shared Services Agreement"), pursuant to which Kellwood would provide support services in various areas, including, among other things, certain accounting functions, tax, e-commerce operations, distribution, logistics, information technology, accounts payable, credit and collections and payroll and benefits administration. ***Since the IPO, the Company has been working on transitioning certain functions performed by Kellwood under the Shared Services Agreement. Functions that have transitioned to the Company, including its outsource service providers, include certain accounting related functions, e-commerce customer service, distribution***

*and logistics, payroll and benefits administration and information technology support for systems that have been implemented.  Additionally, to date, the Company has completed the implementation of its own point-of-sale system, third party e-commerce platform, human resource recruitment system, distribution applications, and network infrastructure.  The Company is currently in the process of transitioning the remainder of the Kellwood systems and services, including tax, accounts payable, credit and collections, as well as its own enterprise resource planning ("ERP") and supporting systems and related IT support services*.  Until those systems are implemented, the Company will continue to utilize the Kellwood information technology infrastructure under the Shared Services Agreement.

*       *       *

Since the IPO and Restructuring Transactions, we have relied on certain administrative and operational support functions and systems of Kellwood to run our business pursuant to a Shared Services Agreement (the "Shared Services Agreement"), dated November 27, 2013, by and between Kellwood and us. *To date, we have completed the implementation of our own point-of-sale system, third party e-commerce platform, human resource recruitment system, distribution applications, and network infrastructure…In addition, we have transitioned certain support services, including e-commerce operations, distribution, logistics, accounting, payroll, benefits administration, and information technology support for our systems implemented to either internal or external resources.  We are currently in the process of transitioning the remainder of the Kellwood systems and services, including tax, accounts payable, credit and collections, as well as our own enterprise resource planning ("ERP") and supporting systems and related IT support services, and we expect to complete such transition by the end of fiscal 2016.  We have engaged third party service providers to assume tax, accounts payable, collections as well as information technology support functions from Kellwood and are in the process of integrating the service providers into our processes*.

*       *       *

The Shared Services Agreement governs the provisions of certain support services to us, including distribution, information technology and back office support by Kellwood, as described above. Kellwood will provide these services until we elect to terminate the provision thereof in accordance with the terms of the agreement.  The Shared Services Agreement will terminate automatically upon the termination of all services provided thereunder, unless earlier terminated by either party in connection with the other party's material breach upon 30 days prior notice to such defaulting party. After termination of the agreement, Kellwood will have no obligation to provide any services to us.... *As of July 30, 2016, we have terminated some of the services provided by Kellwood upon completion of the transition of such services to our own resources and have given notice to Kellwood of our intent to terminate the remaining services once the transition of those services is complete*.

- 48 -

127.     The 2Q 2016 10-Q also stated that Vince had already "**substantially completed** the process of migrating our U.S. distribution system from Kellwood to a new third party provider." The 2Q 2016 10-Q also stated that Vince's "ability to meet the needs of [its] wholesale partners and [its] own direct-to-consumer business depends on the proper operation of this distribution facility" and that the "migration of these services from Kellwood required [Vince] to implement new system integrations and requires Kellwood to assist with the migration."  Although the 2Q 2016 10-Q stated that "[p]roblems with our distribution system, including any disruption caused by the migration, **could** materially harm [Vince's] ability to meet customer expectations, manage inventory, complete sale transactions and achieve targeted operating efficiencies," it failed to disclose that significant challenges had already occurred as a result of the systems migration, rendering the conditional statements of potential harm in the 2Q 2016 10-Q themselves materially misleading.

128.     Similarly, the 2Q 2016 10-Q stated that Vince had already "**substantially completed** the transition" of "certain key services" from Kellwood "to our own systems or processes, and are in the process of transitioning the rest of the services to internal and external resources."  Although the 2Q 2016 10-Q stated that "**if**" Vince "cannot successfully implement the necessary new systems, processes and functions, or complete the transition of the remaining services from Kellwood" the Company's "business, financial condition, results of operations and cash flows **could** be materially harmed," it failed to disclose that significant challenges had already occurred as a result of the systems migration, rendering the conditional statements of potential harm in the 2Q 2016 10-Q themselves materially misleading.

