UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x

RICHARD ZECHER, ROBERT YADEGAR,  :
ZECH CAPITAL LLC, Y-GAR CAPITAL  :
LLC, RICHARD N. ZECHER 2010 FAMILY  :
TRUST, RICHARD N. ZECHER 2010  :
FAMILY TRUST FOR THE BENEFIT OF  :
EVAN GREGORY ZECHER and RICHARD  :
N. ZECHER 2010 FAMILY TRUST FOR  :
THE BENEFIT OF RACHEL JOY ZECHER,  :
:
                    Plaintiffs,  :
:
    vs.  :
:
VINCE HOLDING CORP., JILL GRANOFF,  :
LISA KLINGER, MARK BRODY,  :
BRENDAN HOFFMAN, DAVID STEFKO,  :
MARC J. LEDER, SUN CAPITAL  :
PARTNERS, INC., SUN CARDINAL, LLC,  :
SCSF CARDINAL, LLC and SUN CAPITAL  :
PARTNERS MANAGEMENT V, LLC,  :
:
                    Defendants.  :

———————————————————— x

Civil Action No. 2:18-cv-05072 (JFB) (AYS)


AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS


DEMAND FOR JURY TRIAL

**TABLE OF CONTENTS**

**Page**

SUMMARY OF THE ACTION ............................................................................... 1

JURISDICTION AND VENUE ............................................................................... 5

BASIS OF ALLEGATIONS .................................................................................... 6

PARTIES ................................................................................................................. 6

    Plaintiffs ............................................................................................................ 6

    Vince Defendants .............................................................................................. 8

    Sun Capital Defendants .................................................................................. 10

SUBSTANTIVE ALLEGATIONS ........................................................................ 11

    The Company and Its Business ....................................................................... 11

    Background of the Emergence of Cloud-Based ERP Platforms ...................... 12

        Properly Functioning ERP Systems Are Important to Retail Operations .............. 12

        The Role of Middleware in Traditional ERP Systems .......................... 12

    Microsoft Dynamics AX-7: A Cloud-Based ERP Platform that Eliminated the Need for Integration Middleware ................................................................... 13

    The Importance of Network Redundancies During a Transition ..................... 16

    Vince Used Kellwood's ERP Infrastructure While It Developed, Tested, and Implemented Its Own ERP Platform ............................................................... 17

    Vince Implements an ERP System on Beta AX-7 and Experiences Widespread Systems Failures ............................................................................................. 18

    Company Management Knew About, or Recklessly Disregarded, the Data Integration Problems ....................................................................................... 23

DEFENDANTS' FALSE AND MISLEADING STATEMENTS  AND OMISSIONS DURING THE RELEVANT PERIOD ..................................................................... 27

    Fiscal Year 2014 ............................................................................................ 27

        4Q2014 .................................................................................................. 27

    Fiscal Year 2015 ............................................................................................ 33

**Page**

1Q15................................................................................................33

2Q15................................................................................................36

3Q15................................................................................................37

4Q2015.............................................................................................41

Fiscal Year 2016.....................................................................................48

1Q16................................................................................................48

2Q16................................................................................................51

3Q16................................................................................................57

VINCE DISCLOSES PROBLEMS  WITH THE INTEGRATION .............................................64

DEFENDANTS FAILED TO DISCLOSE  KNOWN MATERIAL TRENDS OR
UNCERTAINTIES ........................................................................................66

THE RISK DISCLOSURES IN VINCE'S  PUBLIC DISCLOSURES WERE
INADEQUATE ............................................................................................68

THE SUN CAPITAL DEFENDANTS CONTROLLED VINCE DURING THE
RELEVANT PERIOD AND BENEFITTED FROM THE FRAUD .............................................69

ADDITIONAL SCIENTER ALLEGATIONS..................................................................72

The Core Importance of Vince's Support Systems...........................................72

Vince's CFO and Other Senior Vince Management Had Actual Knowledge that
the New ERP Platform Was Implemented Using Beta Software, and that the
Transition Issues, and Business and Financial Problems, Were Caused by
Integration Failures ..........................................................................73

Defendants' Motive and Opportunity to Commit Fraud.......................................75

LOSS CAUSATION..........................................................................................78

APPLICABILITY OF THE PRESUMPTION OF RELIANCE:  FRAUD ON THE
MARKET..................................................................................................80

NO SAFE HARBOR .......................................................................................81

**Page**

COUNT I .................................................................................................................82

    For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against Vince and
    the Individual Defendants ...................................................................................82

COUNT II ...............................................................................................................83

    For Violation of §20(a) of the Exchange Act Against the Individual Defendants
    and the Sun Capital Defendants ..........................................................................83

PRAYER FOR RELIEF ..........................................................................................84

JURY DEMAND .....................................................................................................84

Plaintiffs Richard Zecher, Robert Yadegar, Zech Capital LLC, Y-Gar Capital LLC, Richard N. Zecher 2010 Family Trust, Richard N. Zecher 2010 Family Trust for the Benefit of Evan Gregory Zecher, and Richard N. Zecher 2010 Family Trust for the Benefit of Rachel Joy Zecher ("Plaintiffs"), by their undersigned attorneys in this Amended Complaint for Violations of the Federal Securities Laws (the "Complaint"), allege the following upon knowledge as to their own acts, and upon the investigation conducted by Plaintiffs' counsel as detailed below.

## SUMMARY OF THE ACTION

1.      Plaintiffs bring this federal securities action under the Securities Exchange Act of 1934 (the "Exchange Act") against Vince Holding Corp. ("Vince") and certain of its former and current officers, directors, and controlling shareholders to recover damages for losses Plaintiffs have suffered in connection with their acquisition of Vince common stock between March 19, 2015 and May 19, 2017, inclusive (the "Relevant Period").  Plaintiffs purchased Vince common stock at artificially inflated prices during the Relevant Period and suffered damages as a result of the violations of the securities laws alleged herein.

2.      Defendant Vince is a luxury clothing brand company based in New York City. The Company markets itself as "a prominent, high-growth contemporary apparel brand known for its modern, effortless style and everyday luxury essentials."

3.      Defendant Vince is majority owned and has been controlled by private equity firm Sun Capital Partners, Inc. ("Sun Capital") and its affiliates at all times relevant herein.  Sun Capital formed Vince by spinning off assets from the Kellwood Company (together with all parents, subsidiaries and successors, "Kellwood"), which was wholly-owned by Sun Capital.  In November 2013, Sun Capital took Vince public in an initial public offering (the "IPO"), selling ten million shares at $20 per share and generating gross proceeds of $200 million.

4.      Prior to the IPO, Vince had operated as a business unit of Kellwood, and relied on Kellwood's administrative and operational support systems to operate its business.  Specifically, Vince's entire retail operation relied on Kellwood's enterprise resource planning ("ERP") infrastructure, which consisted of a fully integrated retail point-of-sale ("POS") network, warehousing and distribution systems, inventory management applications, and other critical operational support systems.

5.      After the IPO, Vince's retail operations continued to utilize Kellwood's ERP system pursuant to a Shared Services Agreement dated November 27, 2013 (the "Shared Services Agreement"), but expressed the Company's intention to separate itself from Kellwood and utilize its own systems.  To that end, the Shared Services Agreement allowed Vince to continue its operations uninterrupted until it developed, tested, and implemented its own ERP infrastructure that could reliably coordinate all aspects of its operations.  Because Vince's entire retail segment depended upon a reliable ERP infrastructure, the Shared Services Agreement, which ensured Vince's continued access to a dependable ERP platform, was critical to Vince's success.

6.      Vince reported that it began implementing its new ERP system in March 2015. Unbeknownst to investors, however, Vince had chosen to develop its new ERP system using a revolutionary new ERP platform called Microsoft Dynamics AX-7 that had no track record and had not been relied upon by other retail businesses.  The Dynamics AX-7 platform eschewed the traditional use of customized software to facilitate the transmission of data between separate business operations, relying instead on a network of cloud-based servers to perform this functionality.

7.     Moreover, unbeknownst to investors, Vince began implementing its new ERP platform based on an unfinished, beta-version of the AX-7 software.  The beta software, which had been released for testing and development purposes only, was still riddled with bugs and glitches.  As a result, its core feature – the seamless transmission of data across Vince's business – was subject to interruptions and failures, as would be expected of a beta version of a software product.

8.     Without a reliable data integration system, the transition away from the Kellwood system to the new, cloud-based ERP system, was a disaster from the start characterized by disorganization, dysfunction and, ultimately, severe disruptions to Vince's business and operations.  For example, issues with the new systems and software impeded the ability of stores to timely process credit card transactions.  Delivery delays caused seasonal merchandise to arrive too late, and major inventory systems failed.  Cash registers broke down and customer transactional data was lost, corrupted or categorized incorrectly.  Shoppers walked out on transactions that failed to timely process, once-loyal customers stopped returning, and new ones failed to take their place.  Vince's sales plummeted as the quality of its customers' experiences with the Company deteriorated.

9.     Even though Vince implemented an untested system, relied on the beta version of the platform, and suffered severe technical and business disruptions, Defendants made positive statements about the transition to the new system and failed to disclose the problems to investors.

10.     As alleged in more detail below, Vince was controlled by Sun Capital and the members of the Company's board of directors, many of whom were appointed by Sun Capital. Sun Capital affiliates entered into a tax receivable agreement with Vince that required the Company to pay to these affiliates an amount equal to 85% of certain tax benefits to which the

Company would otherwise be entitled, essentially shifting these tax benefits to Sun Capital (the "Tax Receivable Agreement").  As a result of the foregoing, Sun Capital was highly incentivized to make it appear that Vince was successful and to minimize or conceal any operational difficulties at the Company so that Vince could raise money from investors, the proceeds of which could be used to make the payments that Vince owed to Sun Capital and its affiliates. Members of Vince's board of directors (the "Board"), as well as Sun Capital, reaped substantial financial benefits as a result of the fraud alleged herein.

11.     Eventually, in a series of startling public disclosures, Vince belatedly acknowledged severe complications with the transition after a number of sales and earnings shortfalls.  On April 14, 2017, Vince issued a press release announcing that it would be unable to timely file its annual financial report for the fiscal year ended January 28, 2017 due to delays "related to the transition from Kellwood."  In addition, the Company disclosed that its use of the new ERP platform had led to one or more material weaknesses in its internal controls over financial reporting and systems infrastructure.  The impairment to Vince's business as a result of these challenges was so great that the Company warned investors that its very ability to operate was in doubt.

12.     Following this news, the price of Vince stock plummeted more than 19%, or $2.29 per share, in a single trading day to close at $9.59 per share on April 17, 2017.

13.     On April 28, 2017, the Company further shocked investors when it finally issued its unaudited results for the fourth quarter and fiscal year ended January 28, 2017.  The Company disclosed that net sales had fallen 21.9% to $63.9 million during the fourth quarter.  In addition, Vince posted a massive net loss of $162.1 million, which included $55.1 million in asset impairment charges.  This compared to net income of $1.8 million for the fourth quarter of 2015.

14.     In the press release, Hoffman blamed the abysmal performance "primarily" on "challenges related to our systems conversion."  The press release also confirmed that there was a substantial doubt about the Company's ability to operate as a going concern and that multiple material weaknesses plagued the Company's financial, risk, and systems controls as a result of problems from the transition.

15.     These disclosures further decimated the price of Vince stock.  Over three trading days, the price of Company shares plummeted about 72%, or $8.86 per share, to close at $3.47 per share on May 2, 2017.

16.     On May 19, 2017, Vince issued a press release announcing that it had received a written notice from the New York Stock Exchange ("NYSE") informing the Company that it was in violation of exchange listing requirements.  While the Company had once boasted more than $1 billion in market capitalization in the months following the IPO, its market capitalization had shrunk to approximately $47.2 million as of May 15, 2017.

17.     Despite the failure of Vince and the collapse of its share price, Sun Capital and its affiliates have received hundreds of millions of dollars from the Company and its investors.  Meanwhile, Vince's public investors were left holding the bag as the Company teetered on the edge of bankruptcy, and Plaintiffs have lost tens of millions of dollars on their Vince investments as a result of Defendants' fraud.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the Securities and Exchange Commission ("SEC").

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

20.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District and Plaintiffs reside in this District.

21.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## BASIS OF ALLEGATIONS

22.     The allegations herein are based upon the investigation conducted by and under the supervision of Plaintiffs' counsel, which included interviewing former Vince employees and reviewing and analyzing information from numerous public and proprietary sources (such as LexisNexis, Dow Jones, and Bloomberg, Inc.), including, *inter alia*, SEC filings, other regulatory filings and reports, publicly available annual reports, press releases, published interviews, news articles, and other media reports, reports of securities analysts and investor advisory services, and public data related in order to obtain the information necessary to plead Plaintiffs' claims with particularity where necessary.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## PARTIES

**Plaintiffs**

23.     Plaintiff Richard Zecher ("Zecher"), together with entities and accounts that he owns, controls and/or for which he has received assignment to prosecute these claims, purchased

tens of millions of dollars' worth of Vince common stock during the Relevant Period at artificially inflated prices and has been damaged thereby.

24.     Plaintiff Robert Yadegar ("Yadegar"), together with entities and accounts that he owns and controls, purchased tens of millions of dollars' worth of Vince common stock at artificially inflated prices during the Relevant Period and has been damaged thereby.

25.     Plaintiff Zech Capital LLC ("Zech Capital") is an investment firm owned, operated, and controlled by Plaintiff Zecher.  Plaintiff Zech Capital purchased over ten million dollars' worth of Vince common stock during the Relevant Period at artificially inflated prices and has been damaged thereby.

26.     Plaintiff Y-GAR Capital LLC ("Y-GAR Capital") is an investment firm owned, operated, and controlled by Plaintiff Yadegar.  Plaintiff Y-GAR Capital purchased tens of millions of dollars' worth of Vince common stock during the Relevant Period at artificially inflated prices and has been damaged thereby.

27.     Plaintiff Richard N. Zecher 2010 Family Trust is a family trust maintained for the Benefit of Plaintiff Zecher and members of his family.

28.     Plaintiff Richard N. Zecher 2010 Family Trust for the Benefit of Evan Gregory Zecher is a family trust maintained for the benefit of members of Plaintiff Zecher's family.

29.     Plaintiff Richard N. Zecher 2010 Family Trust for the Benefit of Rachel Joy Zecher is a family trust maintained for the benefit of members of Plaintiff Zecher's family.

30.     The Plaintiffs listed in ¶¶27-29 are collectively referred to herein as "Plaintiff Zecher Family Trust."  Plaintiff Zecher Family Trust purchased over ten million dollars' worth of Vince common stock during the Relevant Period at artificially inflated prices and has been damaged thereby.

31.     Plaintiffs suffered damages in connection with their purchases of Vince common stock throughout the Relevant Period, including, without limitation, those purchases on or about November 24, 2015, April 4, 2016, July 29, 2016, December 29, 2016, and February 13, 2017.

**Vince Defendants**

32.     Defendant Vince is a luxury brand headquartered in New York, New York. Vince common stock trades on the NYSE under the ticker symbol, "VNCE."

33.     Defendant Jill Granoff ("Granoff") served as Vince's Chairman from April 28, 2014 until June 2, 2015, and as Vince's Chief Executive Officer ("CEO") from May 2012 until September 1, 2015.  Sun Capital selected Defendant Granoff to fill these roles and assume her CEO position before the IPO.  Granoff signed Vince's annual report for fiscal year ended January 31, 2015, which was filed with the SEC on Form 10-K on March 27, 2015 (the "2014 10-K"), and Vince's quarterly report for the period ended April 31, 2015, which was filed with the SEC on Form 10-Q on June 10, 2015 (the "1Q15 10-Q").

34.     Defendant Lisa Klinger ("Klinger") served as Vince's Chief Financial Officer ("CFO") and Treasurer from December 2012 until her resignation in June 2015.  Sun Capital selected Defendant Klinger to fill these roles before the IPO.  Klinger signed Vince's 2014 10-K and the 1Q15 10-Q.