129.     On December 8, 2016, Vince issued a press release announcing its financial results for the quarter ended October 29, 2016 (the "3Q 2016 Release").  The 3Q 2016 Release stated that net sales for the Company had decreased by 6.0% to $76 million during the quarter.  It also stated

that the Company had earned net income of $3.4 million, or $0.07 per diluted share, for the quarter. The 3Q 2016 Release lowered the Company's net sales guidance for 2016 to between $280 million and $290 million, and raised the top-end of its diluted EPS estimate to $0.00 to $0.07. The 3Q 2016 Release quoted Defendant Hoffman as stating in pertinent part:

> We were pleased with the initial favorable response to our fall collection which was developed under the leadership of our returning founders. The feedback from our wholesale partners was also highly encouraging, and even more importantly, Rea and the team are energized by how much we've learned from this delivery and are excited to move forward. ***Our third quarter sales results are reflective of continued challenges in the retail industry, in addition to the impact of warm weather, although we managed to meaningfully expand our gross margin rate as we focused on full-price selling.*** Despite the continuation of macro headwinds, ***we remain confident in our belief that we are taking the brand in the right direction*** with a fashion assortment that combines urban utility and modern effortless style. Looking ahead, while we are reducing our guidance, we continue to see significant long term growth opportunity as we gain market share within the wholesale channel and expand our direct to consumer presence both in our retail stores and online.

130.    Also on December 8, 2016, Vince hosted an earnings call with investors and analysts to discuss the quarterly results, in which Defendant Hoffman and Defendant Stefko participated.  In his prepared remarks, Defendant Hoffman stated that he was "pleased with progress we are making as we continue through a transitional phase at Vince."  He also stated that the lowered guidance was largely due to "macro" headwinds.  Although he stated that certain transition steps had "negatively impacted near-term results to a larger degree than we initially expected," Defendant Hoffman failed to disclose the severity of these issues and stated the Company was "where we need to be" to generate sales growth, stating in pertinent part:

> However, our results for the quarter reflect ongoing headwinds in the retail and macro environment, including continuing traffic challenges and warm weather. In addition, as you know we have taken several steps to transition the business, some of which negatively impacted near-term results to a larger degree than we initially expected, particularly in our retail business. ***We nonetheless believe these measures are right for the business long-term.***

*        *        *

- 50 -

We were also impacted by later product deliveries. As we mentioned on our last call, part of the delay was due to the transition to a new warehouse, as well as our ongoing systems migration. ***We continue to believe that these changes will become a vehicle to drive further growth and efficiency as we enter 2017.***

\*     \*     \*

***We are starting to see the momentum build behind our business***, although the clear pivot in results will take a little longer than we originally anticipated. We have an excellent team that is engaged and excited to continue moving forward as they gather insights to enhance our collections, and enable us to continue to make more prudent decisions about our brand. I think that ***we are where we need to be at this point***, and we will continue to make strides towards gaining market share within the wholesale channel, expanding our direct-to-consumer presence, growing international, and expanding the business over the long-term.

131.    Defendant Stefko, in his prepared remarks, likewise stated that the systems migration had simply been delayed, but did not reveal the serious impairments to Vince's business and operations that had already occurred as a result of problems stemming from these efforts.  To the contrary, he represented that the migration was in its "final phase" and would "drive future efficiency and support growth."  Defendant Stefko also stated that Vince was employing "more disciplined inventory management" and that "managing [its] business prudently." He stated in pertinent part:

Since Vince spun-off from Kellwood, we have continued to operate on all Kellwood IT platforms through a shared services agreement. As we previously discussed, we undertook an IT migration project to make us completely independent from Kellwood. Given the complexity of this project, as we have brought in new software platforms and hardware configurations that will manage every facet of the business, it has taken us longer to complete this transition than we initially projected.

As we speak, ***we are executing the final phase of this new platform***, and therefore expect that most of the costs associated with this migration will be behind us after this year. As Brendan mentioned, ***we believe this strategic investment will drive future efficiency and support growth.***

\*     \*     \*

Capital expenditures for the fiscal year are now projected to approximately $16.5 million. This increase in our capital projection is driven by increased costs ***we expect***

- 51 -

*to incur to finalize our IT migration efforts, the final phase of which is currently being executed.*

132.    That same day, Vince filed its quarterly report on Form 10-Q with the SEC for the quarter ended October 29, 2016 (the "3Q 2016 10-Q"), which Defendant Hoffman and Defendant Stefko signed and certified were accurate, not misleading and free from fraud.  The 3Q 2016 10-Q contained the sales and earnings figures previously provided in the 3Q 2016 Release.  In addition, the 3Q 2016 10-Q claimed that Vince had already successfully begun separating its assets and migrating its critical systems away from Kellwood, but failed to disclose any problems or issues that had arisen as a result of that migration, stating in pertinent part:

Shared Services Agreement

In connection with the consummation of the Company's IPO on November 27, 2013, Vince, LLC entered into a Shared Services Agreement with Kellwood (the "Shared Services Agreement"), pursuant to which Kellwood would provide support services in various areas, including, among other things, certain accounting functions, tax, e-commerce operations, distribution, logistics, information technology, accounts payable, credit and collections and payroll and benefits administration. ***Since the IPO, the Company has been working on transitioning certain functions performed by Kellwood under the Shared Services Agreement. Functions that have transitioned to the Company, including its outsource service providers, include certain accounting related functions, e-commerce customer service, distribution and logistics, payroll and benefits administration and information technology support for systems that have been implemented. Additionally, to date, the Company has completed the implementation of its own point-of-sale system, third party e-commerce platform, human resource recruitment system, distribution applications, and network infrastructure. The Company is currently in the process of transitioning the remainder of the Kellwood systems and services, including tax, accounts payable, credit and collections, as well as its own enterprise resource planning ("ERP") and supporting systems and related IT support services***. Until those systems are implemented, the Company will continue to utilize the Kellwood information technology infrastructure under the Shared Services Agreement.

\*          \*          \*

Since the IPO and Restructuring Transactions, we have relied on certain administrative and operational support functions and systems of Kellwood to run our business pursuant to a Shared Services Agreement (the "Shared Services Agreement"), dated November 27, 2013, by and between Kellwood and us. ***To date, we have completed the implementation of our own point-of-sale system, third party***

*e-commerce platform, human resource recruitment system, distribution applications, and network infrastructure… In addition, we have transitioned certain support services, including e-commerce operations, distribution, logistics, accounting, payroll, benefits administration, and information technology support for our systems implemented to either internal or external resources. We are currently in the process of transitioning the remainder of the Kellwood systems and services, including tax, accounts payable, credit and collections, as well as our own enterprise resource planning ("ERP") and supporting systems and related IT support services, and we expect to complete such transition by the end of fiscal 2016. We have engaged third party service providers to assume tax, accounts payable, collections as well as information technology support functions from Kellwood and are in the process of integrating the service providers into our processes.*

*       *       *

The Shared Services Agreement governs the provisions of certain support services to us, including distribution, information technology and back office support by Kellwood, as described above. Kellwood will provide these services until we elect to terminate the provision thereof in accordance with the terms of the agreement. The Shared Services Agreement will terminate automatically upon the termination of all services provided thereunder, unless earlier terminated by either party in connection with the other party's material breach upon 30 days prior notice to such defaulting party. After termination of the agreement, Kellwood will have no obligation to provide any services to us…. *We have terminated some of the services provided by Kellwood upon completion of the transition of such services to our own resources and have given notice to Kellwood of our intent to terminate the remaining services once the transition of those services is complete.*

133.    The 3Q 2016 10-Q also stated that Vince had already "*completed* the process of migrating our U.S. distribution system from Kellwood to a new third party provider."  In addition, the 3Q 2016 10-Q also stated that Vince's "ability to meet the needs of [its] wholesale partners and [its] own direct-to-consumer business depends on the proper operation of this distribution facility" and that the "migration of these services from Kellwood required [Vince] to implement new system integrations."  Although the 3Q 2016 10-Q stated that "[p]roblems with our distribution system, including any disruption caused by the migration, *could* materially harm [Vince's] ability to meet customer expectations, manage inventory, complete sale transactions and achieve targeted operating efficiencies," it failed to disclose that significant challenges had already occurred as a result of the

systems migration, rendering the conditional statements of potential harm in the 3Q 2016 10-Q themselves materially misleading.

134.    Further, the 3Q 2016 10-Q stated that Vince had already "***substantially completed*** the transition" of "certain key services" from Kellwood "to our own systems or processes, and are in the process of transitioning the rest of the services to internal and external resources."  Although the 3Q 2016 10-Q stated that "*if*" Vince "cannot successfully implement the necessary new systems, processes and functions, or complete the transition of the remaining services from Kellwood" the Company's "business, financial condition, results of operations and cash flows ***could*** be materially harmed," it failed to disclose that significant challenges had already occurred as a result of the systems migration, rendering the conditional statements of potential harm in the 3Q 2016 10-Q themselves materially misleading.

135.    The statements referenced above in ¶¶119-134 were materially false and/or misleading because they misrepresented and failed to disclose the adverse facts detailed in ¶¶78-81, 115 pertaining to the Company's business, operations and financial condition, which were known to Defendants or recklessly disregarded by them as detailed.

136.    Then, on January 9, 2017, Vince issued a press release updating its 2016 financial guidance (the "2016 Guidance Update").  The 2016 Guidance Update stated that Vince now expected its sales and EPS results to come in at or below the low end of its previously announced 2016 guidance "due to an anticipated shift in the timing of a larger than planned portion of the Spring collection shipments from late January to early February, as well as softer than expected sales performance during the holiday season."  Defendant Hoffman was quoted in the press release stating the following:

> Despite a solid Black Friday week and improved trends towards the end of December, sales for the holiday season were softer than we anticipated. That said, for

the holiday season, while direct-to-consumer segment sales results were near the low end of our guidance range, they were better than sell-through performance in the wholesale segment. Overall, we continue to gain valuable insights from our retail team and wholesale partners. We are also encouraged by the favorable response to our return to the style and quality that was the cornerstone of the Vince brand at its inception. We remain committed to driving market share gains within the wholesale channel, expanding our direct-to-consumer business and growing our international presence over the long-term.