35.     Defendant Mark Brody ("Brody") served as Vince's CFO from June 2015 until September 2015, as the Interim CEO from September 2015 to October 2015, and as a director from 2008 until his resignation on April 15, 2016.  As a director, Brody signed: (i) Vince's 2014 10-K; and (ii) Vince's annual report for fiscal year ended January 31, 2016, which was filed with the SEC on Form 10-K on April 14, 2016 (the "2015 10-K").  As the Interim CEO, Brody signed Vince's quarterly report for the period ended July 31, 2015, which was filed on Form 10-Q with the SEC on September 8, 2015 (the "2Q15 10-Q").  In addition to his roles with Vince,

Defendant Brody served as the Managing Director and Group CFO for Sun Capital both before and after serving as a senior executive with the Company, although he has subsequently left Sun Capital.

36.     Defendant Brendan Hoffman ("Hoffman") served as CEO and a director of Vince since October 22, 2015.  Defendant Hoffman was appointed to these positions by Sun Capital through its control and influence over the Company, its management, and the Board.  Hoffman signed the following quarterly reports: (i) quarterly report for the period ended July 31, 2015, which was filed on Form 10-Q with the SEC on December 10, 2015 (the "3Q15 10-Q"); (ii) the 2015 10-K; (iii) the quarterly report for the period ended April 31, 2016, which was filed on Form 10-Q with the SEC on June 8, 2016 (the "1Q16 10-Q"); (iv) the quarterly report for the period ended July 31, 2016, which was filed on Form 10-Q with the SEC on September 8, 2016 (the "2Q16 10-Q"); (v) the quarterly report for the period ended October 31, 2016, which was filed on Form 10-Q with the SEC on December 8, 2016 (the "3Q16 10-Q"); (vi) the annual report for fiscal year ended January 31, 2017, which was filed on Form 10-K with the SEC on April 27, 2017 (the "2016 10-K"); (vii) the quarterly report for the period ended April 31, 2017, which was filed on Form 10-Q with the SEC on June 9, 2017 (the "1Q17 10-Q"); and (viii) the quarterly report for the period ended July 31, 2017, which was filed with the SEC on Form 10-Q on September 17, 2017 (the "2Q17 10-Q").

37.     Defendant David Stefko ("Stefko") has served as Vince's CFO since September 1, 2015 (initially on an interim basis).  Defendant Stefko was appointed to these positions by Sun Capital through its control and influence over the Company, its management and the Board.  Before assuming his roles with Vince, Defendant Stefko served as Group CFO for Sun Capital.  Defendant Stefko signed the: (i) 2Q15 10-Q; (ii) 3Q15 10-Q; (iii) 2015 10-K;

- 9 -

(iv) 1Q16 10-Q; (v) 2Q16 10-Q; (vi) 3Q16 10-Q; (vii) 2016 10-K; (viii) 1Q17 10-Q; and (ix) 2Q17 10-Q.

38.     Defendant Marc J. Leder ("Leder") has served as a director of Vince since April 2014 and as its Chairman of the Board since June 2015.  He is the Co-Founder and Co-CEO of Sun Capital and maintains significant ownership interests in Sun Capital-affiliated funds and entities.  Leder signed Vince's 2014, 2015, and 2016 Forms 10-K.

39.     The Defendants referenced above in ¶¶33-38 are collectively referred to herein as the "Individual Defendants."  The Individual Defendants made, or caused to be made, materially false and misleading statements that artificially inflated the price of Vince common stock.

40.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Vince's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

**Sun Capital Defendants**

41.     Defendant Sun Capital is a private equity firm headquartered in Boca Raton, Florida.  Prior to the IPO, Sun Capital privately owned the Company through various affiliates.

42.     Defendant Sun Cardinal, LLC ("Sun Cardinal") is an affiliate of Sun Capital and was a selling stockholder in the IPO.

43.     Defendant SCSF Cardinal, LLC ("SCSF Cardinal") is an affiliate of Sun Capital and was a selling stockholder in the IPO.

44.     Defendant Sun Capital Partners Management V, LLC ("Sun Capital Management") is the investment management arm of Sun Capital.

45.     Defendants Sun Capital, Sun Cardinal, SCSF Cardinal and Sun Capital Management are collectively referred to herein as the "Sun Capital Defendants."  As explained in ¶¶41-44, *infra*, the Sun Capital Defendants controlled and exercised substantial influence over Vince before, during and after the IPO, and are liable as "control persons" under §20 of the Exchange Act.

## SUBSTANTIVE ALLEGATIONS

**The Company and Its Business**

46.     Defendant Vince is a luxury consumer brand company founded in 2002.  The Company specializes in high-end women's garments, such as cashmere sweaters and knits, and menswear.  The Company is incorporated in Delaware and headquartered in New York, New York.

47.     Vince operates through two primary sales channels: (1) wholesale; and (2) direct-to-consumer.  The Company's wholesale channel consists of sales to premier department stores and specialty stores, which in turn sells these items to consumers.  Vince's direct-to-consumer sales channel consists of Vince's own retail stores and sales through the Company's website.

48.     Historically, the Company generated approximately 80% of its net sales through its wholesale segment (both U.S. and international), while approximately 20% of its sales were generated through Vince's direct-to-consumer segment.  After its 2013 IPO, however, the

Company turned its focus to its direct-to-consumer retail and e-commerce segment.  By fiscal year 2016, the direct-to-consumer sales channel accounted for 37% of Vince's net sales and the Company was operating 54 store locations, a 100% increase in the number of Vince retail stores shortly before the IPO.

49.     Consequently, in the years following the IPO, the success of the Company increasingly depended on the performance of its direct-to-consumer segment, which in turn, relied on a dependable ERP infrastructure.

**Background of the Emergence of Cloud-Based ERP Platforms**

**Properly Functioning ERP Systems Are Important to Retail Operations**

50.     ERP systems are integrated software packages designed to support critical day-to-day business processes in companies.  In retail settings, a properly-integrated ERP system can coordinate order taking, POS transactions, inventory, accounting, and distribution.  A failing or misbehaving ERP system, by contrast, can cause lost orders, misrouted payments, inventory issues, and disgruntled customers, resulting in millions of dollars of lost business for the enterprise.

**The Role of Middleware in Traditional ERP Systems**

51.     Enterprise platforms are typically comprised of hundreds if not thousands of applications that are custom-built, acquired from third-parties, part of a legacy system, or a combination thereof, operating in multiple tiers of different operating system platforms.  In order to support common business processes and data sharing across applications, these applications need to be integrated in a manner that provides efficient, reliable, and secure data exchanges between multiple enterprise applications.

52.     ERP systems are integrated software packages designed to achieve that goal, and support critical day-to-day business processes for companies.  In a retail setting, for example, a

properly-integrated ERP system could coordinate order taking, POS transactions, inventory, accounting, and distribution.  A failing or misbehaving ERP system, by contrast, could cause lost orders, misrouted payments, inventory issues, and disgruntled customers, resulting in millions of dollars of lost sales and profits and cause major disruptions for the enterprise.  Thus, it is crucial that ERP systems work correctly.

53.     To facilitate the integration of data across different business applications, traditional ERP systems utilize specialized software called "middleware."  Middleware is both effective and reliable from a data integration perspective.  Middleware, however, can be expensive to maintain, its integration processes may lag behind real time, and it is difficult and costly to scale.  Until recently, there were no suitable alternatives to using an ERP system with middleware so this setup was widely adopted by major retail operations.

**Microsoft Dynamics AX-7: A Cloud-Based ERP Platform that Eliminated the Need for Integration Middleware**

54.     Before and during the Relevant Period, Microsoft offered an enterprise ERP system that utilized middleware named Microsoft Dynamics AX 2012 ("Dynamics 2012").  This system was relied upon by large companies and was capable of being hosted on Microsoft's cloud computing[1] network.  Dynamics 2012 was well known and stable.  Even though Dynamics 2012 was capable of being hosted on Microsoft's cloud network, it depended on middleware to integrate data between cloud-based applications and other hardware.

55.     In November 2014, Microsoft announced it was working on a new revolutionary cloud-based ERP system that would eliminate the need for integration middleware.  This new ERP platform – dubbed "AX-7" – would utilize Microsoft's cloud computing network to

---

[1]   "Cloud computing" refers to the operation of infrastructure, platforms, and software in a virtualized environment whose components can be accessed and used over the Internet.  "Azure" is the name of Microsoft's cloud offering.

integrate data across all applications hosted on its cloud platform to "create a full-end-to-end cloud solution."

56.     Microsoft released a preview of AX-7 on December 2, 2014.  Since the new technology was still in beta mode,[2] companies were encouraged to download the system for testing and development purposes only.

57.     Even though the risks of relying on a beta product are widely known, some companies began developing new platforms around the beta AX-7 technology.  Microsoft did not condone the development by those companies.  For example, in a March 2015 interview with *InformationWeek.com*, Microsoft Chief Technology Officer Mike Ehrenberg acknowledged that "'a few customers' had moved into production without awaiting Microsoft's blessings," and explained that the technology was just not ready.

58.     On November 19, 2015, Microsoft unveiled an early beta-version of AX-7, which offered some core software applications that could operate natively on Microsoft's Azure cloud-computing server network.  Because all data integration processes were performed across the Azure servers, there was no longer any need for middleware.

59.     AX-7 was officially named "Dynamics AX" without any year or version number. This simplified branding reflected the platform's evolution from a traditional system that required frequent upgrades to a cloud-based system that would receive regular updates over the cloud network.

---

[2]     Beta mode refers to the software development phase when the software is feature complete, but likely to contain a number of known or unknown bugs.  Software in beta phase will generally have speed or performance issues, many more bugs than completed software, and may cause crashes or data loss.  The focus of beta testing is reducing impacts to users.  Beta version software is often delivered to users or prospective customers for demonstrations, previews, or usability testing.

60.     At the time, Mike Ehrenberg characterized the release as "a major transformation for Dynamics AX."  Commentators called AX-7 "a major departure from many of the traditional conventions of enterprise resource planning technology," and stated that the AX-7 technology was so different than previous ERP systems that "you might have a hard time recognizing it." But according to a November 29, 2015 article on *MSDynamicsWorld.com*, the platform was still under development, and "a significant amount of work remained to shore up the new AX for real consumers."

61.     The public beta version of AX-7 was released in December 2015.  Users were again encouraged to download and operate the new system in trial mode as it was not ready to be relied upon as if it were a finished product.  To that end, AX-7 included a feature that allowed companies to perform a simulated deployment so companies could test planned configurations and confirm that the data from different business processes was properly integrated.  This allowed companies to test the software and make the appropriate adjustments to the new platform before its actual rollout for real world use.

62.     Ensuring the platform worked seamlessly was especially important because, as explained in a March 8, 2016 *Fortune* article, a flawed ERP system based on AX-7 could substantially disrupt a company's operations:

> With this AX release, Microsoft rebuilt the product for the cloud, said Mike Ehrenberg, Microsoft technical fellow.  That's important because if there's one thing business customers don't want to take chances on, it is their accounting application, aka enterprise resource planning (or ERP) software.  This is the stuff that runs their ledgers and tracks inventory.  If it screws up, products may not get made and people may not get paid.

63.     On March 9, 2016, AX-7 was finally released as a finished software platform.  As alleged below, unbeknownst to investors, Vince utilized the beta version of AX-7 in its operations instead of waiting for the finished platform and suffered severe business disruptions.

**The Importance of Network Redundancies During a Transition**

64.     Network redundancy is implemented in enterprise network infrastructure to provide a redundant source of network communications.  It serves as a backup mechanism for quickly swapping network operations onto a redundant infrastructure in the event of unplanned network outages or other problems.

65.     If a company has a single point of failure in the network's communication path and it fails, then the company has nothing to rely on and its operations will stall.  By implementing additional methods of network access, the company's ability to connect to its resources will be unhampered, and its operations uninterrupted, even when the main communication path goes down.

66.     Network redundancies are especially critical to cloud-based retail systems which depend entirely on the internet.  Retail POS systems require fast, reliable connectivity in order to access payment networks and transmit payment card data.  Additionally, POS systems enable many other critical business processes such as sales reporting, inventory management, employee scheduling, and payroll services.

67.     Network redundancies are thus critical to seamless retail operations.  Transaction processing efficiencies quickly disappear if a retailer or restaurant operator experiences a POS system crash and has not implemented data redundancy into its solution.  Long lines form at the counter or cash register as efforts are made to rectify the problem and as store associates manually verify credit card information because the internet cannot be used to obtain issuers' approval for credit card transactions.  Lost connectivity results in lost customers and lost revenue.  Every minute of POS downtime, on average, costs a retailer $4,700, according to research by The Standish Group, a research organization that focuses on software project performance.

68.     Network redundancies are especially critical during a transition to a new infrastructure.  A company's operations could grind to a halt if it retires its legacy platform before confirming that the new platform is fully operational.  Accordingly, companies that are transitioning from a traditional ERP system to a fully integrated cloud-based ERP system are generally advised to run the new ERP system in test mode before rolling out a final implementation.

69.     As alleged below, contrary to Defendants' statements about redundancies supported by Kellwood, Vince did not have properly functioning network redundancies.

**Vince Used Kellwood's ERP Infrastructure While It Developed, Tested, and Implemented Its Own ERP Platform**

70.     Before the IPO, Vince relied entirely on Kellwood's ERP infrastructure.  The Kellwood ERP system utilized customized software to facilitate the seamless transmission of data across "a suite of third-party hosted retail applications," including merchandising, retail inventory management, POS, fulfillment and accounting applications.  The Kellwood ERP system was also fully integrated with the warehouse management and distribution applications used at the Kellwood-owned distribution facilities used by Vince.  As explained in the Company's 2014 10-K:

> Our [current Kellwood] ERP system was developed from a core system that is widely used in the apparel and fashion industry, which we have customized to suit our inventory management and order processing requirements.  We have integrated Oracle Financials with our ERP system to meet our financial reporting and accounting requirements.  Additionally, we use a suite of third-party hosted retail applications integrated with our ERP system that provide us with merchandising, retail inventory management, point-of-sale systems, customer relationship management and retail accounting.  Our retail applications are supported through a "Software as a Service" model, which allows for new implementations to occur quickly. Our ERP and warehouse management systems are also integrated with a hosted, third-party e-commerce platform.

71.     Under the Shared Services Agreement, Vince would continue using the Kellwood systems until it developed and implemented its own infrastructure.

**Vince Implements an ERP System on Beta AX-7 and Experiences Widespread Systems Failures**

72.     In early 2015, Vince hired a Westchester-based technology consulting firm named International Technology Solutions, Inc. ("ITS") to develop its new ERP system.  The firm's CEO, Jeff Young ("Young"), was installed as Vince's Chief Information Officer ("CIO") to oversee the development and transition of all retail applications and transition from Kellwood's systems.[3]

73.     In order to provide comfort to Vince's stockholders and public investors, as the development progressed and plans for the transition from the Kellwood systems started taking shape, the Company assured investors it would operate with full network redundancies to the Kellwood systems during the transition.  On March 19, 2015, for example, during a conference call with investors and analysts, Defendant Granoff stated, "[d]uring this migration, we will . . . run dual systems . . . to ensure a smooth migration with minimal disruption."  Likewise, Defendant Klinger assured investors the transition to the new ERP system would be effected "very thoughtfully and prudently" and stated that "we're making sure that we have full redundancy during the transaction."

74.     Throughout the Relevant Period, Defendants assured investors that it was approaching the transition "very thoughtfully and prudently" and that it would continue to utilize the Kellwood ERP system until the new platform was fully implemented.  On March 27, 2015,

---

[3]     Young was well-known in fashion retail circles, and had a reputation for working closely with senior management during the implementation of ERP solutions in retail enterprises.  In November 2016, he gave a seminar at the Microsoft Dynamics US Industry Summit explaining the "do's and don'ts of how to engage the c-suite during the sales cycle and post-sale implementation."

for example, Vince filed its 2014 10-K, which stated that "Kellwood has continued to provide certain information technology services to us [including an ERP system and retail applications] and will continue to do so" until the termination of the Shared Services Agreement.  Similarly, Vince's 1Q15 10-Q, stated that the Company would "continue to utilize the Kellwood information technology infrastructure" until the new ERP system is "completed and functional," stating, in pertinent part, as follows:

> We have also been working on developing our own information technology infrastructure and are now in the process of implementing our own enterprise resource planning ("ERP") system.  We have engaged with a new e-commerce platform provider and migrated the human resource recruitment system.  ***The new ERP system is planned to be completed and functional by the end of fiscal year 2015, however, until such time, we will continue to utilize the Kellwood information technology infrastructure under the Shared Services Agreement.***

75.     Vince, however, offered very few details about the new ERP platform.  The 2014 10-K simply stated that "[t]he new ERP system is based on a system from Microsoft Dynamics AX and is cloud based."