137.    On the disclosure that Vince would miss or barely make its 2016 guidance, the price of Vince stock declined over 20%, or $7.76 per share, over two trading days to close at $31.52 per share on January 11, 2017, on abnormally high trading volume.

138.    However, Defendants failed to disclose that the downward guidance revisions were due to severe problems with Vince's migration to systems away from Kellwood.  In addition, Defendants' statements were intended to mitigate, and did in fact mitigate, fallout from Vince's second quarter results and to prevent the full truth of the Company's business disruptions and operational failures as a result of the Company's disastrous systems migration from becoming known to the investing public.  As a result, the price of Vince stock remained at artificially inflated levels as Defendants failed to disclose the facts detailed in ¶¶78-81, 115.

**Item 303**

139.    In addition, Defendants' failure to provide the true state of Vince's systems migration to investors during the Relevant Period violated SEC rules and regulations.  The SEC created specific rules governing the content of disclosures by public companies in their filings with the SEC. SEC Regulation S-K requires that every Form 10-Q and Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S K, 17 C.F.R. §229.303 ("Item 303").  The MD&A requirements are intended to provide material historical and prospective textual disclosures that

- 55 -

enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

140.    Specifically, Item 7 of Form 10-K and Item 2 of Form 10-Q require that a company's SEC filings furnish the information required under Item 303(a)(3) of Regulation S K.  Item 303(a)(3) of Regulation S-K requires that the MD&A section of a company's filings with the SEC, among other things:

(i)    Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected.  In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

(ii)    Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

141.    Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

142.    Defendants violated the affirmative disclosure duties imposed by Item 303(a)(3) of Regulation S-K, and thus Section 10(b) of the Exchange Act, by failing to disclose, in the

Company's Form 10-Ks and Form 10-Qs issued during the Relevant Period, the following material information that was known to management as described more fully in ¶¶78-81, 115: (i) Vince had undertaken efforts to migrate its critical infrastructure and support systems without necessary safeguards, redundancies, plans and qualified personnel in place; (ii) changes in Vince's critical infrastructure and support systems had caused severe disruptions to Vince's business, operations and ability to achieve successful and predictable financial results; and (iii) Vince suffered from numerous material weaknesses in its internal controls over financial reporting and related to its systems migration efforts.

143.     The foregoing concealed facts were required to be disclosed because they were, among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations[.]"

**Item 503**

144.     Defendants also violated their affirmative disclosure duties imposed by Item 503(c) of Regulation S-K, 17 C.F.R. §229.503(c), which governs disclosure of risk factors and requires an issuer to "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the [securities] speculative or risky" ("Item 503"). Specifically, Item 503(c) requires the issuer to "[e]xplain how the risk affects the issuer or the securities" and to "[s]et forth each risk factor under a subcaption that adequately describes the risk." Additionally, the SEC further instructs issuers, in Item 1A to Part I of the General Instructions governing the preparation of an issuer's

annual report on Form 10-K, to "[s]et forth, under the caption 'Risk Factors,' where appropriate, the risk factors described in Item 503(c) of Regulation S K," codified at 17 C.F.R. §229.503(c).  Item 1A to Part II of the General Instructions governing the preparation of an issuer's quarterly report on Form 10-Q similarly requires the issuer to "[s]et forth any material changes from risk factors as previously disclosed in the registrant's Form 10 K (§249.310) in response to Item 1A. to Part [I] of Form 10-K."

145.    Defendants violated the affirmative disclosure duties imposed by Item 503 of Regulation S-K, and thus Section 10(b) of the Exchange Act, by failing to disclose that, as described more fully in ¶¶78-81, 115: (i) Vince had undertaken efforts to migrate its critical infrastructure and support systems without necessary safeguards, redundancies, plans and qualified personnel in place; (ii) changes in Vince's critical infrastructure and support systems had caused severe disruptions to Vince's business, operations and ability to achieve successful and predictable financial results; and (iii) Vince suffered from numerous material weaknesses in its internal controls over financial reporting and related to its systems migration efforts.

146.    The foregoing concealed facts were "significant factors" that made Vince securities "speculative or risky," and therefore, were required to be disclosed in the Company's SEC filings, but were not.

**Subsequent Events During the Relevant Period**

147.    On February 13, 2017, Vince announced that it was ending the previously-announced consulting agreements with its Company founders well before the two-year expiry of their contracts.