76.     At the time, there was nothing unusual about the fact that Vince had chosen an ERP platform "based on a system from Microsoft Dynamics AX."  Rather, the latest iteration of the Dynamics ERP system, Dynamics 2012, was one of the most popular and well-established ERP systems on the market.  The Company indicated that Vince was developing its own ERP system around an existing, highly-dependable technology.

77.     In truth, however, the Company was attempting to develop its ERP system using the brand new AX-7 technology platform, which had not yet been proven reliable and was not even offered as a finished product out of beta.  Whereas the Kellwood ERP system had relied on a bundle of customized middleware to facilitate its data integration processes across various business applications, Vince sought to develop core business applications based on a fully

integrated, end-to-end, cloud-based ERP solution offered by Microsoft with no middleware, something that had not yet been utilized in the retail space by major retail brands.

78.     According to the Company, after an initial delay, the transition began in earnest in November 2015 – the same month Microsoft unveiled a beta-version of Dynamics AX-7, and before the public beta was released.

79.     For the first phase of the transition, the Company contracted with a new distribution partner and transferred its physical inventory from Kellwood's California distribution facility to a new warehouse.  By the end of 1Q16, Vince's new distribution partner was outfitted with Vince's newly-developed warehouse management and distribution applications.   The new distribution systems, however, lacked dependable data integration capabilities because the Company relied on AX-7's beta-version, cloud-based integration technology to communicate with Vince's other business applications. Thus, unbeknownst to stockholders, Vince was implementing its ERP system on unfinished software, which exposed the Company to substantial undisclosed risks.

80.     In its 2015 10-K, filed on April 14, 2016, Vince simply stated that the "new ERP system is operated on *a* system from Microsoft Dynamics AX," without disclosing that its new ERP system was the beta version of the new Dynamics AX-7 platform.

81.     On June 8, 2016, Vince announced in its 1Q16 10-Q that it "substantially completed the process of migrating [its] U.S. distribution system from Kellwood to a new third party provider."

82.     Even though Defendants represented that Vince implemented "new system integrations," Defendants failed to warn investors that the new system integration software ***itself*** was not yet ready for full release, and it had not yet proven itself reliable.  In other words, there

was not just a risk that Vince would not be able to properly integrate the various systems, but there was an undisclosed risk that the system itself – Dynamics AX-7 – was not ready for use by Vince in connection with actual business operations.

83.     Over the next several months, Vince attempted to transition to its newly developed retail applications, including the POS system, inventory management, and warehousing and distribution applications.  Vince, however, encountered significant problems with the new system.  Even though a particular retail application may have functioned on an individual basis, the system did not work together.  And without reliable networking and data integration capabilities, Vince's core retail applications suffered crippling setbacks and failures.

84.     Each new implementation created new communication failures, resulting in massive operational disruptions and crippling setbacks.  For example, Vince's retail POS systems had no reliable means to communicate with its inventory management and distribution applications.  As a result, the Company's ability to manage its warehouse, check, and validate inventory levels, and fill customer orders was severely impaired.  Things got so bad that store managers could not rely on the inventory management software and had to physically visit the warehouses to verify if products were in stock.

85.     In addition, the POS applications used to process in-store transactions froze and experienced long load times and suffered from software bugs.  Credit processing applications suffered from network connectivity issues, and were unable to timely process credit card transactions.  These issues negatively impacted Vince's sales since aggravated customers simply walked out of the stores and stopped shopping at Vince.

86.     To make matters worse, customer transactional data was lost, corrupted, or mis-categorized, adversely impacting the Company's ability to track sales, inventory and cash. Delivery delays caused seasonal merchandise to arrive too late, resulting in even more lost sales.

87.     These problems plagued Vince retail locations across the country.   At the Philadelphia branch, for example, the POS systems were extremely glitchy, and froze when retail associates tried to register transactions.   When the issue was reported to Vince's information technology ("IT") department, the retail associates were simply instructed to reboot their computers, which did not solve the core problems.   When a transaction would finally register, the credit card systems would freeze while processing payments, sometimes taking as much as twenty minutes to process a single transaction.   Impatient customers left the store without completing their purchases.   To avoid losing sales, store managers would mail the packages to the customers, or personally deliver the items to their homes when their shifts ended.   Store managers complained about these issues to Erica Nieves, the Atlantic Coast District Manager, Kristine Shum, the Manager of Retail Operations, and other corporate managers that visited the Philadelphia branch during the transition period.

88.     In the Washington D.C. branch, similar issues continued until at least May 2017. Between October 2016 and May 2017, cash registers were often out of order, and nearly fifty percent of the time during some periods.   Sales associates were instructed to keep written logs of the transactions, but the data was never transferred into the store's computer system.   As a result, these sales were omitted from the daily sales reports that were automatically transmitted to Vince's corporate headquarters.   On some days, the shortfall was as high as $900.00.

89.     On other occasions, sales associates would order items that were out of stock using the in-store POS application.   The POS system would process the sale and generate a

purchase number, but the order was never communicated to the Company's fulfillment and distribution facilities.

90.     The Washington D.C. branch also experienced severe problems with its credit card terminal, and some customers were billed multiple (sometimes as many as four) times for a single transaction.  Store managers were advised by the IT department that the charges would fall off.  Store managers at the Washington D.C. location discussed these issues with Kristine Shum.

91.     The Company's Boston, Palo Alto, and White Plains locations encountered similar problems, as did New York locations.

**Company Management Knew About, or Recklessly Disregarded, the Data Integration Problems**

92.     Company management learned of the data integration issues since they were discussed during weekly Company-wide teleconferences with managers from retail locations throughout the country.  Moreover, during monthly, company-wide conference calls, Vince management would probe store managers and other participants about different issues with the ERP application, but failed to ever explain why the issues were not being addressed.

93.     In addition to store managers, the following Vince employees participated on these monthly calls:

(a)     Kristine Shum: Shum served as the Coordinator of Retail Operations from March 2014 through April 2016.  She served as the Manager of Retail Operations from April 2016 through February 2017.  And she served as the Senior Manager of Retail Operations from March 2017 until April 2018.

(b)     Danielle Kaplan: Kaplan served as the Director of Retail Operations from August 2013 through July 2016.

(c)     <u>Erica Nieves</u>: Nieves served as the District Manager for Atlantic Coast, the area covering the Miami, Atlanta, Boston, Washington D.C. and Philadelphia markets, from September 2014 through July 2016.

(d)     <u>Tracy Cassell</u>: Cassell served as the District Manager for Northwest and Central United States from September 2015 through August 2016.  She served as the District Manager for the Mid-Atlantic and Southeast Region from August 2016 through July 2017

(e)     <u>Kelly St. Hilaire</u>: St. Hilaire was the Human Resources Manager from August 2015 through February 2017.

(f)     <u>Jesse Zak</u>: Zak has served as a Retail Operations Coordinator since he was hired in November 2015.

(g)     <u>Suzanne Prioa</u>: Regional Manager in Boston from April 2014 through May 2016.

94.     The issues with the new ERP system already had an impact on Vince's revenues. On September 8, 2016, the Company issued a press release announcing its financial results for the quarter ended July 30, 2016.  The 2Q 2016 Release stated that net sales for the Company had decreased by 24.1% to $60.7 million during the quarter.  It also stated that the Company had posted a net loss of $2.0 million, or $0.04 per share, for the quarter.

95.     On news of the disappointing second quarter results, the price of Vince stock declined approximately 5%, or $3.20 per share, over two trading days to close at $58.01 per share on September 9, 2016 on abnormally high trading volume.  An analyst described the results as "dreadful," as Vince had barely met the diminished expectations it had set for itself.

96.     Despite the severity and ubiquity of the problems, however, Defendants failed to disclose that the disappointing quarterly results were due in significant part to problems with Vince's transition from the Kellwood systems to the AX-7 platform.

97.     Vince's financial performance continued to suffer as the transition progressed. Yet, on September 8, 2016, during a conference call with investors and analysts, Defendant Hoffman told investors that "our infrastructure, e-commerce site, and POS systems in our store are now all live."

98.     In stark contrast to the problems caused by the transition, during an exchange with an analyst about the overall condition of the Vince's retail stores, Defendant Stefko stated that the Company was "patting ourselves on the back a little bit."

99.     By that point, the new ERP platform had caused such problems that Defendant Stefko hired a second IT consulting firm, ITPeopleNetwork, to assist with the transition.  Hazlitt Noronha, then Vince's Vice President of Technology, led the new consulting team working on the transition and related issues.

100.    Contrary to rosy statements by the Company about the transition, ITPeopleNetwork identified extensive data integration issues between the warehouse management systems, the retail POS applications, and other ERP applications.  Upon learning that Vince had implemented a beta version of AX-7, members of the ITPeopleNetwork team implored Vince management to upgrade from the beta version to the production version of the AX-7 software.

101.    Vince's senior management and the Individual Defendants were aware of these problems because Hazlitt Noronha and members of his team presented these issues to senior

Vince management, including (i) Defendant Stefko, (ii) the Senior VP of Merchandising; and (iii) the head of e-commerce, at weekly meetings held at the Company's New York headquarters.

102.    The problems caused by the transition issues snowballed as the 2016 holiday season drew closer.  Recurrent failures in the inventory management system forced management to institute six warehouse freezes while they tried to resolve the data integration issues.

103.    By the end of the third quarter of fiscal 2016, customer traffic was down an average of 60% in every Vince store except the Washington D.C. branch.  The Company tracked foot traffic using a counter mounted on top of each door and reported the daily figures in daily flash memos sent by corporate to store managers.

104.    Nevertheless, the Company continued to falsely report to stockholders that that the transition was complete with respect to various items.  Vince's 3Q16 10-Q, filed on December 8, 2016, stated, "the Company has completed the implementation" of its retail, e-commerce, and distribution applications and network infrastructure.

105.    The Company announced that by the end of fiscal year 2016 (January 28, 2017), the Company fully completed the transition away from the Kellwood systems to its own platform.

106.    It was not until April 28, 2017, that the Company finally disclosed for the first time that "[its] enterprise resource planning ("ERP") system is Microsoft Dynamics AX [*i.e.*, AX-7]."

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS
## AND OMISSIONS DURING THE RELEVANT PERIOD

**Fiscal Year 2014**

### 4Q2014

107. The Relevant Period starts on March 19, 2015. On that date, Vince hosted a conference call for investors and analysts to discuss, *inter alia*, its fourth quarter and fiscal year 2014 financial results. During the conference call, Defendant Granoff pronounced that Vince would "take control of [its] own destiny" through various strategic initiatives, including by migrating its system services away from Kellwood. Defendant Granoff discussed the status of the transition and stated that the Company would "run dual systems" during the transition "to ensure a smooth migration with minimal disruption," stating, in pertinent part, as follows:

> Finally, on the operations front, we will continue to build our infrastructure to support the long-term growth of the business. As I mentioned earlier, we accomplished significant achievements in 2014 related to our operation strategy, by adding talent, expanding vendor relationships and enhancing our internal capabilities. We also completed the migration of several shared service activities from Kellwood.

> During 2015, we plan to fully migrate our IT systems, processes and support structure. While a major undertaking, we believe that having control of our technical infrastructure will enable us to more efficiently respond to our specific business needs and support our growth initiatives. ***During this migration, we will incur incremental transition costs, as we run dual systems for a period of time to ensure a smooth migration with minimal disruption.***

108. The statements referenced above in ¶107 concerning the "plan to fully migrate our IT systems, processes and support structure" were materially false and misleading when made because Defendant Granoff knew, or recklessly disregarded, that: (i) Vince planned to migrate its IT systems to a new revolutionary Dynamics AX-7 platform that had never previously been used by major retailers; (ii) a fully functional final version of Dynamics AX-7 had not yet been released to the public; and (iii) there were numerous undisclosed risks associated with the

transition to this untested system, including the risk that redundancies would not function correctly.  Additionally, contrary to Defendant Granoff's assurance of "a smooth migration with minimal disruption," since the Company was utilizing a new, unfinished platform, Defendant Granoff lacked a reasonable basis to represent the transition would be "smooth" with "minimal disruption."

109.    During the same conference call, in response to an analyst question about transition costs, Defendant Klinger stated, "we're making sure that we have full redundancy" and that the Company would be incurring additional costs due to "the dual system and the migration."  The exchange with an analyst is set forth, in pertinent part, as follows:

**Ed Yurma** - *KeyBanc Capital Markets - Analyst*

Got it, and two quick follow-ups, I guess.  Are you -- do you think you're seeing cannibalization, as you open more stores and your wholesale partners?  And then, I guess, Lisa, if you would contextualize how much of the duplicative costs from some the Kellwood transition costs you will not have to incur again?  Either whatever you incurred this year, and then I guess the incremental for 2015, that would be appreciated.  Thank you.

*             *             *

**Lisa Klinger** - *Vince Holding Corporation - CFO*

Yes.  And then as far as the IT migration, ***obviously we want to make sure that we're doing this very thoughtfully and prudently, so we're making sure that we have full redundancy during the transaction.  So the dual system and the migration, right now we're planning to incur incremental transition costs of between \$700,000 and \$1 million into our SG&A this year.*** It obviously also influences our overall CapEx guidance that we've incorporated as well. But from an operating expense perspective, again, we're planning between \$[700,000] and \$1 million.

110.    The statements referenced in ¶109 above concerning the IT migration, including, that "we're making sure that we have full redundancy during the transaction" and that the Company was "run[ning] dual systems" were materially false and misleading when made because Defendant Granoff knew, or recklessly disregarded, that: (i) Vince planned to migrate its

IT systems to a new revolutionary Dynamics AX-7 platform that had never previously been used by major retailers; (ii) a fully functional final version of Dynamics AX-7 had not yet been released to the public; and (iii) there were numerous undisclosed risks associated with the transition to this untested system, including the risk that redundancies would not function correctly. The statement "we want to make sure that we're doing this very thoughtfully and prudently" was materially misleading when made because an IT transition based on a new, untested product such as AX-7 created substantial risks that were not "thoughtful" or "prudent."

111. On March 27, 2015, Vince filed the 2014 10-K. In the 2014 10-K, Vince stated that it "recently commenced the development and implementation of our own ERP system and IT infrastructure, engaged with a new e-commerce platform provider," stating, in pertinent part, as follows:

> **Shared Services Agreement**
>
> In connection with the consummation of the IPO, Vince, LLC entered into a shared services agreement with Kellwood Company, LLC on November 27, 2013 (the "Shared Services Agreement") pursuant to which Kellwood Company, LLC provides certain support services, including distribution, information technology and back office support. Kellwood will provide these services until we elect to terminate the provision thereof in accordance with the terms of such agreement. Some of the Kellwood systems we continue to use following the IPO include enterprise resourcing planning, or "ERP", human resource management systems and distribution applications. In conjunction with our separation from Kellwood, we are in the process of separating our assets from those of Kellwood. *We have recently commenced the development and implementation of our own ERP system and IT infrastructure, engaged with a new e-commerce platform provider and migrated the human resource recruitment system.* Refer to the discussion under "Information Systems" below for further information on our ERP implementation.

112. The statements referenced in ¶111 above were materially false and misleading when made because they failed to disclose and misrepresented the following material adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)     that the Company was developing an ERP system around a new technology that had not been proven;

(b)     that the Company was developing its ERP platform using an unfinished beta-version of AX-7 that had been released for testing and development purposes only;

(c)     that the Company was not developing middleware to perform the necessary data integration processes; and

(d)     that the foregoing conduct substantially increased the risk of severe complications during the transition, and the likelihood that Vince's business and results of operations would be adversely affected.

113.    The 2014 10-K assured investors that Vince would continue to utilize the Kellwood ERP systems until its new ERP system was fully developed and implemented, stating, in pertinent part, as follows:

**Information Systems**

*Kellwood has continued to provide certain information technology services to us and will continue to do so until such time as we elect to terminate provision of such services in accordance with the terms of the Shared Services Agreement.* These services currently include information technology planning and administration, desktop support and help desk, our ERP system, financial applications, warehouse systems, reporting and analysis applications and our retail and e-commerce interfaces.