148.    On April 14, 2017, Vince issued a press release announcing that it would be unable to timely file its annual report for the year ended January 28, 2017.  In the release, the Company revealed that the delay was "necessary due to unanticipated delays in compiling financial reports and other data that are necessary in preparing and completing the financial statements."  The release

stated that the delays were "related to the transition from Kellwood, the Company's former parent company, and the integration of the Company's new ERP System with its internal business processes and third-party systems, as well as additional procedures and processes that the Company is undertaking to ensure that its financial statements are fairly and accurately presented." Finally, the release revealed that the Kellwood transition and implementation had likely caused one or more material weaknesses in internal controls, that the Company believed it would need to take material asset impairment charges, and that the Company had run into severe liquidity challenges that threatened its ability to continue to operate as a going concern.

149. On this news, the price of Vince stock declined approximately 19%, or $2.29 per share, to close at $9.59 per share on April 17, 2017, the next trading day, on abnormally high trading volume. However, because Defendants failed to disclose the full truth about the nature, extent and severity of the problems from the Company's systems migration and the impact of these problems on Vince's financial results, business and prospects, the price of Vince stock remained at inflated levels.

150. Two weeks later, on April 28, 2017, the Company issued a press release announcing its fourth quarter and year ended January 28, 2017 financial results (the "FY 2016 Release"). The FY 2016 Release revealed that Vince's sales had declined 21.9% to $63.9 million during the quarter and declined 11.3% to $268.2 million for the year. The net annual sales results were thus $11.8 million below the low-end of the Company's previous announced 2016 guidance. The FY 2016 Release also stated that Vince had posted a staggering net loss of *$162.1 million*, or *$3.28 per share*, for the quarter, partly as a result of a massive non-cash long-lived asset impairment charge. For the full year, Company had suffered a *loss of $3.50 per share*, compared to the Company's prior EPS guidance of $0.00 to $0.08. The FY 2016 Release blamed the abysmal performance on problems related to the transfer of Vince's systems away from Kellwood, which Vince belatedly

acknowledged had led to delayed shipments, off-price shipments and lower than expected performance. In addition, the FY 2016 disclosed that there was substantial doubt about Vince's ability to operate as a going concern.

151.     That same day, Vince confirmed that it had identified material weaknesses related to its risk assessment controls and the design and maintenance of its critical information systems controls as a result of the Company's botched systems migration. Specifically, in the Company's Form 10-K filing for the year ended January 28, 2017, it acknowledged, "[W]e did not maintain appropriate corporate governance and oversight, change management and system implementation controls intended to address the risks associated with the implementation of our ERP and payroll systems and to timely identify and appropriately mitigate such risk prior to transitioning to the new systems." The filing continued, "the Company did not (i) maintain program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records were tested, approved and implemented appropriately; and (ii) maintain adequate user access controls to ensure appropriate segregation of duties and to adequately restrict access to financial applications and data."

152.     This news once again decimated the price of Vince stock. Over the course of three trading days, the price of Vince stock plummeted *72%*, or $8.86 per share, to close at $3.47 per share on May 2, 2017, or only $0.38 per share on an unadjusted basis.

153.     On May 19, 2017, Vince issued a press release announcing that it had received a written notification from the NYSE two days before notifying the Company that it did not satisfy exchange requirements that it maintain a 30-day average closing stock price above $1 per share and a market capitalization above $50 million. By comparison, in the months following the IPO, Vince

boasted a market capitalization of more than $1 billion.  The following chart illustrates the dramatic

decline in the price of Vince stock as the truth was revealed over time:



154.    While the Sun Capital Defendants have earned hundreds of millions of dollars from

Vince and the sale of Vince securities to the public, Plaintiffs lost tens of millions of dollars as a

direct and proximate result of Defendants' fraudulent conduct and have sustained damages under the

federal securities laws.

**ADDITIONAL ALLEGATIONS OF SCIENTER**

155.    In addition to the facts alleged herein and throughout, the following facts provide

additional indicia of scienter: (i) the misrepresentations alleged herein involved the most important

aspects of Vince's business and operations; (ii) the Individual Defendants were personally involved

in and oversaw the migration of Vince's systems away from Kellwood; (iii) the Individual Defendants admitted that they had personal knowledge of the systems migration and the systems being migrated; (iv) Defendants had the motive and the opportunity to commit fraud; and (v) the extraordinary number of resignations at the highest levels of Vince throughout the relevant time period further indicates severe behind-the-scenes turmoil in the Company's business and operations.

**The Core Importance of Vince's Support Systems**

156.    The support systems that Kellwood provided Vince pursuant to the Shared Services Agreement supported and integrated the most basic and central aspects of Vince's business and operations.  Through the Shared Services Agreement, Kellwood provided Vince with, among other things, certain accounting functions, tax, e-commerce operations, distribution, warehouse management, logistics, IT, accounts payable, credit and collections and payroll and benefits administration.