114.    The statements referenced above in ¶113 were materially false and misleading because of the reasons set forth in ¶112 above. The statement that "Kellwood has continued . . . and will continue" to provide and support infrastructure was materially false and misleading when made because Defendants lacked a reasonable basis to assure investors that Vince's systems would work correctly due to redundancies from Kellwood since it was attempting to implement a new revolutionary software platform.

115.    With respect to the new ERP system, the 2014 10-K stated that "[t]he new ERP system is based on a system from Microsoft Dynamics AX and is cloud based," stating, in pertinent part, as follows:

> During fiscal 2014, we commenced the development and implementation of our own ERP system and IT infrastructure, engaged with a new e-commerce platform provider and migrated the human resource recruitment system.   The ERP implementation is expected to be completed by the end of the third quarter of fiscal 2015.   **The new ERP system is based on a system from Microsoft Dynamics AX and is cloud based. It will replace our current Oracle Financials and retail related sub systems.**

116.    The statements referenced above in ¶115 were materially false and misleading because of the reasons set forth in ¶112 above.   The statement that "[t]he new ERP system is based on a system from Microsoft Dynamics AX" was materially false and misleading when made because it indicated that Vince was developing its own ERP system around an existing, highly-dependable technology, Dynamics 2012, when in fact it was developing an ERP system around a new technology that had not been proven or even offered as a finished product out of beta.

117.    The 2014 10-K cautioned that the new ERP systems "may not operate as successfully as the systems we historically used" and stated Vince's operations and financial results "may" be adversely affected "[i]f we fail to successfully transition the systems," stating, in pertinent part, as follows:

> **Kellwood provides us with certain key services for our business, some of which we are in the process of transitioning to our own systems.  If Kellwood fails to perform its obligations to us during the period of transition or if we cannot successfully transition these services to our own systems, our business, financial condition, results of operations and cash flows could be materially harmed.**
>
> Prior to the IPO and Restructuring Transactions that closed on November 27, 2013, we operated as a business unit of Kellwood, and we historically relied on the financial resources and the administrative and operational support systems of Kellwood to run our business.  Some of the Kellwood systems we continue to use

following the IPO and Restructuring Transactions include ERP, human resource management systems and distribution applications. In conjunction with our separation from Kellwood, we are in the process of separating our assets from those of Kellwood. *We have recently commenced the development and implementation of our own ERP system and IT infrastructure, engaged with a new e-commerce platform provider and migrated the human resource recruitment system. The new systems we implement may not operate as successfully as the systems we historically used as such systems are highly customized or proprietary.* Moreover, we may be unable to obtain necessary goods, technology and services to continue replacing the Kellwood systems at prices and on terms as favorable as those available to us prior to the separation, which could increase our costs and reduce our profitability. *If we fail to successfully transition the systems, our business and results of operations may be materially and adversely affected.*

118. The statements referenced above in ¶117 were materially false and misleading when made because of the reasons set forth in ¶112 above. In addition, the statement that "[t]he new systems we implement may not operate successfully as the systems we historically used as such systems are highly customized or proprietary," was materially false and misleading when made because it failed to disclose that Vince was relying on an unfinished software platform, and that the system may not operate successfully for the additional reason that the software platform itself may not function correctly.

119. The 2014 10-K also warned investors that "[a]ny failure or significant downtime" of the legacy Kellwood systems or the new ERP systems during the transition period "could" adversely affect Vince's operations and financial results, stating, in pertinent part, as follows:

We entered into a Shared Services Agreement in connection with the IPO and Restructuring Transactions on November 27, 2013. The Shared Services Agreement governs the provisions by which Kellwood provides certain support services to us, including distribution, information technology and back office support. Kellwood will provide these services until we elect to terminate the provision thereof in accordance with the terms of such agreement . . . *Any failure or significant downtime in our own financial or administrative systems or in Kellwood's financial or administrative systems during the transitional period and any difficulty in separating our assets from Kellwood's assets and integrating newly acquired assets into our business could result in unexpected costs, impact our results or prevent us from paying our suppliers and employees*

> *and performing other administrative services on a timely basis and materially*
> *harm our business, financial condition, results of operations and cash flows.*

120.    The statements referenced above in ¶119 were materially false and misleading because of the reasons set forth in ¶112 above.  In addition, the statement that "[a]ny failure or significant downtime in [our own or Kellwood's] financial or administrative systems . . . could . . . materially harm our business" was materially false and misleading because it failed to disclose that there was a substantial undisclosed risk of "downtime" due to use of a new, beta version software platform.

**Fiscal Year 2015**

### 1Q15

121.    On June 4, 2015, Vince hosted an earnings call with investors and analysts to discuss the Company's first quarter results, in which Defendant Granoff and Defendant Klinger participated.  During the call, Defendant Granoff highlighted the IT migration process as a key to the Company's long-term growth, and stated that Vince "remain[s] on track to fully migrate our IT systems, processes, and support structure during the back half of the year," stating, in pertinent part, as follows:

> Finally, we continue to invest in the business to build out an infrastructure that will support the Company as we grow.  ***We remain on track to fully migrate our IT systems, processes, and support structure during the back half of the year.***  We also continue to add talent and capabilities in our key growth areas.

122.    The statements referenced above in ¶121 were materially false and misleading because of the reasons set forth in ¶112 above.

123.    On June 10, 2015, Vince filed its quarterly report for the fiscal quarter ended May 2, 2015 on Form 10-Q with the SEC.  In the 1Q15 10-Q, the Company stated that it was "in the process of implementing our own enterprise resource planning ("ERP") system," and assured

investors that it would "continue" to utilize the Kellwood systems until the new ERP system was

"completed and functional," stating, in pertinent part, as follows:

### Shared Services Agreement

In connection with the consummation of our IPO on November 27, 2013, Vince, LLC entered into a Shared Services Agreement pursuant to which Kellwood provides support services in various operational areas, including, among other things, e-commerce operations, distribution, logistics, information technology, accounts payable, credit and collections and payroll and benefits.  Since the IPO, we have been working on transitioning certain back office functions performed by Kellwood under the Shared Services Agreement. Among these functions that have transitioned to Vince are certain accounting related functions as well as benefits administration.  ***We have also been working on developing our own information technology infrastructure and are now in the process of implementing our own enterprise resource planning ("ERP") system.***  We have engaged with a new e-commerce platform provider and migrated the human resource recruitment system. ***The new ERP system is planned to be completed and functional by the end of fiscal year 2015, however, until such time, we will continue to utilize the Kellwood information technology infrastructure under the Shared Services Agreement.***

124.   The statements referenced above in ¶123 were materially false and misleading

because of the reasons set forth in ¶112 above.  In addition, the statement that "until such time

[as the ERP system is 'completed and functional'], we will continue to utilize the Kellwood

information technology infrastructure" was materially misleading because it provided false

assurances to investors that Vince's systems would work correctly due to redundancies from

Kellwood while it was attempting to implement its new software system.

125.   The 1Q15 10-Q contained the following Sarbanes-Oxley ("SOX") Certification

signed by Defendants Klinger and Granoff:

[CEO or CFO] Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

I, [Defendant Granoff or Defendant Klinger], certify that:

1.      I have reviewed this quarterly report on Form 10-Q of Vince Holding Corp.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

        a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

        b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

        c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;

        d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

        a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

126.    The statements referenced above in ¶125 were materially false and misleading when made because of the reasons set forth in ¶112 above.  In addition, the statements referenced above in ¶125 were materially false and misleading when made because they misrepresented or failed to disclose the following facts which were known or recklessly disregarded by Defendants: (i) Vince's disclosure controls and internal controls were materially deficient and not operating effectively; and (ii) based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's finances.

**2Q15**

127.    On September 8, 2015, Vince filed its quarterly report for the fiscal quarter ended August 1, 2015 on Form 10-Q with the SEC.  The 2Q15 10-Q stated that Vince was "in the process of implementing our own enterprise resource planning ("ERP") system" and assured investors that it would continue to use the Kellwood ERP system "[u]ntil [the new ERP and related] systems are implemented," stating, in pertinent part, as follows:

**Shared Services Agreement**

In connection with the consummation of our IPO on November 27, 2013, Vince, LLC entered into a Shared Services Agreement pursuant to which Kellwood provides support services in various operational areas, including, among other things, e-commerce operations, distribution, logistics, information technology, accounts payable, credit and collections and payroll and benefits. Since the IPO, we have been working on transitioning certain back office functions performed by Kellwood under the Shared Services Agreement.  Among these functions that have transitioned to Vince are certain accounting related functions as well as benefits administration.  ***We have also been working on developing our own information technology infrastructure and are now in the process of implementing our own enterprise resource planning ("ERP") system.  We have engaged with a new e-commerce platform provider and are still developing that system.  The new ERP system is also under development.  Until those systems are implemented, we will continue to utilize the Kellwood information***

*technology infrastructure, including e-commerce platform systems, under the Shared Services Agreement.*

128.    The statements referenced above in ¶127 were materially false and misleading when made because of the reasons set forth in ¶112 above.  In addition, the statement that "we will continue to utilize the Kellwood information technology infrastructure" until the new systems were implemented was materially misleading when made because there was a substantial undisclosed risk that redundancies from Kellwood's systems would not work correctly since Vince was attempting to implement a new, untested software platform that had not yet been released as a finished product.

129.    The 2Q15 10-Q contained SOX Certifications signed by Defendants Brody and Stefko certifying that the 2Q15 10-Q was accurate, not misleading, and free from fraud using language substantially similar to the language referenced above in ¶125.

130.    The statements referenced above in ¶129 were materially false and misleading when made because of the reasons set forth in ¶112 above.  In addition, the statements referenced in ¶129 above were materially false and misleading when made because they misrepresented or failed to disclose the following facts which were known or recklessly disregarded by Defendants: (i) Vince's disclosure controls and internal controls were materially deficient and not operating effectively; and (ii) based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's finances.

**3Q15**

131.    On December 10, 2015, Vince hosted an earnings call with investors and analysts to discuss the Company's third quarter results, in which Defendant Hoffman and Defendant Stefko participated.  During the call, Defendant Hoffman stated that Vince was "very pleased with the direction of the e-commerce business," and that it was "launching the platform in 2016,

which we think is just going to increase our ability to service the customer," stating, in pertinent part, as follows:

> No we're not going to break that out. I'll just tell you, ***we're very pleased with the direction of the e-commerce business. We're launching the platform in 2016, which we think is just going to increase our ability to service the customer.*** Also, as we get the brand identity back, that's going to really impact all our touch points. We're going to be much more brand-right with all the way we reach out to our customer. And I think e-commerce is going to be a big benefit of that as well.

132.    The statements referenced above in ¶131 were materially false and misleading because of the reasons set forth in ¶112 above.

133.    Similarly, in response to an analyst's question about "big system investments [that Vince] needs in order to get on track," Defendant Stefko stated, "we have our ongoing conversion from Kellwood that we have discussed in the past, that is going forward," stating, in pertinent part, as follows:

**Lindsay Drucker Mann** - *Goldman Sachs - Analyst*

Okay. And one last one.  Are there any big systems investments you think that the business needs in order to get on the right track?  Anything we should be thinking about for 2016?

*      *      *

**David Stefko** - *Vince Holding Corporation - Interim CFO & Treasurer*

You know, ***we have our ongoing conversion from Kellwood that we have discussed in the past, that is going forward.  We also have the launching of a new e-commerce platform in line with that. And that is a project that started in 2015, and we plan on finishing that in 2016.***

134.    The statements referenced above in ¶133 were materially false and misleading because of the reasons set forth in ¶112 above.

135.    Also on December 10, 2015, Vince filed its quarterly report for the fiscal quarter ended October 31, 2015 on Form 10-Q with the SEC.  In the 3Q15 10-Q, the Company stated that it was "in the process of implementing our own enterprise resource planning ("ERP")

system" and assured investors that it would continue to utilize the Kellwood ERP system "[u]ntil [the new ERP and related] systems are implemented," stating, in pertinent part, as follows:

**Shared Services Agreement**

In connection with the consummation of our IPO on November 27, 2013, Vince, LLC entered into a Shared Services Agreement pursuant to which Kellwood provides support services in various operational areas, including, among other things, e-commerce operations, distribution, logistics, information technology, accounts payable, credit and collections and payroll.  Since the IPO, we have been working on transitioning certain back office functions performed by Kellwood under the Shared Services Agreement.   Among these functions that have transitioned to Vince are certain accounting related functions as well as benefits administration.  ***We have also been working on developing our own information technology infrastructure and are now in the process of implementing our own enterprise resource planning ("ERP") system.  We have engaged with a new e-commerce platform provider and are still developing that system.  The new ERP system is also under development.  Until those systems are implemented, we will continue to utilize the Kellwood information technology infrastructure, including e-commerce platform systems, under the Shared Services Agreement.***

136.    The statements referenced above in ¶135 were materially false and misleading because of the reasons set forth in ¶112.  The statement "in the process of implementing our own . . . ERP system" was materially misleading because it failed to disclose that Vince was "implementing" a new "ERP system" based on a beta version of a new software platform and there was a substantial risk the system would not operate correctly.   In addition, the statement that "we will continue to utilize the Kellwood information technology infrastructure" until the new systems were implemented was materially misleading when made because:

(a)    there was a substantial undisclosed risk that redundancies from Kellwood's systems would not work correctly since Vince was attempting to implement a system based on a beta version of a new software platform that was not released as a finished product;

(b)    it provided false assurances to investors that Vince's systems would work correctly due to redundancies from Kellwood while it was attempting to implement its new software system; and

(c)    Defendants failed to disclose to investors that Vince had implemented the system before it was ready for operation and Kellwood's redundancies did not ensure that Vince would not experience problems with its systems.

137.    With respect to the Company's new distribution systems, the 3Q15 10-Q stated that Vince's "ability to meet the needs of . . . [its] retail stores" depended on the success of "new system integrations," and cautioned that problems with the transition and integration "could" adversely affect its financial results, stating, in pertinent part, as follows:

> *We are in the process of migrating our U.S. distribution system from Kellwood to a new third party provider.  Problems with our distribution system, including any disruption caused by the migration, could materially harm our ability to meet customer expectations, manage inventory, complete sale transactions and achieve targeted operating efficiencies.*
>
> In the U.S., we historically relied on a distribution facility operated by Kellwood in City of Industry, California as part of the Shared Services Agreement.  In November 2015, we entered into a service agreement with a new third-party distribution provider and commenced the migration of the distribution facility from Kellwood.  Our ability to meet the needs of our wholesale partners and our own retail stores depends on the proper operation of this distribution facility.  *The migration of these services from Kellwood requires us to implement new system integrations and requires Kellwood to assist with the migration.*  Although we have implemented a migration schedule and Kellwood has agreed to assist us through the process, *there can be no assurance that the transition from Kellwood to the third party, including the completion of such transition within our expected timeline, will be successful*, and problems encountered in such transition could have a material adverse effect on our business, financial condition, liquidity and results of operations.

138.    The statement referenced above in ¶137 was materially false and misleading because of the reasons set forth in ¶112.  In addition, the statement that the "new system integrations" could fail was materially false and misleading when made because there was

substantial undisclosed risk that the system itself – Dynamics AX-7 – would not be ready for use by Vince in connection with actual business operations.

139.    The 3Q15 10-Q contained SOX Certifications signed by Defendants Hoffman and Stefko certifying that the 3Q15 10-Q was accurate, not misleading, and free from fraud, using substantially similar language to the language referenced in ¶125 above.

140.    The statements referenced above in ¶139 were materially false and misleading when made because of the reasons set forth in ¶112.  In addition, the statements referenced in ¶139 were materially false and misleading when made because they misrepresented or failed to disclose the following facts which were known or recklessly disregarded by Defendants: (i) Vince's disclosure controls and internal controls were materially deficient and not operating effectively;  and (ii) based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's finances.

**4Q2015**

141.    On March 29, 2016, Vince issued a press release announcing its financial results for the quarter and year ended January 30, 2016 (the "FY 2015 Release").  The FY 2015 Release stated that the Company's net sales had decreased 13.6% to $81.8 million during the quarter and decreased 11.1% to $302.5 million for the year.  Also on March 29, 2016, Vince hosted an earnings call with investors and analysts to discuss the quarter and year end results, in which Defendant Hoffman and Defendant Stefko participated.  During the conference call, Defendant Hoffman stated that "we . . . will be migrating to a new platform that will enable us to increase the functionality of the site," stating, in pertinent part, as follows:

> In addition, ***we continue to be pleased with our e-commerce business, and will be migrating to a new platform that will enable us to increase the functionality of the site.***  This will be followed by a creative overhaul to ensure that the site is more reflective of the Vince brand, as we want consumers to have a consistent experience across channels.