157.    Vince, a retailer, relied on these services to timely, accurately and effectively process sales information, fill customer orders, replenish merchandise, manage inventory and record and report its financial information, among many other central tasks.  These services were necessary to integrate information across Vince's operations, and many of the support systems were complex and highly customized to Vince and/or proprietary. Defendants themselves repeatedly characterized these services as "key" to the Company's business, operations and prospects in public filings and recognized that any disruption or failure to successfully migrate the services away from Kellwood would have a material and negative impact on Vince's financial performance.  In fact, when Vince failed to smoothly and successfully migrate its systems away from Kellwood as alleged herein, the resulting disruptions negatively impacted almost every aspect of Vince's core operations and business functions – such as the Company's sales, earnings, merchandising, inventory and financial

reporting – aspects that were known to, overseen by and monitored on a regular basis by the Individual Defendants.

**The Individual Defendants' Personal Involvement**

158.    In light of the critical importance of the support systems provided by Kellwood to Vince under the Shared Services Agreement, the Individual Defendants, given their high-level positions as officers and/or directors of the Company, personally oversaw the systems migration efforts and were keenly aware of the problems, setbacks and roadblocks related to these efforts in real time and as they unfolded.  For example, Defendant Granoff and Defendant Klinger were involved in and oversaw the initial systems migration efforts following the IPO.  After assuming their positions, Defendant Hoffman and Defendant Stefko were likewise involved in and oversaw the decision to hire additional consultants after various roadblocks and challenges arose in the work performed by the earlier-hired consultants.  Each of these Defendants also tracked and received periodic updates on the work being performed by the various consultants and in-house technicians as to their progress – or lack thereof – in implementing the systems migration in regular conference calls, meetings, emails and progress reports.

159.    Representatives from Sun Capital likewise visited Vince's corporate offices and received periodic updates from Vince and their many representatives in place at the Company, as well as by virtue of their ownership of Kellwood, regarding the progress of the work being performed by these third party consultants and, on occasion, directly influenced the Company's decisions with respect to the migration efforts.

160.    Moreover, sales and inventory information was recorded on a daily or almost daily basis and reported to the Individual Defendants and others in Vince's corporate offices.  These reports and other information, which would have been reviewed by the Individual Defendants, reflected adverse sales and earnings trends as a result of problems with the systems migration.

**The Individual Defendants Have Publicly Stated**
**They Had Personal Knowledge of the Systems Migration Efforts**

161.    The Individual Defendants, as Vince's most senior executive officers and/or directors, held themselves out to investors as the ones most knowledgeable about the Company's systems migration efforts.  In almost every conference call from March 2015 onward, the Individual Defendants provided updates on the systems migration efforts and professed to have up-to-date and personal knowledge about how the systems migration was progressing. At various times, the Individual Defendants represented to investors that the efforts were "on track," that they were "continu[ing] to make progress," and that they were "incredibly pleased" with the results based on their first-hand knowledge, among similar comments as detailed herein.

162.    The Individual Defendants also repeatedly stated that the systems migration, or aspects of Vince's business that relied on these systems, was at the forefront of their minds.  For example, during a September 3, 2014 conference call, Defendant Klinger stated that inventory management, which relied on services provided under the Shared Services Agreement, was "***clearly a top priority*** for this management team.  ***It is monitored in detail on a very regular basis.***" Similarly, in a March 19, 2015 conference call, Defendant Klinger stated that Vince's management was carrying out the migration efforts "***very thoughtfully and prudently***" to ensure a smooth transition.  Likewise, during a September 3, 2015 conference call, Defendant Brody stated that "***our top priority*** is to focus on improving our inventory management." On September 8, 2016, Defendant Hoffman stated on another call with investors that Vince's "inventory management is really ***top of mind***."  Indeed, in numerous conference calls throughout the Relevant Period, the Individual Defendants repeatedly stated that the systems migration was among the most important strategic initiatives at the Company that they were overseeing and that these efforts were critical the Company's success and future growth and thus a near-constant focus of their attention.

**Defendants' Motive and Opportunity to Commit Fraud**

163.    Defendants also had the motive and opportunity to commit fraud.  As detailed herein, the Sun Capital Defendants owned and controlled Vince throughout the Relevant Period.  Several of the Individuals Defendants, meanwhile, controlled and/or had substantial ownership interests in the Sun Capital Defendants and their affiliates, including Defendant Leder, Sun Capital's Co-CEO.