142.    The statements referenced above in ¶141 were materially false and misleading because of the reasons set forth in ¶112 above.

143.    On April 14, 2016, Vince filed its annual report for fiscal year ended January 30, 2016 on Form 10-K with the SEC.  In the 2015 10-K, the Company stated that it was "in the process of implementing our own enterprise resource planning ("ERP") system, point-of-sale systems, e-commerce platform and supporting systems," and that it would "continue to utilize" the Kellwood ERP system until the new system is implemented, stating, in pertinent part, as follows:

**Shared Services Agreement**

In connection with the consummation of the IPO, Vince, LLC entered into a shared services agreement with Kellwood Company, LLC on November 27, 2013 (the "Shared Services Agreement") pursuant to which Kellwood Company, LLC would provide certain support services in various operational areas including, among other things, e-commerce operations, distribution, logistics, information technology, accounts payable, credit and collections and payroll and benefits. Since the IPO, we have been working on transitioning certain back office functions performed by Kellwood under the Shared Services Agreement.  Among these functions that have transitioned to Vince are certain accounting related functions as well as benefits administration.  ***We have also been working on developing our own information technology infrastructure and are now in the process of implementing our own enterprise resource planning ("ERP") system, point-of-sale systems, e-commerce platform and supporting systems.  We are also in the process of migrating our U.S. distribution system from Kellwood to a new third party provider.  Until those systems are implemented, we will continue to utilize the Kellwood information technology infrastructure, including e-commerce platform systems, under the Shared Services Agreement.***

*                *                *

**Shared Services Agreement**

On November 27, 2013, Vince, LLC entered into the Shared Services Agreement with Kellwood pursuant to which Kellwood would provide certain support services in various operational areas including, among other things, e-commerce operations, distribution, logistics, information technology, accounts payable, credit and collections and payroll and benefits.  Since the IPO, we have been working on transitioning certain back office functions performed by Kellwood under the Shared Services Agreement.  Among these functions that have

- 42 -

transitioned to Vince are certain accounting related functions as well as benefits administration. ***We have also been working on developing our own information technology infrastructure and are now in the process of implementing our own enterprise resource planning ("ERP") system, point-of-sale systems, ecommerce platform and supporting systems. We are also in the process of migrating our U.S. distribution system from Kellwood to a new third party provider. Until those systems are implemented, we will continue to utilize the Kellwood information technology infrastructure, including ecommerce platform systems, under the Shared Services Agreement.***

144.   The statements referenced above in ¶143 were materially false and misleading because of the reasons set forth in ¶112.  In addition, the statement that "we will continue to utilize the Kellwood information technology infrastructure" until the new systems were implemented was materially misleading when made because of the reasons set forth in ¶136.

145.   With respect to the new system, the 2015 10-K also stated that the "new ERP system is operated on a system from Microsoft Dynamics AX and is cloud based," stating, in pertinent part, as follows:

We have commenced the development and implementation of our own ERP, POS and supporting systems and network infrastructure, engaged with a new e-commerce platform provider and completed the migration of the human resource recruitment system.   The ERP, POS, e-commerce platform and supporting system implementations are expected to be completed in 2016. ***Our new ERP system is operated on a system from Microsoft Dynamics AX and is cloud based and will integrate with our new POS, e-commerce platform and other supporting systems.***   Collectively, these systems will replace the current ERP, Oracle Financials and all other systems currently used under the Shared Services Agreement.   Once implemented, we will no longer rely on Kellwood's information technology services.

146.   The statements referenced above in ¶145 were materially false and misleading when made because of the reasons set forth in ¶112.  The statement that "our new ERP system is operated on a system from Microsoft Dynamics AX" was materially misleading when made because it conveyed to investors that Vince was developing its ERP system around an existing, highly-dependable technology, Dynamics 2012, when in fact it was developing an ERP system

around a new technology that had not been proven, and Vince was utilizing a beta version of that product.

147.    The 2015 10-K purported to caution investors that "[t]he new [ERP] systems we implement may not operate as successfully as the systems we historically used," and that Vince's business and results of operations may be adversely affected if the transition was unsuccessful, stating, in pertinent part, as follows:

> ***Kellwood provides us with certain key services for our business, which we are in the process of transitioning to our own systems and processes.  If Kellwood fails to perform its obligations to us during the period of transition or if we cannot successfully transition these services to our own systems, our business, financial condition, results of operations and cash flows could be materially harmed.***
>
> Prior to the IPO and Restructuring Transactions that closed on November 27, 2013, we operated as a business unit of Kellwood, and we historically relied on the financial resources and the administrative and operational support systems of Kellwood to run our business.  Some of the Kellwood systems we continue to use following the IPO and Restructuring Transactions include ERP, POS and human resource management systems as well as distribution applications.  ***We are in the process of transitioning to our own systems and processes from those of Kellwood.  We have recently commenced the development and implementation of our own ERP, POS and supporting systems and network infrastructure, engaged with a new e-commerce platform provider and completed the migration of the human resource recruitment system.  The new systems we implement may not operate as successfully as the systems we historically used as such systems are highly customized or proprietary.***  Moreover, we may be unable to obtain necessary goods, technology and services to continue replacing the Kellwood systems in a timely manner to meet business needs or at prices and on terms as favorable as those available to us prior to the separation, which could increase our costs and reduce our profitability.  ***If we fail to successfully transition the systems, our business and results of operations may be materially and adversely affected.***

148.    The statements referenced above in ¶147 were materially false and misleading because of the reasons set forth in ¶112.  In addition, the statement that "[t]he new system we implement may not operate successfully as the systems we historically used as such systems are highly customized or proprietary," was materially misleading when made because it limited the

risk of transition failures to the customized and proprietary nature of ERP systems even though there was a substantial risk due to Vince using a beta version of a new unproven software platform.

149.    The 2015 10-K also warned investors that "[a]ny failure or significant downtime" of the legacy Kellwood systems or the new ERP systems during the transition period "could" adversely affect Vince's operations and financial results, stating, in pertinent part, as follows:

> We entered into a Shared Services Agreement in connection with the IPO and Restructuring Transactions on November 27, 2013. The Shared Services Agreement governs the provisions by which Kellwood provides certain support services to us, including distribution, information technology and back office support. Kellwood will provide these services until we elect to terminate the provision thereof in accordance with the terms of such agreement . . . *Any failure or significant downtime in our own financial or administrative systems or in Kellwood's financial or administrative systems during the transitional period and any difficulty in separating our assets from Kellwood's assets and integrating newly acquired assets into our business could result in unexpected costs, impact our results or prevent us from paying our suppliers and employees and performing other administrative services on a timely basis and materially harm our business, financial condition, results of operations and cash flows.*

150.    The statements referenced above in ¶149 were materially false and misleading when made because of the reasons set forth in ¶112.  In addition, the statement that "[a]ny failure or significant downtime in [our own or Kellwood's] financial or administrative systems . . . could . . . materially harm our business" was false and misleading because it failed to disclose that the risk of "downtime" was amplified due to the use of beta software.

151.    With respect to the Company's new distribution systems, the 2015 10-K stated that Vince's "ability to meet the needs of . . . [its] retail stores" depended on the success of "new system integrations," and cautioned that problems with the transition and integration "could" adversely affect its financial results, stating, in pertinent part, as follows:

> *We are in the process of migrating our U.S. distribution system from Kellwood to a new third party provider. Problems with our distribution system, including any disruption caused by the migration, could materially harm our ability to*

*meet customer expectations, manage inventory, complete sale transactions and achieve targeted operating efficiencies.*

In the U.S., we historically relied on a distribution facility operated by Kellwood in City of Industry, California as part of the Shared Services Agreement.  In November 2015, we entered into a service agreement with a new third-party distribution provider in California and commenced the migration of the distribution facility from Kellwood.  ***Our ability to meet the needs of our wholesale partners and our own direct-to-consumer business depends on the proper operation of this distribution facility. The migration of these services from Kellwood requires us to implement new system integrations and requires Kellwood to assist with the migration.***  The migration commenced during the first quarter of 2016.  Although we have implemented a migration schedule and Kellwood has agreed to assist us through the process of migrating the rest of the business, ***there can be no assurance that the transition from Kellwood to the third party, including the completion of such transition within our expected timeline, will be successful, and problems encountered in such transition, including significant chargebacks from our wholesale partners and delays in shipments of merchandise to our customers, could have a material adverse effect on our business, financial condition, liquidity and results of operations.***  We also have a warehouse in Belgium operated by a third-party logistics provider to support our wholesale orders for customers located primarily in Europe.

152.   The statements referenced above in ¶151 were materially false and misleading because of the reasons set forth in ¶112.  In addition, the statement that the "new systems integrations" could fail was materially false and misleading when made because there was an undisclosed risk that the system itself – Dynamics AX-7 – would not ready for use by Vince in connection with actual business operations.

153.   The 2015 10-K also represented that Vince management had reviewed the Company's internal controls over financial report and that these controls were effective as of January 30, 2016.  The 2015 10-K stated in pertinent part:

*Changes in Internal Control Over Financial Reporting*

*There was no change in our internal control over financial reporting that occurred during our latest fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting*.

*Management's Annual Report on Internal Control Over Financial Reporting*

- 46 -

Management, including our Chief Executive Officer and Chief Financial Officer, is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) and 15d-15(f) under the Exchange Act). Our internal control over financial reporting is a process to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Our internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on our financial statements.

*       *       *

Management assessed the effectiveness of our internal control over financial reporting as of January 30, 2016. In making this assessment, management used the criteria established by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control-Integrated Framework (2013). ***Based on this assessment, management has concluded that, as of January 30, 2016, our internal control over financial reporting was effective, at a reasonable assurance level***.

154.     The statements referenced above in ¶153 were materially false and misleading when made because they misrepresented or failed to disclose that as a result of the transition, Vince's disclosure controls and internal controls were materially deficient and not operating effectively.

155.     The 2015 10-K contained SOX Certifications signed by Defendants Hoffman and Stefko certifying that the 2015 10-K was accurate, not misleading, and free from fraud, using substantially similar language to the language referenced in ¶125 above.

156.     The statements referenced above in ¶155 were materially false and misleading because of the reasons set forth in ¶112.   In addition, the statements referenced in ¶155 were materially false and misleading when made because they misrepresented or failed to disclose that

Vince's disclosure controls and internal controls were materially deficient and not operating effectively.

**Fiscal Year 2016**

**1Q16**

157.    On June 7, 2016, Vince hosted an earnings call with investors and analysts to discuss the Company's first quarter results, in which Defendant Hoffman and Defendant Stefko participated.   Defendant Hoffman used his prepared remarks to once again highlight the Company's purported successes in substantially completing the transition its distribution systems away from Kellwood, and the Company's continuing progress in transitioning the remaining IT systems, stating, in pertinent part, as follows:

> Finally, we continue to make investments in the business that will ultimately support our long-term growth.   ***During the first quarter we substantially completed the changeover to our new distribution center, which will enable us to better control our inventory going forward and***, in turn, drive gross margin expansion.

> In addition, ***we continue to make progress on our IT migration which is due to be completed later this year***.   Among the benefits will be better reporting analytics as well as improved functionality on the website, which should also drive higher margin in the future.

158.    The statements referenced above in ¶157 were materially false and misleading because of the reasons set forth in ¶112.   In addition, the statement that Vince "substantially completed the changeover to our new distribution center" was materially false and misleading when made because it failed to disclose that the distribution facilities had no dependable means of communicating with the Company's existing systems.   The statement that the transition to the new distribution facility "will enable us to better control our inventory" was materially false and misleading when made because it failed to disclose that the new distribution system hindered the Company's ability to manage its inventory.

159.    On June 8, 2016, Vince filed its quarterly report for the period ended April 30, 2016 on Form 10-Q with the SEC.  In the 1Q16 10-Q, the Company stated that it was "in the process of implementing its own enterprise resource planning ("ERP") system, point-of-sale systems, e-commerce platform and supporting systems," and that "[u]ntil those systems are implemented, the Company will continue to utilize the Kellwood information technology infrastructure," stating, in pertinent part, as follows:

**Shared Services Agreement**

In connection with the consummation of the Company's IPO on November 27, 2013, Vince, LLC entered into a Shared Services Agreement pursuant to which Kellwood would provide support services in various operational areas, including, among other things, e-commerce operations, distribution, logistics, information technology, accounts payable, credit and collections and payroll and benefits. Since the IPO, the Company has been working on transitioning certain back office functions performed by Kellwood under the Shared Services Agreement. Among these functions that have transitioned to Vince are certain accounting related functions as well as benefits administration.  ***The Company has also been working on developing its own information technology infrastructure and is now in the process of implementing its own enterprise resource planning ("ERP") system, point-of-sale systems, e-commerce platform and supporting systems.***  The Company has substantially completed the migration of its U.S. distribution system from Kellwood to a new third party provider. ***Until those systems are implemented, the Company will continue to utilize the Kellwood information technology infrastructure, including e-commerce platform systems, under the Shared Services Agreement.***

160.    The statements referenced above in ¶159 were materially false and misleading because of the reasons set forth in ¶112.  In addition, the statement that "the Company will continue to utilize the Kellwood information technology infrastructure" until the new systems were implemented was materially misleading when made because of the reasons set forth in ¶136.  The statement that "[t]he Company has substantially completed the migration of its U.S. distribution system from Kellwood to a new third party provider" was materially false and misleading when made because it failed to disclose that the distribution facilities had no dependable means of communicating with the Company's existing systems.

161.    With respect to the transition of the distribution systems, the 1Q16 10-Q stated that it was required "to implement new system integrations," and that "[p]roblems with our distribution system, including any disruption caused by the migration, could materially harm our ability to meet customer expectations, manage inventory, complete sale transactions and achieve targeted operating efficiencies," stating, in pertinent part, as follows:

> ***We have substantially completed the process of migrating our U.S. distribution system from Kellwood to a new third party provider. Problems with our distribution system, including any disruption caused by the migration, could materially harm our ability to meet customer expectations, manage inventory, complete sale transactions and achieve targeted operating efficiencies.***
>
> In the U.S., we historically relied on a distribution facility operated by Kellwood in City of Industry, California as part of the Shared Services Agreement.  In November 2015, we entered into a service agreement with a new third-party distribution provider in California and substantially completed the migration of the distribution facility from Kellwood during the first quarter of fiscal year 2016.  ***Our ability to meet the needs of our wholesale partners and our own direct-to-consumer business depends on the proper operation of this distribution facility. The migration of these services from Kellwood required us to implement new system integrations and required Kellwood to assist with the migration.  There can be no assurance that we will not encounter problems as a result of such transition, including significant chargebacks from our wholesale partners and delays in shipments of merchandise to our customers, which could have a material adverse effect on our business, financial condition, liquidity and results of operations.***  We also have a warehouse in Belgium operated by a third-party logistics provider to support our wholesale orders for customers located primarily in Europe.

162.    The statements referenced above in ¶161 were materially false and misleading because of the reasons set forth in ¶112.  In addition, the statement that Vince "substantially completed the migration of its U.S. distribution system from Kellwood" was materially false and misleading when made because it failed to disclose that the distribution facilities had no dependable means of communicating with the Company's existing systems.  The statement that the "new system integrations" could fail was materially false and misleading when made because there was an undisclosed risk that the system itself – Dynamics AX-7 – would not be ready for

use by Vince in connection with actual business operations.  Finally, the statement that problems with the transition "could materially harm our ability to meet customer expectations, manage inventory, complete sale transactions and achieve targeted operating efficiencies," was false and misleading when made because those problems had already materialized and were known to Vince management.

163.  The 1Q16 10-Q contained SOX Certifications signed by Defendants Hoffman and Stefko certifying that the 1Q16 10-Q was accurate, not misleading, and free from fraud, using substantially similar language to the language referenced in ¶125.

164.  The statements referenced above in ¶163 were materially false and misleading because of the reasons set forth in ¶112.  In addition, the statements referenced in ¶163 were materially false and misleading when made because they misrepresented or failed to disclose the following facts which were known or recklessly disregarded by Defendants: (i) Vince's disclosure controls and internal controls were materially deficient and not operating effectively; and (ii) based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's finances.