164.    Among other indicia of control, the Sun Capital Defendants owned a majority of the voting shares of the Company, appointed a majority of the Company's directors, and hand-selected the Individual Defendants to serve as the Company's top management and to oversee the Company's business and affairs.  Indeed, at times, the Sun Capital Defendants simply placed Sun Capital employees in the most senior positions of power and influence at the Company, including by installing the following Sun Capital employees: Defendant Brody as Vince's Interim CEO and CFO, Defendant Stefko as Vince's CFO, and Defendant Leder as Vince's Chairman. The Sun Capital Defendants also demonstrated that they could richly reward Company insiders such as the Individual Defendants for being subservient to their interests, as they provided Defendant Granoff a $6 million "debt recovery bonus" in connection with the IPO for helping orchestrate payments to the Sun Capital Defendants from IPO proceeds, among other activities.  They also demonstrated that they had power to fire and hire the Individual Officer Defendants, as they had Defendant Granoff and Defendant Klinger replaced, at least initially, with hand-selected Sun Capital employees. Furthermore, in SEC filings, Vince acknowledged not only that it was majority owned and controlled by the Sun Capital Defendants, but also that the interests of the Sun Capital Defendants may in some circumstances "conflict with [Vince's] interests and the interests of [Vince's] other stockholders."

165.    After receiving hundreds of millions of dollars from Vince and the Company's shareholders in the IPO and in the Secondary Offering, the Sun Capital Defendants stood to receive

approximately $172 million more in payments from Vince pursuant to the Tax Receivable Agreement. However, in order to receive these payments, Vince needed to generate sufficient capital in order to make the payments while continuing to operate as a going concern so that it could make more such payments in the future. By September 2015, after Vince had begun to experience operational difficulties and adverse sales and earnings trends, it became clear to Defendants that Vince would not be able to generate sufficient capital through its operational revenue streams to make good on payments due the Sun Capital Defendants under the Tax Receivable Agreement. As a result, in Vince's 2Q 2015 10-Q, the Company disclosed that it was deferring $22.8 million in payments to Sun Capital under the Tax Receivable Agreement "as a result of lower than expected cash from operations due to weaker than projected performance."

166.    Rather than disclose the true state of Vince's business and the severe impairment to the Company's business, operations and prospects as a result of problems from the systems migration, Defendants orchestrated the First Rights Offering to enable Vince to raise tens of millions of dollars from the Company's existing shareholders that could be used to repay amounts due the Sun Capital Defendants under the Tax Receivable Agreement. In furtherance of this scheme, in December 2015, Vince announced that it had received a "commitment" from Sun Capital to provide $65 million in cash proceeds in the event the Company conducted a share rights offering. However, this "commitment" was for the purpose of propping up Vince's share price, rather than ultimately committing Sun Capital to provide financing to Vince, as Sun Capital knew that the First Rights Offering would be conducted at a steep discount to Vince's then-current share price, essentially ensuring near full subscription by Vince's outside shareholders and thereby minimizing the amount of capital that Sun Capital would actually have to commit to the Company.

167.     On March 16, 2016, Vince announced the price of the First Rights Offering at $5.50 per share (unadjusted), which represented an approximately 29% discount to the then-current trading price of Vince shares.  On April 22, 2016, Vince announced that existing shareholders had purchased 11.6 million shares of its common stock, allowing Vince to raise approximately $63.9 million from these investors.    By contrast, Defendant Sun Cardinal and Defendant SCSF Cardinal only contributed $1.1 million to Vince through the First Rights Offering, or *less than 2%* of the actual proceeds.  As planned, Vince then used $22.3 million of the proceeds from the First Rights Offering to make payments to the Sun Capital Defendants due under the Tax Receivable Agreement.  In other words, the amount of payments received by the Sun Capital Defendants was more than 1,900% greater than the amount of contribution paid to Vince by the Sun Capital Defendants in the First Rights Offering.

168.     The suspect timing of the First Rights Offering is no coincidence, but rather further indicia of Defendants' fraud and culpable state of mind.  The First Rights Offering was carried out during a temporary peak in the price of Vince shares and in the months following Vince's announcement that it was "fully migrat[ing]" its support systems away from Kellwood, a migration that would later be revealed to be a complete disaster.  The First Rights Offering also came shortly before a collapse in the price of Vince shares, with sharp declines beginning in September 2016, only five months after the First Rights Offering was completed.  Within approximately one year of the First Rights Offering, the Company had revealed the grave extent of the systems migration problems, multiple material weaknesses impacting its critical internal controls, and concerns about the Company's ability to operate as a going concern.  The following chart illustrates this highly suspect sequence of events, which provides additional compelling indicia of scienter:



**The Mass Exodus of Key Personnel**

169.    Throughout the relevant time period, Vince experienced a mass exodus of its most senior and important employees, including several of the Individual Defendants themselves.  The following is a list of known defections of key employees at the Company since Vince's IPO: (i) Christopher T. Metz (Chairman); (ii) Jason Neimark (director); (iii) T. Scott King (director); (iv) Defendant Klinger (CFO); (v) Defendant Granoff (CEO and formerly Chairman); (vi) Livia Lee (Senior Vice President Merchandising); (vii)  Defendant Brody (director, former Interim CEO and CFO); (viii) Katayone Adeli (Artistic Director); (ix) Rea Laccone (founder, consultant); (x) Christopher LaPolice (founder, consultant); and (xi) Steven M. Liff (director).  Others who have been reported to have left the Company during or soon after the Relevant Period include the

Company's General Counsel, the Company's President and Chief Creative Officer, and the Company's Senior Vice President of Retail Operations.  This outflux of key personnel further demonstrates the extent of the behind-the-scenes turmoil and chaos at the Company and provides additional indicia that Defendants knew of severe behind-the-scenes disruptions to the Company's business and operations during the Relevant Period.

## LOSS CAUSATION AND ECONOMIC LOSS

170.    As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Vince common stock and operated as a fraud or deceit on purchasers of Vince common stock.  As detailed above, when the truth about Vince's misconduct was revealed, the value of the Company's stock declined precipitously as the prior artificial inflation no longer propped up the stock's prices.  The declines in Vince's share price were the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the share price declines negate any inference that the loss suffered by Plaintiffs were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiffs, was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of the Company's stock and the subsequent significant decline in the value of the Company's stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

171.    At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiffs. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Vince's business, operations and financial condition, as alleged herein.  Before and during the time of Plaintiffs' purchases of Vince securities, Defendants issued materially false

and misleading statements and omitted material facts necessary to make their statements not false or misleading, causing the prices of Vince's stock to be artificially inflated.  Plaintiffs purchased Vince stock at those artificially inflated prices, causing them to suffer damages as complained of herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

172.    At all relevant times, the market for Vince common stock was an efficient market for the following reasons, among others:

(a)    Vince stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    according to the Company's Form 10-K for its fiscal 2016, filed on April 28, 2017, the Company had over 49 million common shares outstanding as of March 31, 2017, demonstrating a very active and broad market for Vince common stock;

(c)    as a regulated issuer, Vince filed periodic public reports with the SEC;

(d)    Vince regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(e)    unexpected material news about Vince was rapidly reflected in and incorporated into the Company's stock price.

173.    As a result of the foregoing, the market for Vince common stock promptly digested current information regarding Vince from publicly available sources and reflected such information in Vince stock price.  Under these circumstances, a presumption of reliance applies to Plaintiffs' purchases of Vince stock.

174.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiffs' claims

are based, in significant part, on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding their business and operations, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

175.    Defendants' false or misleading statements alleged to be actionable herein were not forward-looking statements ("FLS"), or were not identified as such by Defendants, but rather statements of historical and present fact, and thus did not fall within any "Safe Harbor."

176.    Defendants' verbal "Safe Harbor" warnings accompanying any of their oral FLS failed to provide meaningful cautionary statements regarding the specific facts and circumstances facing the Company, and thus were ineffective to shield those statements from liability.

177.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Vince who knew that the FLS was false. Further, none of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against Vince and the Individual Defendants

178.    Plaintiffs incorporate the foregoing paragraphs by reference.

- 71 -

179.    Vince and the Individual Defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

180.    These Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)      Employed devices schemes and artifices to defraud;

(b)      Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with their purchases of Vince securities.

181.    Plaintiffs have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Vince securities.  Plaintiffs would not have purchased Vince securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

182.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Vince securities.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants and the Sun Capital Defendants

183.    Plaintiffs incorporate the foregoing paragraphs by reference.

184.    The Individual Defendants and the Sun Capital Defendants acted as controlling persons of Vince within the meaning of §20(a) of the Exchange.

185.    By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with, or had, unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

186.    Further, and as detailed herein, the Sun Capital Defendants controlled Vince and the Individual Defendants by virtue of their majority share ownership, power to appoint directors, agreements with the Company and historical and professional relationships with Vince and the Individual Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Awarding Plaintiffs damages at an amount to be determined at trial and interest thereon;

B.    Awarding Plaintiffs' reasonable costs, including attorneys' fees; and

C.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

- 73 -

DATED:  September 7, 2018

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN


*/s/ Samuel H. Rudman*
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
bcochran@rgrdlaw.com

LEEDS BROWN LAW, P.C.
JEFFREY K. BROWN
One Old Country Road, Suite 347
Carle Place, NY  11514
Telephone:  516/873-9550
516/747-5024 (fax)
jbrown@leedsbrownlaw.com

*Attorneys for Plaintiffs*