**2Q16**

165.  On September 8, 2016, the Company issued a press release announcing its financial results for the second quarter ended July 30, 2016 (the "2Q 2016 Release").  The 2Q 2016 Release stated that net sales for the Company had decreased by 24.1% to $60.7 million during the quarter.  It also stated that the Company had posted a net loss of $2.0 million, or $0.04 per share, for the quarter.  That same day, the Company hosted a conference call for investors and analysts, during which Defendant Hoffman stated that "our infrastructure, e-commerce site, and POS system in our stores are now all live," stating, in pertinent part, as follows:

We completed the transition of our e-commerce site to Demandware in July, and have continued to see strong performance in this business. The site looks fantastic. We now have added functionality which will further enhance our customer experience. We are incredibly pleased with the elevated look and feel on our website, as well as the way that it's translated to our social media outreach as we work to reconnect and re-engage customers with the Vince brand and recapture the DNA.

I would note that the product changeover for fall was delayed a few weeks by the migration to our distribution center, which was not entirely unexpected with a project of this nature. It is largely behind us now. ***Importantly our infrastructure, e-commerce site and POS system in our stores are now all live***. We are still working on upgrading the systems for our wholesale business and back-office functions, and expect these transitions to be substantially completed by year end.

166.    The statements referenced above in ¶165 were materially false and misleading because of the reasons set forth in ¶112.

167.    In addition, during the September 8, 2016 conference call, Defendant Stefko stated that the Company was "working on . . . the transition of our warehouse to our independent third-party provider away from [Kellwood]," stating, in pertinent, as follows:

One, things we've been working on which we talked about, the transition of our warehouse to our independent third-party provider away from [Kellwood]. And then there's some factors of headcount that we've added. And then when we look at the back half of the year, we're looking at things, just from a delivery standpoint, being more efficient in our supply chain, how quick we can get product from when it hits the port onto the shelf, investments in that. Some of looking at supply chain is causing us to look at some investments in leadership which we may make. And then also exit packaging, looking at how we deliver to the customer when you look at our direct-to-consumer channel.

168.    The statements referenced above in ¶167 were materially false and misleading because of the reasons set forth in ¶112.

169.    Also, on September 8, 2016, Vince filed its quarterly report for the fiscal period ended July 30, 2016 on Form 10-Q with the SEC. In the 2Q16 10-Q, Vince stated that "the Company has been working on transitioning certain functions performed by Kellwood under the Shared Services Agreement," and stated that "[u]ntil those systems are implemented, the

Company will continue to utilize the Kellwood information technology infrastructure," stating, in pertinent part, as follows:

### Shared Services Agreement

In connection with the consummation of the Company's IPO on November 27, 2013, Vince, LLC entered into a Shared Services Agreement with Kellwood (the "Shared Services Agreement"), pursuant to which Kellwood would provide support services in various areas, including, among other things, certain accounting functions, tax, e-commerce operations, distribution, logistics, information technology, accounts payable, credit and collections and payroll and benefits administration.   Since the IPO, the Company has been working on transitioning certain functions performed by Kellwood under the Shared Services Agreement.   Functions that have transitioned to the Company, including its outsource service providers, include certain accounting related functions, e-commerce customer service, distribution and logistics, payroll and benefits administration and information technology support for systems that have been implemented.   ***Additionally, to date, the Company has completed the implementation of its own point-of-sale system, third party e-commerce platform, human resource recruitment system, distribution applications, and network infrastructure.   The Company is currently in the process of transitioning the remainder of the Kellwood systems and services, including tax, accounts payable, credit and collections, as well as its own enterprise resource planning ("ERP") and supporting systems and related IT support services. Until those systems are implemented, the Company will continue to utilize the Kellwood information technology infrastructure under the Shared Services Agreement.***

170.    The statements referenced above in ¶169 were materially false and misleading because of the reasons set forth in ¶112.   In addition, the statement that "the Company will continue to utilize the Kellwood information technology infrastructure" until the new systems were implemented was materially misleading when made because of the reasons set forth in ¶136. The statement that "[t]he Company has completed the implementation of its own point-of-sale system, third party e-commerce platform, human resource recruitment system, distribution applications, and network infrastructure" was materially false and misleading when made because it failed to disclose serious, known problems with the Company's retail applications and network infrastructure.

171.    With respect to the transition to, and integration of, the new distribution systems, the 2Q16 10-Q stated that Vince was "required . . . to implement new system integrations" and that "[p]roblems with our distribution system, including any disruption caused by the migration, could materially harm our ability to meet customer expectations, manage inventory, complete sale transactions and achieve targeted operating efficiencies," stating, in pertinent part, as follows:

> ***We have substantially completed the process of migrating our U.S. distribution system from Kellwood to a new third party provider.  Problems with our distribution system, including any disruption caused by the migration, could materially harm our ability to meet customer expectations, manage inventory, complete sale transactions and achieve targeted operating efficiencies.***
>
> In the U.S., we historically relied on a distribution facility operated by Kellwood in City of Industry, California as part of the Shared Services Agreement.  In November 2015, we entered into a service agreement with a new third-party distribution provider in California and substantially completed the migration of the distribution facility from Kellwood during the first quarter of fiscal 2016. ***Our ability to meet the needs of our wholesale partners and our own direct-to-consumer business depends on the proper operation of this distribution facility. The migration of these services from Kellwood required us to implement new system integrations and required Kellwood to assist with the migration.  There can be no assurance that we will not encounter problems as a result of such transition, including significant chargebacks from our wholesale partners and delays in shipments of merchandise to our customers, which could have a material adverse effect on our business, financial condition, liquidity and results of operations.***  We also have a warehouse in Belgium operated by a third-party logistics provider to support our wholesale orders for customers located primarily in Europe.

172.    The statements referenced above in ¶171 were materially false and misleading because of the reasons set forth in ¶112.  In addition, the statement that problems with the transition "could materially harm our ability to meet customer expectations, manage inventory, complete sale transactions and achieve targeted operating efficiencies," was false and misleading when made because those problems had already materialized and were known to Vince management.

173.    The 2Q16 10-Q also announced that Vince had completed the implementation of key retail applications, including POS, distribution, and network infrastructure, and was on track to complete the implementation of its new ERP system.  It nevertheless cautioned investors that "[t]he new systems . . . may not, initially or at all, operate as successfully as the systems we historically used," stating, in pertinent part, as follows:

> **Kellwood has provided us with certain key services for our business since the IPO. We have substantially completed the transition of some of such services to our own systems or processes, and are in the process of transitioning the rest of the services to internal and external resources. If we cannot successfully implement the necessary new systems, processes and functions, or complete the transition of the remaining services from Kellwood, our business, financial condition, results of operations and cash flows could be materially harmed.**
>
> Since the IPO and Restructuring Transactions, we have relied on certain administrative and operational support functions and systems of Kellwood to run our business pursuant to a Shared Services Agreement (the "Shared Services Agreement"), dated November 27, 2013, by and between Kellwood and us.  **To date, we have completed the implementation of our own point-of-sale system, third party e-commerce platform, human resource recruitment system, distribution applications, and network infrastructure. The new systems we have recently implemented may not, initially or at all, operate as successfully as the systems we historically used as such systems were highly customized or proprietary.**  Moreover, the processes and functions that were transitioned to our internal capabilities may not achieve the appropriate levels of operational efficiency in a timely manner, or at all.  In addition, we have transitioned certain support services, including e-commerce operations, distribution, logistics, accounting, payroll, benefits administration, and information technology support for our systems implemented to either internal or external resources.  **We are currently in the process of transitioning the remainder of the Kellwood systems and services, including tax, accounts payable, credit and collections, as well as our own enterprise resource planning ("ERP") and supporting systems and related IT support services, and we expect to complete such transition by the end of fiscal 2016.**  We have engaged third party service providers to assume tax, accounts payable, collections as well as information technology support functions from Kellwood and are in the process of integrating the service providers into our processes.  The third party service providers may be unable to effectively replace the functions historically provided by Kellwood in a manner that meets our business needs.  **If we are unable to successfully implement these new systems, processes and functions, or fail to complete the transition of the remaining systems and functions from Kellwood in a timely manner or as planned, we may be forced to adopt more costly, less capable alternatives to replace those systems**

*and functions and our business and results of operations, cash flows and liquidity may be materially and adversely affected.*

174.    The statements referenced above in ¶173 were materially false and misleading because of the reasons set forth in ¶112.  In addition, the statement that "we have completed the implementation" of key retail systems was materially false and misleading when made because it failed to disclose serious, known problems with the Company's retail applications and network infrastructure.  Furthermore, the statement that "[t]he new systems we implement may not operate successfully as the systems we historically used as such systems are highly customized or proprietary," was materially false and misleading when made because it conveyed to investors that the risk of transition failures was due solely to the customized and proprietary nature of ERP systems, and not due to any other factor.

175.    At the same time, the 2Q16 10-Q assured investors that it would continue using the Kellwood Systems until the new systems were fully implemented, stating, in pertinent part, as follows:

**Shared Services Agreement**

In connection with the consummation of the Company's IPO on November 27, 2013, Vince, LLC entered into a Shared Services Agreement with Kellwood (the "Shared Services Agreement"), pursuant to which Kellwood would provide support services in various areas, including, among other things, certain accounting functions, tax, e-commerce operations, distribution, logistics, information technology, accounts payable, credit and collections and payroll and benefits administration. Since the IPO, the Company has been working on transitioning certain functions performed by Kellwood under the Shared Services Agreement. Functions that have transitioned to the Company, including its outsource service providers, include certain accounting related functions, e-commerce customer service, distribution and logistics, payroll and benefits administration and information technology support for systems that have been implemented. Additionally, *to date, the Company has completed the implementation of its own point-of-sale system, third party e-commerce platform, human resource recruitment system, distribution applications, and network infrastructure. The Company is currently in the process of transitioning the remainder of the Kellwood systems and services, including tax, accounts payable, credit and collections, as well as its own enterprise resource*

- 56 -

*planning ("ERP") and supporting systems and related IT support services. Until those systems are implemented, the Company will continue to utilize the Kellwood information technology infrastructure under the Shared Services Agreement.*

176.    The statements referenced above in ¶175 were materially false and misleading because of the reasons set forth in ¶112.  In addition, the statement that "we have completed the implementation" of key retail systems was materially false and misleading when made because it failed to disclose serious, known problems with the Company's retail applications and network infrastructure.  Furthermore, the statement that "the Company will continue to utilize the Kellwood information technology infrastructure" until the new systems were implemented was materially misleading when made because of the reasons set forth in ¶136.

177.    The 2Q16 10-Q contained SOX Certifications signed by Defendants Hoffman and Stefko certifying that the 2Q16 10-Q was accurate, not misleading, and free from fraud, using substantially similar language to the language referenced in ¶125.

178.    The statements referenced above in ¶177 were materially false and misleading because of the reasons set forth in ¶112.  In addition, the statements referenced in ¶177 were materially false and misleading when made because they misrepresented or failed to disclose the following facts which were known or recklessly disregarded by Defendants: (i) Vince's disclosure controls and internal controls were materially deficient and not operating effectively; and (ii) based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's finances.

**3Q16**

179.    On December 8, 2016, Vince hosted an earnings call with investors and analysts to discuss the Company's third quarter results, in which Defendant Hoffman and Defendant Stefko participated.  In his prepared remarks, Defendant Hoffman stated that certain transition

steps had "negatively impacted near-term results to a larger degree than we initially expected," but failed to disclose the severity of these issues, stating, in pertinent part, as follows:

> However, our results for the quarter reflect ongoing headwinds in the retail and macro environment, including continuing traffic challenges and warm weather. ***In addition, as you know we have taken several steps to transition the business, some of which negatively impacted near-term results to a larger degree than we initially expected, particularly in our retail business.*** We nonetheless believe these measures are right for the business long-term.
>
> *         *         *
>
> We are starting to see the momentum build behind our business, ***although the clear pivot in results will take a little longer than we originally anticipated.*** We have an excellent team that is engaged and excited to continue moving forward as they gather insights to enhance our collections, and enable us to continue to make more prudent decisions about our brand. I think that we are where we need to be at this point, and we will continue to make strides towards gaining market share within the wholesale channel, expanding our direct-to-consumer presence, growing international, and expanding the business over the long-term.

180.    The statements referenced above in ¶179 were materially false and misleading because of the reasons set forth in ¶112.  In addition, the statements that the Company's efforts to transition away from the Kellwood systems "negatively impacted near term results to a larger degree than we initially expected, particularly in our retail business" and that "the clear pivot in results will take a little longer than we originally anticipated" were materially false and misleading when made because they failed to disclose that the issues were due to data integration issues caused by the Company's use of beta AX-7 software, and that Defendants were well aware of the risks of relying on a beta software platform.  Indeed, Microsoft, the developer of the platform, recommended against relying on the beta version.

181.    During the same conference call, Defendant Stefko told investors that "we have brought in new software platforms and hardware configurations that will manage every facet of the business [and] it has taken us longer to complete this transition than we initially projected."

Nevertheless, Defendant Stefko represented that "we are executing the final phase of this new platform," stating, in pertinent part, as follows:

> Since Vince spun-off from Kellwood, we have continued to operate on all Kellwood IT platforms through a shared services agreement. As we previously discussed, *we undertook an IT migration project to make us completely independent from Kellwood. Given the complexity of this project, as we have brought in new software platforms and hardware configurations that will manage every facet of the business, it has taken us longer to complete this transition than we initially projected*.
>
> *As we speak, we are executing the final phase of this new platform,* and therefore expect that most of the costs associated with this migration will be behind us after this year. As Brendan mentioned, we believe this strategic investment will drive future efficiency and support growth.

182.    The statements referenced above in ¶181 were materially false and misleading because of the reasons set forth in ¶112.  In addition, the statement that "we have brought in new software platforms and hardware configurations that will manage every facet of the business" was materially false and misleading when made because it failed to disclose that the new software that was intended to "manage every facet of the business" was in fact beta AX-7 software, and that Defendants were well aware of the risks of relying on a beta software platform.  Indeed, Microsoft, the developer of the platform, recommended against relying on the beta version.

183.    Also on December 8, 2016, Vince filed its quarterly report for the fiscal period ended October 29, 2016 on Form 10-Q with the SEC.  In the 3Q16 10-Q, Vince announced that it had completed the transition of various retail applications, and was in the process of implementing its own ERP system.  At the same time, Vince assured investors it would "continue to utilize the Kellwood information technology infrastructure under the Shared Services Agreement" until the new ERP system was fully implemented, stating, in pertinent part, as follows:

**Shared Services Agreement**

In connection with the consummation of the Company's IPO on November 27, 2013, Vince, LLC entered into a Shared Services Agreement with Kellwood (the "Shared Services Agreement"), pursuant to which Kellwood would provide support services in various areas, including, among other things, certain accounting functions, tax, e-commerce operations, distribution, logistics, information technology, accounts payable, credit and collections and payroll and benefits administration.   Since the IPO, the Company has been working on transitioning certain functions performed by Kellwood under the Shared Services Agreement.   Functions that have transitioned to the Company, including its outsource service providers, include certain accounting related functions, e-commerce customer service, distribution and logistics, payroll and benefits administration and information technology support for systems that have been implemented.   Additionally, ***to date, the Company has completed the implementation of its own point-of-sale system, third party e-commerce platform, human resource recruitment system, distribution applications, and network infrastructure.*** The Company is currently in the process of transitioning the remainder of the Kellwood systems and services, including tax, accounts payable, credit and collections, as well as its own enterprise resource planning ("ERP") and supporting systems and related IT support services.   ***Until those systems are implemented, the Company will continue to utilize the Kellwood information technology infrastructure under the Shared Services Agreement.***

184.   The statements referenced above in ¶183 were materially false and misleading because of the reasons set forth in ¶112.  In addition, the statement that "we have completed the implementation" of key retail systems was materially false and misleading when made because it failed to disclose serious, known problems with the Company's retail applications and network infrastructure.  Furthermore, the statement that Vince "will continue to utilize the Kellwood information technology infrastructure" until the new systems were implemented was materially misleading when made because of the reasons set forth in ¶136.

185.   With respect to the transition to, and integration of, the new distribution systems, the 3Q16 10-Q stated that Vince was "required . . . to implement new system integrations" and that "[p]roblems with our distribution system, including any disruption caused by the migration, could materially harm our ability to meet customer expectations, manage inventory, complete

sale transactions and achieve targeted operating efficiencies," stating, in pertinent part, as follows:

> *We have completed the process of migrating our U.S. distribution system from Kellwood to a new third party provider. Problems with our distribution system, including any disruption caused by the migration, could materially harm our ability to meet customer expectations, manage inventory, complete sale transactions and achieve targeted operating efficiencies.*
>
> In the U.S., we historically relied on a distribution facility operated by Kellwood in City of Industry, California as part of the Shared Services Agreement.   In November 2015, we entered into a service agreement with a new third-party distribution provider in California and *completed the migration* of the distribution facility from Kellwood in 2016. Our ability to meet the needs of our wholesale partners and our own direct-to-consumer business depends on the proper operation of this distribution facility.   *The migration of these services from Kellwood required us to implement new system integrations. There can be no assurance that we will not encounter problems as a result of such transition to the new third party provider, including significant chargebacks from our wholesale partners and delays in shipments of merchandise to our customers, which could have a material adverse effect on our business, financial condition, liquidity and results of operations.*   We also have a warehouse in Belgium operated by a third-party logistics provider to support our wholesale orders for customers located primarily in Europe.

186.    The statements referenced above in ¶185 were materially false and misleading because of the reasons set forth in ¶112.  In addition, the statement that the Company "completed the migration of the distribution facility" was materially false and misleading when made because it failed to disclose that the distribution facilities had no dependable means of communicating with the Company's existing systems.  In addition, the statement that the "new system integrations" could fail was materially false and misleading when made because there was an undisclosed risk that the system itself – Dynamics AX-7 – would not be ready for use by Vince in connection with actual business operations.  Finally, the statement that problems with the transition "could materially harm our ability to meet customer expectations, manage inventory, complete sale transactions and achieve targeted operating efficiencies," was materially

false and misleading when made because those problems had already materialized and were known to Vince management.

187.     The 3Q16 10-Q further warned that Vince's financial results could be harmed if Vince failed to successfully implement the new ERP system or complete the transition from the legacy Kellwood Systems, stating, in pertinent part, as follows:

> ***Kellwood has provided us with certain key services for our business since the IPO. We have substantially completed the transition of some of such services to our own systems or processes, and are in the process of transitioning the rest of the services to internal and external resources.  If we cannot successfully implement the necessary new systems, processes and functions, or complete the transition of the remaining services from Kellwood, our business, financial condition, results of operations and cash flows could be materially harmed.***

> Since the IPO and Restructuring Transactions, we have relied on certain administrative and operational support functions and systems of Kellwood to run our business pursuant to a Shared Services Agreement (the "Shared Services Agreement"), dated November 27, 2013, by and between Kellwood and us. To date, we have completed the implementation of our own point-of-sale system, third party e-commerce platform, human resource recruitment system, distribution applications, and network infrastructure.  ***The new systems we have recently implemented may not, initially or at all, operate as successfully as the systems we historically used as such systems were highly customized or proprietary. Moreover, the processes and functions that were transitioned to our internal capabilities may not achieve the appropriate levels of operational efficiency in a timely manner, or at all.*** In addition, we have transitioned certain support services, including e-commerce operations, distribution, logistics, accounting, payroll, benefits administration, and information technology support for our systems implemented to either internal or external resources.  ***We are currently in the process of transitioning the remainder of the Kellwood systems and services, including tax, accounts payable, credit and collections, as well as our own enterprise resource planning ("ERP") and supporting systems and related IT support services, and we expect to complete such transition by the end of fiscal 2016.***  We have engaged third party service providers to assume tax, accounts payable, collections as well as information technology support functions from Kellwood and are in the process of integrating the service providers into our processes. The third party service providers may be unable to effectively replace the functions historically provided by Kellwood in a manner that meets our business needs.  ***If we are unable to successfully implement these new systems, processes and functions, or fail to complete the transition of the remaining systems and functions from Kellwood in a timely manner or as planned, we may be forced to adopt more costly, less capable alternatives to replace those systems***

*and functions and our business and results of operations, cash flows and liquidity may be materially and adversely affected.*

188.    The statements referenced above in ¶187 were materially false and misleading because of the reasons set forth in ¶112.  In addition, the statement that "[w]e have substantially completed the transition of some of such services to our own systems or processes," was materially false and misleading when made because it failed to disclose that the newly-implemented systems had no dependable means of communicating with the Company's existing systems or with each other.  In addition, the statement that "the new systems we have recently implemented may not . . . operate as successfully as the systems we historically used as such systems were highly customized or proprietary," was materially false and misleading when made because it indicated that the risk of transition failures was due solely to the customized and proprietary nature of ERP systems, and not due to any other factor, including the use of an entirely new type of software platform, and the beta version of the platform, as opposed to a finished version.

189.    The 3Q16 10-Q contained SOX Certifications signed by Defendants Hoffman and Stefko certifying that the 3Q16 10-Q was accurate, not misleading, and free from fraud, using substantially similar language to the language referenced in ¶125.

190.    The statement referenced above in ¶189 was materially false and misleading because of the reasons set forth in ¶112.  In addition, the statements referenced in ¶189 were materially false and misleading when made because they misrepresented or failed to disclose the following facts which were known or recklessly disregarded by Defendants: (i) Vince's disclosure controls and internal controls were materially deficient and not operating effectively; and  (ii) based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's finances.

## VINCE DISCLOSES PROBLEMS
## WITH THE INTEGRATION

191.    On April 14, 2017, Vince issued a press release announcing that it would be unable to timely file its annual report for the fiscal year ended January 28, 2017.  In the release, the Company revealed that the delay was "necessary due to unanticipated delays in compiling financial reports and other data that are necessary in preparing and completing the financial statements."

192.    The press release stated that the delays were "related to the transition from Kellwood, the Company's former parent company, and *the integration of the Company's new ERP System with its internal business processes and third-party systems*, as well as additional procedures and processes that the Company is undertaking to ensure that its financial statements are fairly and accurately presented."  Finally, the release revealed that the Kellwood transition and implementation had likely caused one or more material weaknesses in internal controls, that the Company believed it would need to take material asset impairment charges, and that the Company had run into severe liquidity challenges that threatened its ability to continue to operate as a going concern.

193.    On this news, the price of Vince stock declined approximately 19%, or $2.29 per share, to close at $9.59 per share on April 17, 2017, the next trading day, on abnormally high trading volume.  However, because Defendants failed to disclose the full truth about the nature, extent, and severity of the problems from the Company's systems migration and the impact of these problems on Vince's financial results, business, and prospects, the price of Vince stock remained at inflated levels.

194.    Two weeks later, on April 28, 2017, the Company issued a press release announcing its fourth quarter and year ended January 28, 2017 financial results (the "FY 2016

Release"). The FY 2016 Release revealed that Vince's sales had declined 21.9% to $63.9 million during the quarter and declined 11.3% to $268.2 million for the year. The net annual sales results were $11.8 million below the low-end of the Company's previously-announced 2016 guidance. The FY 2016 Release also stated that Vince had posted a staggering net loss of $162.1 million, or $3.28 per share, for the quarter, partly as a result of a massive non-cash long-lived asset impairment charge. For the full year, the Company had suffered a loss of $3.50 per share, compared to the Company's prior EPS guidance of $0.00 to $0.08. The FY 2016 Release blamed the abysmal performance on problems related to the transfer of Vince's systems away from Kellwood, which Vince belatedly acknowledged had led to delayed shipments, off-price shipments and lower than expected performance. In addition, the FY 2016 Release disclosed that there was substantial doubt about Vince's ability to operate as a going concern.

195.    That same day, Vince confirmed that it had identified material weaknesses related to its risk assessment controls and the design and maintenance of its critical information systems controls as a result of the Company's botched systems migration. Specifically, the Company's Form 10-K filing for the year ended January 28, 2017, acknowledged,

> [w]e did not maintain appropriate corporate governance and oversight, change management and system implementation controls intended to address the risks associated with the implementation of our ERP and payroll systems and to timely identify and appropriately mitigate such risk prior to transitioning to the new systems . . . the Company did not (i) ***maintain program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records were tested, approved and implemented appropriately***; and (ii) maintain adequate user access controls to ensure appropriate segregation of duties and to adequately restrict access to financial applications and data.

196.    Vince stock price plummeted in response to the Company's disclosure. Over the course of three trading days, the price of Vince stock declined 72%, or $8.86 per share, to close at $3.47 per share on May 2, 2017.

197.    On May 19, 2017, Vince issued a press release announcing that it had received a written notification from the NYSE two days before notifying the Company that it did not satisfy exchange requirements that it maintain a 30-day average closing stock price above $1 per share and a market capitalization above $50 million. By comparison, in the months following the IPO, Vince boasted a market capitalization of more than $1 billion.

## DEFENDANTS FAILED TO DISCLOSE
## KNOWN MATERIAL TRENDS OR UNCERTAINTIES

198.    Vince's Relevant Period Forms 10-K and 10-Q failed to disclose material information required to be disclosed therein pursuant to controlling SEC rules and regulations.

199.    The SEC created specific rules governing the content of disclosures made by public companies in their filings with the SEC.  SEC Regulation S-K requires that every Form 10-K and 10-Q filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §229.303.  The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

200.    Item 303(a)(3) of Regulation S-K requires that the MD&A section of a company's filings with the SEC (*i.e.*, Forms 10-Q and 10-K), among other things:

(i) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected.  In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

(ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material *favorable or unfavorable* impact on net sales or revenues or income from continuing operations.  If the registrant knows

of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

201.     Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."  According to the SEC's interpretive guidance on Item 303, issued on May 18, 1989: "A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation."

202.     Defendants' use of beta software in the development and implementation of its ERP systems during the Relevant Period constituted events and created uncertainties that were both "presently known to management" – who themselves participated in that course of conduct – and "reasonably likely to have material effects on [Vince's] condition or results of operation" (and indeed did have those effects).

203.     Defendants violated the affirmative disclosure duties imposed by Item 303 of Regulation S-K, and, thus Section 10(b) of the Exchange Act, by failing to disclose in Vince's Relevant Period Forms 10-K and 10-Q:

(a)     that the Company was developing an ERP system around a new technology that had not been proven, and did not utilize middleware to perform necessary data integration processes;

(b)     that the Company was developing its ERP platform using a unfinished beta-version of AX-7 that had been released for testing and development purposes only; and

(c)     that the foregoing conduct dramatically increased the risk of severe complications, and did cause complications, during the transition, and the likelihood that Vince's business and results of operations would be adversely affected.

204.     In sum, the foregoing concealed facts were required to be disclosed because they were, among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material [favorable or unfavorable] impact on net sales, revenues, or income from continuing operations"; and/or (iii) "unusual or infrequent events or transactions [or significant economic changes] that [were] materially affect[ing] the amount of reported income from continuing operations."

## THE RISK DISCLOSURES IN VINCE'S
## PUBLIC DISCLOSURES WERE INADEQUATE

205.     Item 503(c) of Regulation S-K [17 C.F.R. §229.503] imposes a disclosure obligation on private issuers such as Vince.  It requires that a prospectus or other required filings contain "a discussion of the most significant factors that make the offering speculative or risky." Once undertaken, such a discussion, whether voluntary or required, must be complete and accurate.

206.     Defendants violated the affirmative disclosure duties imposed by Item 503(c), and thus Section 10(b) of the Exchange Act, because the risk factors contained in Vince's Relevant Period Forms 10-K and 10-Q were neither complete, nor accurate, because they failed to disclose the following significant factors:

(a)    that the Company was developing an ERP system around a new technology that had not been proven, and did not utilize middleware to perform necessary data integration processes;

(b)    that the Company was developing its ERP platform using a unfinished beta-version of AX-7 that had been released for testing and development purposes only; and

(c)    that the foregoing conduct dramatically increased the risk of severe complications, and did cause complications, during the transition, and the likelihood that Vince's business and results of operations would be adversely affected.

## THE SUN CAPITAL DEFENDANTS CONTROLLED VINCE DURING THE RELEVANT PERIOD AND BENEFITTED FROM THE FRAUD

207.    Prior to the IPO, Defendant Sun Capital privately owned Vince through various affiliates, including Kellwood Holdings, LLC.  After the IPO, Sun Capital retained a substantial ownership stake (approximately 68%) in the Company and controlled its actions.

208.    According to Vince's certificate of incorporation, Sun Capital, through its affiliates, also had the right to appoint a majority of Vince's Board even if it owned less than a majority of Vince stock, as long as its beneficial ownership exceeded 30%.  Pursuant to that provision, Sun Capital selected, and had significant control over, the Company's senior executive officers, as described herein.

(a)    **Defendant Stefko**: Prior to his appointment as Vince's CFO, and since 2011, Stefko held the position of Group CFO at Sun Capital Partners.  Defendant Stefko took a leave of absence and continued to serve as an employee of Sun Capital when he was hired by Vince.  During that time, he continued to be covered by Sun Capital's health and welfare benefits plan and was eligible to receive a bonus under Sun Capital's annual bonus plan relating to his work by Sun Capital.  He also continued to hold board positions in Sun Capital affiliates.

(b)     **Defendant Brody**: On June 25, 2015, Brody was appointed to replace Defendant Klinger as Vince's Interim CFO and Treasurer.  Defendant Brody took a temporary leave of absence from his current position as the Managing Director and Group CFO at Sun Capital.  During that period, he continued to be covered by Sun Capital's health and welfare benefits plan and was eligible to receive a bonus under Sun Capital's annual bonus plan relating to his work by Sun Capital.

(c)     **Defendant Leder**:   Appointed as a director of Vince in 2014, and Chairman in June 2015, a position which he continued to hold throughout the Relevant Period and to the present.  His is also the Co-Chief Executive Officer of Sun Capital.

209.    Sun Capital has significant agreements and financial arrangements with the Company, either directly or through various affiliates.  These agreements and arrangements include, *inter alia*; the following, among others: (i) the Kellwood Note Receivable; (ii) the Tax Receivable Agreement; (iii) the Secondary Offering; (iv) the First Rights Offering; and (v) the Consulting Agreements.

(a)     **Tax Receivable Agreement**: In connection with the IPO, on November 27, 2013, Sun Capital affiliates entered into a tax receivable agreement with Vince that required the Company to pay to these affiliates an amount equal to 85% of certain tax benefits to which the Company would otherwise be entitled, thereby shifting the benefits away from Vince and to Sun Capital.  At the time of the IPO, the Company estimated that it would make $172 million in payments to affiliates of Sun Capital under this agreement.  The ability of Vince to make these future payments to Sun Capital depended on the Company's ability to continue to generate capital, either through the Company's business performance or through additional capital raises.

(b)     **The Kellwood Note Receivable**: In connection with the IPO, Sun Capital caused Kellwood to issue a $341.5 million note receivable to Vince, which was repaid from IPO proceeds as well as from a new $169.5 million term loan facility taken out by the Company. Kellwood, in turn, used proceeds from the repayment of the Kellwood Note Receivable to repay certain of its indebtedness, including $118 million in term loan agreements with Sun Capital affiliates. Defendant Sun Capital Management also received a $3.3 million restructuring fee and Defendant Granoff received a $6 million debt recovery bonus from the repayment of the Kellwood Note Receivable.

(c)     **The Secondary Offering**: On June 23, 2014, Vince announced that it would conduct a secondary offering to allow the Sun Capital Defendants to sell more of their Vince shares (the "Secondary Offering"). The Secondary Offering was priced at $34.50 per share (unadjusted) on June 25, 2014 and the offering was completed in July 2014. Through the Secondary Offering, the Sun Capital Defendants sold approximately 5 million additional shares of Vince stock at $34.50 per share to the investing public for more than $171 million in gross proceeds. The Company received no proceeds from this offering.

(d)     **The First Rights Offering**: In April 2016, Vince completed a $65 million rights offering supported by Sun Capital that allowed the Company to raise tens of millions of dollars from public investors (the "First Rights Offering"). The Company used proceeds from the First Rights Offering in part to make over $22 million in payments to Sun Capital.

(e)     **The Consulting Agreements**: Sun Capital Management provided consulting and other services to Vince and to Kellwood in exchange for fees pursuant to certain management and consulting services agreements.

210.    As a result of the foregoing, Sun Capital was highly incentivized to make it appear that Vince was successful and to minimize or conceal any operational difficulties at the Company so that Vince could raise money from investors, the proceeds of which could be used to make the payments that Vince owed to Sun Capital and its affiliates.

211.    Despite the failure of Vince and the collapse of its share price, Sun Capital and its affiliates have received hundreds of millions of dollars from the Company and its investors.

### ADDITIONAL SCIENTER ALLEGATIONS

212.    In addition to the facts alleged above, the following facts provide additional indicia of scienter: (i) Defendant Stefko and other Vince executives were intimately involved in the transition and participated in weekly meetings where discussions about the integration issues took place; (ii) the misrepresentations alleged herein involved the most important aspects of Vince's business and operations; and (iii) Defendants had the motive and the opportunity to commit fraud.

**The Core Importance of Vince's Support Systems**

213.    The support systems that Kellwood provided Vince pursuant to the Shared Services Agreement supported and integrated the most basic and central aspects of Vince's business and operations.  Through the Shared Services Agreement, Kellwood provided Vince with, among other things, certain accounting functions, tax, e-commerce operations, distribution, warehouse management, logistics, IT, accounts payable, credit and collections and payroll and benefits administration.

214.    Vince, a retailer, relied on these services to timely, accurately, and effectively process sales information, fill customer orders, replenish merchandise, manage inventory, and record and report its financial information, among many other central tasks.  These services were necessary to integrate information across Vince's operations, and many of the support systems

were complex and highly customized to Vince and/or proprietary. Defendants themselves repeatedly characterized these services as "key" to the Company's business, operations, and prospects in public filings and recognized that any disruption or failure to successfully migrate the services away from Kellwood would have a material and negative impact on Vince's financial performance.   In fact, when Vince failed to smoothly and successfully migrate its systems away from Kellwood as alleged herein, the resulting disruptions negatively impacted almost every aspect of Vince's core operations and business functions – such as the Company's sales, earnings, merchandising, inventory, and financial reporting – aspects that were known to, overseen by, and monitored on a regular basis by the Individual Defendants.

**Vince's CFO and Other Senior Vince Management Had Actual Knowledge that the New ERP Platform Was Implemented Using Beta Software, and that the Transition Issues, and Business and Financial Problems, Were Caused by Integration Failures**

215.   Because Vince's entire direct-to-consumer segment depended on the performance of the ERP platform, the Individual Defendants were personally involved in the transition efforts, and were keenly aware of the problems, setbacks, and roadblocks related to these efforts in real time and as they unfolded.

216.   During the initial stage of the transition, for example, Jeff Young, who had been appointed as CIO, personally reported to Defendant Granoff and Defendant Klinger, and kept them apprised of the status of the transition.   After assuming their positions, Jeff Young continued to report to Defendant Hoffman and Defendant Stefko.   Defendant Stefko closely tracked the progress of Jeff Young's team.

217.   In September 2016, Defendant Stefko was involved in and oversaw the decision to hire the ITPeopleNetwork after various roadblocks and challenges arose in the work performed by the earlier-hired consultants.   During weekly meetings at the Company's New

York headquarters, members of the ITPeopleNetwork explained that the data integration issues were affected by the Company's decision to use beta software, and implored the Company to purchase the full version.

218.    Each of these Defendants also tracked and received periodic updates on the work being performed by the various consultants and in-house technicians as to their progress – or lack thereof – in implementing the systems migration in regular conference calls, meetings, emails and progress reports.

219.    Moreover, the Individual Defendants, as Vince's most senior executive officers and/or directors, held themselves out to investors as the ones most knowledgeable about the Company's transition efforts.  During conference calls from March 2015 onward, the Individual Defendants provided updates on the transition efforts and professed to have up-to-date and personal knowledge about how the systems transition was progressing.  At various times, the Individual Defendants represented to investors that the efforts were "on track," that they were "continu[ing] to make progress," and that they were "incredibly pleased" with the results, as detailed herein.

220.    The Individual Defendants also repeatedly stated that the transition, or aspects of Vince's business that relied on these systems, was at the forefront of their minds.  For example, during a September 3, 2014 conference call, Defendant Klinger stated that inventory management, which relied on services provided under the Shared Services Agreement, was "***clearly a top priority*** for this management team.  ***It is monitored in detail on a very regular basis.***"  Similarly, in a March 19, 2015 conference call, Defendant Klinger stated that Vince's management was carrying out the migration efforts "***very thoughtfully and prudently***" to ensure a smooth transition.  Likewise, during a September 3, 2015 conference call, Defendant Brody

stated that "**our top priority** is to focus on improving our inventory management."   On September 8, 2016, Defendant Hoffman stated on another call with investors that Vince's "inventory management is really **top of mind**."   Indeed, in numerous conference calls throughout the Relevant Period, the Individual Defendants repeatedly stated that the systems migration was among the most important strategic initiatives at the Company that they were overseeing and that these efforts were critical to the Company's success and future growth and thus a near-constant focus of their attention

**Defendants' Motive and Opportunity to Commit Fraud**

221.   Defendants also had the motive and opportunity to commit fraud.   As detailed herein, the Sun Capital Defendants owned and controlled Vince throughout the Relevant Period. Several of the Individuals Defendants, meanwhile, controlled and/or had substantial ownership interests in the Sun Capital Defendants and their affiliates, including Defendant Leder, Sun Capital's Co-CEO.

222.   Among other indicia of control, the Sun Capital Defendants owned a majority of the voting shares of the Company, appointed a majority of the Company's directors, and hand-selected the Individual Defendants to serve as the Company's top management and to oversee the Company's business and affairs.   Indeed, at times, the Sun Capital Defendants simply placed Sun Capital employees in the most senior positions of power and influence at the Company, including by installing the following Sun Capital employees: Defendant Brody as Vince's Interim CEO and CFO, Defendant Stefko as Vince's CFO, and Defendant Leder as Vince's Chairman.   The Sun Capital Defendants also demonstrated that they could richly reward Company insiders such as the Individual Defendants for being subservient to their interests, as they provided Defendant Granoff a $6 million "debt recovery bonus" in connection with the IPO for helping orchestrate payments to the Sun Capital Defendants from IPO proceeds, among other

activities.  They also demonstrated that they had power to fire and hire the Individual Officer Defendants, as they had Defendant Granoff and Defendant Klinger replaced, at least initially, with hand-selected Sun Capital employees.  Furthermore, in SEC filings, Vince acknowledged not only that it was majority owned and controlled by the Sun Capital Defendants, but also that the interests of the Sun Capital Defendants may in some circumstances "conflict with [Vince's] interests and the interests of [Vince's] other stockholders."

223.    After receiving hundreds of millions of dollars from Vince and the Company's shareholders in the IPO and in the Secondary Offering, the Sun Capital Defendants stood to receive approximately $172 million more in payments from Vince pursuant to the Tax Receivable Agreement.  However, in order to receive these payments, Vince needed to generate sufficient capital in order to make the payments while continuing to operate as a going concern so that it could make more such payments in the future.  By September 2015, after Vince had begun to experience operational difficulties and adverse sales and earnings trends, it became clear to Defendants that Vince would not be able to generate sufficient capital through its operational revenue streams to make good on payments due the Sun Capital Defendants under the Tax Receivable Agreement.  As a result, in Vince's 2Q15 10-Q, the Company disclosed that it was deferring $22.8 million in payments to Sun Capital under the Tax Receivable Agreement "as a result of lower than expected cash from operations due to weaker than projected performance."

224.    Rather than disclose the true state of Vince's business and the severe impairment to the Company's business, operations and prospects as a result of problems from the systems migration, Defendants orchestrated the First Rights Offering to enable Vince to raise tens of millions of dollars from the Company's existing shareholders that could be used to repay

amounts due the Sun Capital Defendants under the Tax Receivable Agreement.  In furtherance of this scheme, in December 2015, Vince announced that it had received a "commitment" from Sun Capital to provide $65 million in cash proceeds in the event the Company conducted a share rights offering.  However, this "commitment" was for the purpose of propping up Vince's share price, rather than ultimately committing Sun Capital to provide financing to Vince, as Sun Capital knew that the First Rights Offering would be conducted at a steep discount to Vince's then-current share price, essentially ensuring near full subscription by Vince's outside shareholders and thereby minimizing the amount of capital that Sun Capital would actually have to commit to the Company.

225.    On March 16, 2016, Vince announced the price of the First Rights Offering at $5.50 per share (unadjusted), which represented an approximately 29% discount to the then-current trading price of Vince shares.  On April 22, 2016, Vince announced that existing shareholders had purchased 11.6 million shares of its common stock, allowing Vince to raise approximately $63.9 million from these investors.  By contrast, Defendant Sun Cardinal and Defendant SCSF Cardinal only contributed $1.1 million to Vince through the First Rights Offering, or *less than 2%* of the actual proceeds.  As planned, Vince then used $22.3 million of the proceeds from the First Rights Offering to make payments to the Sun Capital Defendants due under the Tax Receivable Agreement.  In other words, the amount of payments received by the Sun Capital Defendants was more than 1,900% greater than the amount of contribution paid to Vince by the Sun Capital Defendants in the First Rights Offering.

226.    The suspect timing of the First Rights Offering is no coincidence, but rather further indicia of Defendants' fraud and culpable state of mind.  The First Rights Offering was carried out during a temporary peak in the price of Vince shares and in the months following

Vince's announcement that it was "fully migrat[ing]" its support systems away from Kellwood, a migration that would later be revealed to be a complete disaster. The First Rights Offering also came shortly before a collapse in the price of Vince shares, with sharp declines beginning in September 2016, only five months after the First Rights Offering was completed. Within approximately one year of the First Rights Offering, the Company had revealed the grave extent of the systems migration problems, multiple material weaknesses impacting its critical internal controls, and concerns about the Company's ability to operate as a going concern.

## LOSS CAUSATION

227.    Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Vince common stock and operated as a fraud or deceit on purchasers of Vince common stock. As detailed above, when the facts about Vince's misconduct was revealed, and there was a materialization of the undisclosed risks alleged herein, the value of the Company's stock declined precipitously.

228.    On September 8, 2016, the Company issued a press release announcing its financial results for the quarter ended July 30, 2016 (the "2Q 2016 Release"). The 2Q 2016 Release stated that net sales for the Company had decreased by 24.1% to $60.7 million during the quarter. It also stated that the Company had posted a net loss of $2.0 million, or $0.04 per share, for the quarter.

229.    On news of the disappointing second quarter results, the price of Vince stock declined approximately 5%, or $3.20 per share, over two trading days to close at $58.01 per share on September 9, 2016 on abnormally high trading volume. An analyst described the results as "dreadful," as Vince had barely met the diminished expectations it had set for itself.

230.    On April 14, 2017, Vince issued a press release announcing that it would be unable to timely file its annual financial report for the year ended January 28, 2017 due to delays

"related to the transition from Kellwood."  In addition, the Company disclosed that its use of the new systems had led to one or more material weaknesses in its internal controls over financial reporting and systems infrastructure.  The impairment to Vince's business as a result of these challenges was so great that the Company warned investors that its very ability to operate as a going concern was in doubt.  Following this news, the price of Vince stock plummeted more than 19%, or $2.29 per share, in a single trading day to close at $9.59 per share on April 17, 2017.

231.  On April 28, 2017, the Company further shocked investors when it finally issued its unaudited results for the fourth quarter and fiscal year ended January 28, 2017.  The Company disclosed that net sales had fallen 21.9% to $63.9 million during the fourth quarter.  In addition, Vince posted a massive net loss of ***$162.1 million***, which included $55.1 million in asset impairment charges.  The Company attributed these changes "primarily [to] challenges relating to our systems conversion."

232.  These disclosures further decimated the price of Vince stock.  Over three trading days, the price of Company shares plummeted about 72%, or $8.86 per share, to close at $3.47 per share on May 2, 2017.

233.  The declines in Vince's share price were the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market and/or as a result of the materialization of the undisclosed risks alleged herein.  The timing and magnitude of the share price declines negate any inference that the loss suffered by Plaintiffs were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiffs, was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of the Company's stock and the subsequent significant decline in the value of the Company's stock when

Defendants' prior misrepresentations and other fraudulent conduct were revealed, and/or the undisclosed risks alleged herein materialized.

234.    At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiffs. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Vince's business, operations and financial condition, as alleged herein. Before and during the time of Plaintiffs' purchases of Vince securities, Defendants issued materially false and misleading statements and omitted material facts necessary to make their statements not false or misleading, causing the prices of Vince's stock to be artificially inflated. Plaintiffs purchased Vince stock at those artificially inflated prices, causing them to suffer damages as complained of herein.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

235.    At all relevant times, the market for Vince common stock was an efficient market for the following reasons, among others:

(a)    Vince stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    according to the Company's Form 10-K for its fiscal 2016, filed on April 28, 2017, the Company had over 49 million common shares outstanding as of March 31, 2017, demonstrating a very active and broad market for Vince common stock;

(c)    as a regulated issuer, Vince filed periodic public reports with the SEC;

(d)    Vince regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the

national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(e)    unexpected material news about Vince was rapidly reflected in and incorporated into the Company's stock price.

236.    As a result of the foregoing, the market for Vince common stock promptly digested current information regarding Vince from publicly available sources and reflected such information in Vince stock price.  Under these circumstances, a presumption of reliance applies to Plaintiffs' purchases of Vince stock.

237.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiffs' claims are based, in significant part, on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding their business and operations, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

238.    Defendants' false or misleading statements alleged to be actionable herein were not forward-looking statements, or were not identified as such by Defendants, but rather statements of historical and present fact, and thus did not fall within any safe harbor.

239.    Defendants' verbal safe harbor warnings accompanying any of their oral forward-looking statements failed to provide meaningful cautionary statements regarding the specific

facts and circumstances facing the Company, and thus were ineffective to shield those statements from liability.

240.    Defendants are also liable for any false or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Vince who knew that it was false.  Further, none of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against Vince and the Individual Defendants

241.    Plaintiffs incorporate the foregoing paragraphs by reference as if fully alleged herein.

242.    Vince and the Individual Defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

243.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of the Company as specified herein.

244.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Relevant Period.

245.    Plaintiff have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Vince common stock.   Plaintiffs would not have purchased Vince common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

246.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Vince common stock during the Relevant Period.

247.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants and the Sun Capital Defendants

248.    Plaintiffs incorporate the foregoing paragraphs by reference as if fully alleged herein.

249.    As set forth above, Vince and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.   The Individual Defendants and the Sun Capital Defendants acted as controlling persons of Vince within the meaning of §20(a) of the Exchange.

250.     By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with, or had, unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

251.     Further, and as detailed herein, the Sun Capital Defendants controlled Vince and the Individual Defendants by virtue of their majority share ownership, power to appoint directors, agreements with the Company, and historical and professional relationships with Vince and the Individual Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Awarding Plaintiffs damages at an amount to be determined at trial and interest thereon;

B.     Awarding Plaintiffs' reasonable costs, including attorneys' fees; and

C.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  January 28, 2019                ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        SAMUEL H. RUDMAN
                                        EVAN J. KAUFMAN
                                        MOSHE O. BOROOSAN

                                                */s/ Samuel H. Rudman*
                                        SAMUEL H. RUDMAN

                                        58 South Service Road, Suite 200
                                        Melville, NY  11747
                                        Telephone:  631/367-7100
                                        631/367-1173 (fax)
                                        srudman@rgrdlaw.com
                                        ekaufman@rgrdlaw.com
                                        mboroosan@rgrdlaw.com

                                        ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        BRIAN E. COCHRAN
                                        655 West Broadway, Suite 1900
                                        San Diego, CA  92101-8498
                                        Telephone:  619/231-1058
                                        619/231-7423 (fax)
                                        bcochran@rgrdlaw.com

                                        LEEDS BROWN LAW, P.C.
                                        JEFFREY K. BROWN
                                        One Old Country Road, Suite 347
                                        Carle Place, NY  11514
                                        Telephone:  516/873-9550
                                        516/747-5024 (fax)
                                        jbrown@leedsbrownlaw.com

                                        *Attorneys for Plaintiffs*

- 85 -

<u>CERTIFICATE OF SERVICE</u>

I, Samuel H. Rudman, hereby certify that on January 28, 2019, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ Samuel H. Rudman*
SAMUEL H. RUDMAN